UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

SABAS ARREDONDO, et al.,                    NO. CIV. 1:09-01247 WBS SAB

            Plaintiffs,                     MEMORANDUM OF DECISION

      v.

DELANO FARMS COMPANY, CAL-
PACIFIC FARM MANAGEMENT, L.P.,
and T&R BANGI'S AGRICULTURAL
SERVICES, INC.,

            Defendants.
_____

----oo0oo----

        Plaintiffs are a certified class of field workers

employed by farm labor contractors T&R Bangi's Agricultural

Services ("T&R Bangi") and Cal-Pacific Farms ("Cal-Pacific"), who

performed work for defendant Delano Farms Company ("Delano

Farms") during the period from 2005 to 2009.  On January 15, 2013

through January 30, 2013, the court conducted a seven-day bench

trial on the limited issue of whether during the relevant time

frame Delano Farms employed plaintiffs under the Migrant Seasonal

1

Agricultural Workers Protection Act ("AWPA"), 29 U.S.C. § 1801 <u>et</u>
<u>seq.</u>, and under applicable California law.

For the reasons discussed in detail below, the court
concludes that T&R Bangi and Cal-Pacific were independent
contractors, but that Delano Farms was a joint employer of
plaintiffs under both the AWPA and the applicable California law.
This memorandum constitutes the court's findings of fact and
conclusions of law pursuant to Federal Rule of Civil Procedure
52(a).

I.   <u>Factual and Procedural Background</u>

Delano Farms is a grower of table grapes that has been
in operation for more than nineteen years.  It owns approximately
6,300 acres of non-contiguous vineyards in Central California.
Delano Farms has structured its business to be streamlined and
lean.  As a result, Delano Farms contracts for many of its
farming functions, such as pre-harvest field work, picking and
packing the grapes during harvest, and moving the packed grapes
from the fields to the cold storage facility--also called
"swamping."  The primary field tasks performed in-house are
fertilizing the crops, preparing the fields for planting, and
irrigating the plants.  The core of the Delano Farms management
team consists of Joe Campbell, Jack Campbell, and Scott
Quashnick.

T&R Bangi and Cal-Pacific are farm labor contractors
who specialize in providing field employees to grape growers.
T&R Bangi is a corporation whose shares are divided equally
between two brothers, Terry and Teddy Bangi.  T&R Bangi provided
field labor services to Delano Farms since Delano Farms'

1  inception around 1992 until 2004.

2      In 2004, Cal-Pacific, a limited partnership, was
3  formed.  Craig Neville, an administrative employee from T&R
4  Bangi, was the general partner of Cal-Pacific, and the Bangis'
5  wives were the two limited partners.  Cal-Pacific was formed when
6  the liability insurance rates for T&R Bangi's field labor
7  services increased.  (Tr. 161:12-21.)  Terry and Teddy Bangi
8  continued to control the operations of Cal-Pacific, and the
9  organizational structure remained unchanged.  After Cal-Pacific
10 was formed, T&R Bangi stopped providing field labor services to
11 farms.[1]

12      Cal-Pacific provided field labor services to Delano
13 Farms from 2004 to 2009.  In 2009, once T&R Bangi could procure
14 liability insurance at a lower rate, Cal-Pacific ceased
15 operations, and T&R Bangi once again began providing services to
16 Delano Farms.  T&R Bangi provided farm labor services to Delano
17 Farms until approximately 2012.  Kern Ag Labor Management, Inc.,
18 an organization formed by Terry Bangi without his brother,
19 currently provides field labor services to Delano Farms.  Because
20 of the close ties between T&R Bangi and Cal-Pacific, the court
21 will refer to them together as "Contractor" unless it is
22 necessary to do otherwise.

23      Contractor provided several thousand farm laborers to
24 Delano Farms.  (Tr. 86:4-5.)  Pre-harvest services include

25
26
27  _____

28      [1]      T&R Bangi continued to provide laborers in Delano
    Farms' cold storage facility during this time.

3

pruning, suckering,[2] tipping,[3] girdling,[4] and tying.[5]  During
harvest, the workers would typically work in teams of three.   Two
workers would pick the grapes and deliver them to tables at the
end of a crop row, where a packer would pack the grapes into
boxes, trays, or clamshells, depending on the final destination
of the grapes.  (Tr. 335:9-13.)   A foreman would supervise a
crew, which consisted of many teams and approximately 60 people.
(Tr. 333:10-21.)   Foremen would then report to a supervisor.
Supervisors would report to Contractor management, including
Craig Neville, an administrative employee, or Terry Bangi.   There
were approximately ten supervisors working for Contractor.   The
total number of workers, including supervisors, would vary during
the year depending on how much work Contractor was performing.

In 2009, the named plaintiffs brought suit against
Contractor and Delano Farms for wage and hour violations under
both the AWPA (29 U.S.C. § 1801 et seq.) and California law,
including Wage Order 14 (8 Cal. Code Reg. § 11140) and the
California Labor Code.[6]  (Docket No. 2.)   The class was certified

---

[2]    Suckering is removing the unnecessary sprouts forming
on the plaint.  (Tr. 208:17-21.)

[3]    Tipping is "dropping bunches" to increase the quality
of the fruit.  (Tr. 209:19-21.)

[4]    Girdling is cutting a notch around the vine to stress
the vine, which increases grape size and gives them better color.
(Tr. 209:11-14.)

[5]    Tying involves tying plant canes to wire "so the fruit
can hang down."  (Tr. 209:24-210:3.)

[6]    Specifically, plaintiffs allege wage and hour
violations under California Labor Code sections 1194(a), 2802,
226, and 203.  Plaintiffs also bring a claim for unfair
competition under California Business and Professions Code

4

on April 19, 2011.  (Docket No. 85).  Delano Farms brought a motion for summary judgment, arguing that it did not employ plaintiffs under either federal or California law, but the motion was denied.  (Docket No. 165).  Delano Farms then moved to bifurcate the trial.  (Docket No. 169.)  The court ordered that the issue of whether Delano Farms employed plaintiffs should be tried separately by bench trial.  (Docket No. 175.)  The bench trial began on January 15, 2013 and ended on January 30, 2013.

II.  <u>Analysis</u>

    A.  <u>Employment under the AWPA</u>

      Under the AWPA, the term "agricultural employer" means "any person who owns or operates a farm, ranch, processing establishment, cannery, gin, packing shed or nursery, or who produces or conditions seed, and who either recruits, solicits, hires, <u>employs</u>, furnishes, or transports any migrant or seasonal agricultural worker."  29 U.S.C. § 1802(2) (emphasis added).  The term "employ" for the purposes of the AWPA has the same meaning as Section 3(g) of the Fair Labor Standards Act ("FLSA").  <u>Id.</u> § 1802(5).  The FLSA defines "employ" as "to suffer or permit to work."  29 U.S.C. § 203(g).  The ultimate question of whether a defendant is an "employer" is a legal question.  <u>See</u> <u>Bonnette v. Ca. Health & Welfare Agency</u>, 704 F.2d 1465, 1468 (9th Cir. 1983).

      The Ninth Circuit has noted that "[c]ourts have adopted an expansive interpretation of the definitions of 'employer' and 'employee' under the FLSA, in order to effectuate the broad remedial purposes of the Act."  <u>Real v. Driscoll Strawberry</u>

_____

section 17200.  (Docket No. 2.)

1  Asscs., Inc., 603 F.2d 748, 754 (9th Cir. 1979).  Congress passed
2  the AWPA to correct the narrow definition of "farm labor
3  contractor" under the Farm Labor Contractor Registration Act, and
4  the expansive definitions under the FLSA should be applied to the
5  AWPA as well.  See Torres-Lopez v. May, 111 F.3d 633, 639 (9th
6  Cir. 1997).

7        Under regulations passed pursuant to the AWPA, "[t]he
8  definition of the term 'employ' may include consideration of
9  whether or not an independent contractor relationship exists
10 under the Fair Labor Standards Act." 29 C.F.R. § 500.20(h)(4).
11 "If it is determined that the farm labor contractor is an
12 employee of the agricultural employer/association, the
13 agricultural workers in the farm labor contractor's crew are
14 deemed to be employees of the agricultural employee/association .
15 . . ." Id.

16       If, on the other hand, a farm labor contractor is found
17 to be a bona fide independent contractor, the court must still
18 analyze "whether or not the employees of the farm labor
19 contractor are also jointly employed by the agricultural
20 employer/association." Id. § 500.20(h)(5)(I).

21       1.   Independent Contractor or Employee

22       "In determining if the farm labor contractor . . . is
23 an employee or an independent contractor, the ultimate question
24 is the economic reality of the relationship--whether there is
25 economic dependence upon the agricultural employer/association or
26 farm labor contractor, as appropriate." Id. § 500.20(h)(4); see
27 Real, 603 F.2d at 755-56 (holding that when distinguishing
28 employees from independent contractors the test must focus on the

economic realities of the total circumstances).  In making this

determination, courts are to consider all circumstances,

including the following:

> (i)  The nature and degree of the putative employer's
> control as to the manner in which the work is performed;
>
> (ii)  The putative employee's opportunity for profit or
> loss depending upon his/her managerial skill;
>
> (iii)  The putative employee's investment in equipment or
> materials required for the task, or the putative
> employee's employment of other workers;
>
> (iv)  Whether the services rendered by the putative
> employee require special skill;
>
> (v)  The degree of permanency and duration of the working
> relationship;
>
> (vi)  The extent to which the services rendered by the
> putative employee are an integral part of the putative
> employer's business.

29 C.F.R. § 500.20(h)(4).

        "Neither the presence nor absence of any individual

factor is determinative."  _Donovan v. Sureway Cleaners,_ 656 F.2d

1368, 1370 (9th Cir. 1981).  While these factors are helpful to

the courts in determining the economic reality between the

parties, the analysis is "not a mechanical determination."

_Bonnette_, 704 F.2d at 1470.  The factors "provide a useful

framework for analysis," but are not "etched in stone and will

not be blindly applied."  _Id._  The relationship between the

parties "is not determined by a mathematical formula," and "[t]he

purpose of weighing the factors is not to place each in either

the contractor or grower's column, but to view them qualitatively

to assess the evidence of economic dependence, which may point to

both."  _Antenor v. D&S Farms_, 88 F.3d 925, 933 (11th Cir. 1996).

Ultimately, the "determination of the relationship does not

7

depend on such isolated factors but rather upon the circumstances of the whole activity." Rutherford Food Corp. v. McComb, 331 U.S. 722, 730 (1947).

a.   Delano Farms' Control Over the Work

In Real, the court analyzed the relationship between Driscoll Strawberry Associates ("D.S.A."), Donald Driscoll, and sublicensee growers. Real, 603 F.2d at 750-51.  Driscoll provided patented strawberries to Driscoll, who in turn granted sublicensees the right to grow the crop on a parcel of land, usually about three acres. Id.  The court found that economic realities between the parties did not indicate an independent contractor relationship when, among other things, D.S.A. had the power to reject Driscoll's choices of sublicensees, "determine the quantity and variety of the strawberry plants grown by [the sublicensees]," and control "certain important decisions in growing the strawberries, including the spacing of the plants, when and how much fertilizer is to be applied, and the timing and type of spraying for insects." Real, 603 F.2d at 756.  In addition, D.S.A. inspectors directly supervised the sorting and grading of the strawberries at harvest.  Id.

In Torres-Lopez v. May,[7] the Ninth Circuit rejected a district court's finding that a grower did not exercise control when the grower "only gave general instructions to [the farm

---

[7]   The court recognizes that in Torres-Lopez, the Ninth Circuit discussed control in the joint employment context, rather than in the bona fide independent contractor analysis at issue here.  See Torres-Lopez, 111 F.3d at 637.  Nevertheless, the court believes that the discussion in Torres-Lopez and other joint-employment cases are instructive on the issue of control for the independent contractor analysis.

labor contractor] as to when to begin harvesting and what fields to harvest." Torres-Lopez, 111 F.3d at 642.   Rather, the court found that the grower "in fact did exercise significant control" when it "controlled the harvest schedule and the number of workers needed by staggering the planting dates of the [crop]," "advised [the farm labor contractor] about when to begin harvest," and "had the power to decide which days were suitable for harvesting; for example, it called off the harvest one day because of a shortage of bins." Id. at 642.   But see Martinez-Mendoza v. Champion Intern. Corp., 340 F.3d 1200, 1211 (11th Cir. 2003) (noting that "the drafting of planting specifications is unquestionably an agricultural decision which does not constitute the type of 'control' that the FLSA and [AWPA] address").   The grower also "exercised a substantial degree of supervision over the work performed by the farmworkers" because it "had the right to inspect all the work performed by the farmworkers, both while it was being done and after the [crop] was picked," one of the grower's supervisor's "daily presence in the field helped ensure that the farmworkers performed satisfactorily," and the farm labor contractor "communicated three to four times a week with [the grower's supervisor] to ensure that [he] was satisfied." Id. at 642-43.   As characterized by a later Ninth Circuit case, the "grower's representative established the harvest schedule and closely monitored the picking of the plants." Moreau v. Air France, 356 F.3d 942, 947 (9th Cir. 2003).

        While Real and Torres-Lopez indicate that supervision over the quality of the work could be one consideration to support a finding of control, subsequent cases, such as Moreau v.

Air France and Zhao v. Bebe Stores, Inc., 247 F. Supp. 2d 1154 (C.D. Cal. 2003), indicate that supervision over quality control with little more does not contribute to a finding of an employment relationship.[8]  In Moreau, the Ninth Circuit found that there was not an employment relationship when, among other factors, an airline had no ability to directly control the workers, "but would instead communicate any complaints about performance to the service company's supervisors."  Moreau, 356 F.3d at 950-51.  In addition, while the airline was very specific about how it wanted its work performed and checked to ensure that its standards were met, it was "noteworthy" that "much of the indirect supervision or control exercised by Air France over the ground handling employees was purportedly to ensure compliance with various safety and security regulations."  Id. at 951.

In Zhao, a district court noted that, while a national clothing retailer employed quality control personnel at a garment manufacturer's manufacturing facility--even to the point of one quality control supervisor keeping an office at the facility-- "the record [fell] short of demonstrating that this involvement could be properly characterized as control," since the garment manufacturer "had its own supervisors who were primarily responsible for the day to day management of its employees."

_____

[8]   The court recognizes that Zhao and Moreau analyzed joint employment relationships under the FLSA, rather than under the AWPA.  However, the AWPA incorporated the definition of the FLSA, see 29 U.S.C. 1802(5), and both Zhao and Moreau looked to the regulations passed under the AWPA or cases such as Torres-Lopez when analyzing whether a joint employment relationship existed, Moreau, 356 F.3d at 947-48, Zhao, 247 F. Supp. 2d at 1157-58.  Thus, the court finds them instructive on the issue of employer control under the AWPA.

1  <u>Zhao</u>, 247 F. Supp. 2d at 1160.

2          As in <u>Moreau</u>, Delano Farms was specific about the

3  quality of grapes it desired.  Every day the Delano Farms sales

4  team would tell Terry Bangi what types of grapes customers

5  demanded and the type of container those grapes would be packed

6  in.  (Tr. 241:12-242:1, Ex. 109.)  To ensure the quality of the

7  grapes, testimony revealed that Delano Farms largely employed

8  quality control personnel in the cold storage facility, where the

9  Delano Farms personnel would inspect grapes for weight, size, and

10 other attributes.  (Tr. 369:12-370:13.)  Quality control

11 personnel also occasionally operated outside the cold storage

12 facility, such as when Delano Farms designated tractor or

13 irrigation workers to inspect grapes in the fields, (Tr. 318:20-

14 319:7), or when Sylvia Mendez Villa and Maria Mendez ("the

15 Twins") were hired to examine quality control in the fields from

16 2009 until 2011, (Tr. 289:18-20).[9]  Delano Farms also employed a

17 USDA inspector, (Tr. 699:12-700:5), and instituted a tracking

18 system that identified the particular source of grapes as they

19 came in from the fields, (Tr. 587:18-588:5).  Despite defendants'

20 attempts to characterize the system as a way to track or oversee

21 the workers' productivity, Scott Quashnick's testimony revealed

22 that Delano Farms implemented the system to quickly identify the

23 source of the grapes in case a shipment of grapes is recalled due

24

25          [9]  Even the extent of quality control in the field was not
26 constant.  While there was some testimony that Delano Farms
   employed someone to check quality control before the Twins were
27 hired in 2009, but that the person was fired or moved to cold
   storage, thereby creating a period of time in which there were no
28 dedicated Delano Farms quality control personnel in the field for
   a period of time.  (Tr. 419:1-18.)

11

1  to health and safety concerns.  (Tr. 588:6-19.)

2          In addition to quality control, Delano Farms made

3  certain agricultural decisions, such as what varieties of grapes

4  to plant and when spraying for pesticides should occur.  (Tr.

5  499:1-7.)  Other agricultural decisions were discussed jointly

6  with Contractor, such as when the harvest season should start and

7  how pre-harvest maintenance such as pruning, suckering, and

8  tipping should be performed.  (Tr. 211:4-217:24, 499:6-500:4.)

9  Delano Farms occasionally discussed whether coming rain would

10  interfere with harvest.  (Tr. 217:3-22.)

11          Delano Farms did not, however, supervise fieldwork as

12  it was being performed.  When working in the fields, Contractor

13  foremen and supervisors oversaw the picking and packing

14  techniques while also disciplining employees.  (Tr. 244:13-

15  245:25, 389:19.)  In addition, Contractor made many of the daily

16  decisions regarding the harvest and pre-harvest work.  After

17  receiving an order, Terry Bangi would decide which field should

18  be harvested to procure that particular quality of grape and how

19  many crews should be working in that field to procure the desired

20  quantity.  (Tr. 242:2-244:6, 390:17-21.)

21          Plaintiffs attempted to show that Delano Farms

22  exercised control over the fieldwork, such as picking, through

23  their employment of the Twins.  However, the Twins recognized

24  that their work was to be confined to checking the quality of the

25  grapes at the tables, (Tr. 268 11-19, 274:13-17), and that,

26  rather than directly addressing the workers while the workers

27  were picking the grapes, any issue with quality were to be

28  addressed to the Contractor's supervisors or foremen, (Tr.

329:17-330:15).  While Sylvia Mendez testified that occasionally she would ask a foreman to instruct the workers on how to pick quality grapes, (Tr. 342:25-343:20), it appears that this was beyond the scope of her authority for Delano Farms.[10]  (Tr. 394:9-22, 421:18-422:2, 715:22-716:20.)  After approximately two complaints about the Twins' interactions with Contractor's foremen and supervisors, the Twins were moved into a quality control position in the cold storage facility. (Tr. 394:23-395-5, 422:12-426:14.)

As for control over the workers from the cold storage facility, when a box or tray of grapes did not meet weight requirements, specific crews of workers were removed from the fields and, bringing more grapes with them, transported to the cold storage facility to re-pack grape boxes or trays.  (Tr. 535:14-536:12.)  A Delano Farms quality control worksheet had a column entitled "repack," and evidence showed that the Twins, when conducting quality control in cold storage, indicated that some boxes needed to be repacked.  (Ex. 7.)  However, no evidence was presented that Delano Farms quality control personnel made the decisions to call in a crew from the field, nor was any evidence presented that Delano Farms encouraged this policy. Rather, the evidence implies that it was Contractor's decision to call the same workers who packed the boxes in from the fields to repack in the cold storage facility.  (Tr. 392:17-23.)

---

[10]    The Twins also did not begin their employment with Delano Farms until April 2009, only two months before the litigation was filed.  (Tr. 339:19-25.)  Little testimony was presented regarding control over fieldwork during the prior years at issue in this litigation.

1    In addition, the communication between Delano Farms and

2  Contractor was qualitatively different from that at issue in

3  Torres-Lopez.  In Torres-Lopez, one of the farm labor

4  contractor's supervisors in the fields would communicate up to

5  four times a week with one of the grower's supervisors to make

6  sure that the grower was satisfied with the quality of work being

7  performed.  Torres-Lopez, 111 F.3d at 642.  Here, the daily

8  communications between Contractor and Delano Farms largely

9  consisted of the Contractor receiving messages from Delano Farms'

10 sales team regarding what type of grape their customers demanded.

11 Contractor would also communicate regularly with Ryan Randall

12 about pesticide spraying schedules. (Tr. 586:6-587:8.)  These

13 communications were not meant to guarantee to Delano Farms that

14 the workers were performing satisfactorily, but were instead

15 intended to communicate customer demands and ensure the safety of

16 the workers.

17    As in Moreau and Zhao, Delano Farms' control was

18 largely focused on ensuring quality and safety, and thus was

19 qualitatively different from the control in Torres-Lopez. See

20 Moreau, 365 F.3d at 951.  The court recognizes that Delano Farms

21 made some of the agricultural decisions that would be expected of

22 a grower, such as when harvest season would begin, indicating

23 some control over the work.  See Torres-Lopez, 111 F.3d at 642.

24 However, unlike Torres-Lopez, Delano Farms did not closely

25 supervise the fieldwork as it was being performed.  See Moreau,

26 356 F.3d at 947; Torres-Lopez, 111 F.3d at 642.  Since Delano

27 Farms' control over the work was confined to supervision of

28 quality control and agricultural decisions that would be expected

14

1   of a grower, the degree of control only minimally suggests an

2   employment relationship between Delano Farms and Contractor.

3                    b.   Opportunity for Profit or Loss

4            In Real, the Ninth Circuit considered a payment

5   structure in which the putative employer paid the sublicensees a

6   percentage of the net proceeds of sale of the crop, less certain

7   expenses.  Real, 603 F.2d at 752.  The court found that the

8   sublicensees' opportunity or loss depended more upon D.S.A. and

9   Driscoll's managerial skills "in developing fruitful varieties of

10  strawberries, in analyzing soil and pest conditions, and in

11  marketing" than upon the sublicensee's "judgment and work in

12  weeding, dusting, pruning, and picking."  Id. at 755.

13           The payment structure between Delano Farms and

14  Contractor differs markedly from that at issue in Real.  In Real,

15  payment to the sublicensee was determined, in part, by the price

16  that D.S.A. received for the crop in the marketplace.  If D.S.A.

17  decided to lower the price of its crop in the marketplace or

18  chose a less desirable variety, the sublicensees would receive

19  less profit due to no fault of their own.

20           Here, in contrast, Delano Farms paid Contractor the

21  hourly wages of Contractor's workers and any box bonus, plus a

22  commission of about thirty-seven-and-a-half percent of the

23  workers' hourly wages.  (Tr. 225:19-25.)  Fluctuations in the

24  price of table grapes would not affect Contractor's profit or

25  loss.

26           However, while Contractor's profit or loss did not

27  depend upon Delano Farms' marketing acumen, the payment structure

28  between the two parties nonetheless limited Contractor's ability

                                  15

to profit or loss according to its managerial skill.  Kalem
Barserian, a grape grower with many years of experience in the
grape industry, testified that a standard payment structure in
the industry for picking is to pay by the number of boxes picked.
(Tr. 766:14-767:9.)  Under an arrangement where a grower pays a
fixed fee per unit of production or pays a flat fee for the
entire job, the contractor has significant discretion to control
the major costs of its operation.  Its profit or loss is
determined by how it manages those costs, including labor,
materials, and equipment for the operation.

        Here, however, Delano Farms paid Contractor the hourly
wages of the workers in the field and any box bonus, plus a fixed
percentage commission of the overall wages.  Contractor's profit
or loss was derived from the percentage commission paid on top of
the hourly wages of its workers.  Delano Farms therefore
restricted Contractor's opportunity for profit or loss by
restricting Contractor's control over one of its key costs--
labor.  Delano Farms also provided many of the packing materials
used by contractor.  (Tr. 723:11-725:5, Ex. 109.)  By setting the
wages of its workers and providing the materials to be used in
the packing of the grapes, Delano Farms removed discretion over
two key costs that would otherwise provide Contractor an
opportunity to profit or loss depending upon Contractor's
management of those costs.  While Contractor did have an
opportunity for profit or loss based upon its management of other
costs such as equipment and office staff, (225:21-226:5), that
opportunity was limited.

        The court recognizes that payment by hourly wage does

16

not always restrict a contractor's opportunity for profit or loss.  As explained by Kalem Barserian, a grower might wish to pay a contractor by hourly wage when the grower is fairly certain of the number of employees and hours required for the job.  (Tr. 769:6-11.)  In those situations, because the grower has a definite belief in the parameters of the project, paying an hourly wage is roughly equivalent to paying a flat fee.  Here, however, there is no evidence that Delano Farms had any firm understanding of in the number of workers or hours required for the harvest.

Thus, payment structure between Delano Farms and Contractor restricted Contractor's opportunity for profit or loss based on its managerial skill.

c.   <u>Investment in Equipment or Employment of</u>

<u>Other Workers</u>

Contractor provided significant investment in pickup trucks, pump trucks, generators, welders, portable toilets, office equipment, and tools for the workers.  (Tr. 239:9-240:11.) The overall investment was approximated at under $400,000.  (Tr. 166:19-21.)

In <u>Real</u>, the Ninth Circuit determined that the fact the sublicensees' "investment in light equipment--hoes, shovels and picking carts--[was] minimal in comparison with the total investment in land, heavy machinery and supplies" by the grower undercut the growers' assertion that the workers were independent contractors.  <u>Real</u>, 603 F.2d at 755.  The court further recognizes that Contractor's $400,000 investment is likely far less than Delano Farms' investment in land, equipment, and

17

materials.[11]   However, the facts in <u>Real</u> can be distinguished from the facts here because Contractor's investment is far greater than the workers' minimal investment in hoes, shovels, and picking carts discussed in <u>Real</u>.   <u>Id.</u>

In addition, while evidence indicated that Delano Farms constituted "fifty percent or better" of Contractor's business, (Tr. 232:4-235:15, Ex. 9), Contractor provided field labor services to a variety of other growers, including Four Star Fruit, MDR, R.L. Ritchie, Lamanuzzi & Pantaleo, Blanc Vineyards, Red Cedar Vineyards, and Central Coast Farms over the past ten years, (Tr. 179:10-21).   Contractor employed supervisors on these other farms and could move crews to them as needed.   (Tr. 200:9-201:4.)   Kalem Barserian also testified that one of the efficiencies of farm labor contractors is their ability to actively employ workers for a greater percentage of the year by employing them at different farms.   (Tr. 758:22-759:8.)   While a large percentage of Contractor's employees might have worked at Delano Farms during harvest, the evidence indicates that Contractor employed a significant number of workers at a variety of other farms.

d.   <u>Special Skill</u>

In addition to providing the pre-harvest work, picking, and supervision of field activities, Contractor managed and coordinated a workforce consisting of several thousand farm

---

[11]   Delano Farms' equipment used to produce the crop included tractors, trucks, spray rigs, discs, drills, dusters, and other equipment used in the fields, (Tr. 726:15-727:23), but the total value of this equipment was not estimated.

18

laborers working over thousands of acres.[12]   After receiving a

sales report from Delano Farms indicating an amount and type of

grape, it was Contractor's responsibility to determine how many

crews should be assigned to each field and communicate the

demands of Delano Farms to its crews.   Contractor also contacted

the "swamping" contractor to coordinate moving the packed grapes

from the fields to cold storage, (Tr. 210:9-16), and arranged for

materials to be delivered to workers in the fields, (Tr. 689:2-

14).   Contractor also taught this large workforce how to complete

the pre-harvest and harvest tasks required by Delano Farms.   (Tr.

310:22-25.)   Joe Campbell testified that Delano Farms hired

Contractor because Delano Farms did not have the expertise to

manage such a large workforce.   (Tr. 402:25-403:15.)   Overall,

coordinating and teaching the work on such a large scale required

special skill beyond the ken of Delano Farms.

          e.   <u>Permanency of Working Relationship</u>

          Under its various forms, Contractor has provided

services to Delano Farms since Delano Farms' inception over

nineteen years ago.   (Tr. 454:14-20.)   Delano Farms continues to

use Terry Bangi's most recent farm labor contracting organization

as a source of farm labor.   (Tr. 201:16-20.)   In addition, Terry

Bangi's testimony implied that the parties assumed that

---

          [12]   In <u>Real</u>, the focused exclusively on whether the
fieldwork required special skill.   <u>See</u> <u>Real</u>, 603 F.2d at 755
("The services performed by the appellants consist primarily of
physical labor, requiring no special technical knowledge or
skill.").   However, in <u>Real</u> the court was analyzing whether
individual farmers with three acres were independent contractors.
The court did not have the opportunity to consider whether the
large, coordinated operations at issue here required special
skill.

1  Contractor would provide farm labor from year to year, with

2  changes to wage rates occurring only occasionally, often when the

3  minimum wage rate changed.  (Tr. 157:6-23.)  Thus, there was

4  significant permanency in the working relationship between

5  Contractor and Delano Farms.

6          f.   <u>Integral Part of Delano Farms' Business</u>

7        Pre-harvest work, picking, packing table grapes for

8  sale, and coordinating the work of a large number of fieldworkers

9  are undoubtably services that are integral to Delano Farms'

10  business, because unless these services were performed, Delano

11  Farms "would not have been able to realize any of the economic

12  benefits from its substantial investment" in growing the table

13  grapes.  <u>Torres-Lopez</u>, 111 F.3d at 644.

14          g.   <u>Additional Considerations - Shared Premises</u>

15        In determining whether there is economic dependence,

16  the court is to consider "all of the circumstances" relevant to

17  the issue.  29 C.F.R. § 500.20(h)(4).  In <u>Moreau v. Air France</u>,

18  the Ninth Circuit considered the use of shared premises when

19  deciding whether the airline jointly employed ground handling

20  workers.  <u>Moreau</u>, 356 F.3d at 952.  Looking at the relationship

21  between Delano Farms and Contractor, the court finds that, in

22  addition to the factors listed in 29 C.F.R. § 500.20(h)(4), a

23  consideration of shared premises is relevant to the question of

24  economic dependence between Delano Farms and Contractor.

25        The <u>Moreau</u> court found that a ground handling

26  contractor subleasing space from the airline at a percentage

27  above the prevailing rental rate did not indicate a special

28  relationship between the parties.  <u>Moreau</u>, 356 F.3d at 952.

1   Another contractor provided a small office free of charge to the
2   airline, but this arrangement also did not indicate a special
3   relationship when the practice was customary and the cost was
4   covered by service charges billed to the airline.  Id.  Finally,
5   a third contractor provided the airline with over 2,500 square
6   feet of office space "free of charge" and the airline's logo
7   appeared on the side of the contractor's building, but this
8   arrangement also did not indicate a special relationship because
9   the office space was part of the contract between the parties and
10  was "obviously a negotiated point" that was factored into the
11  economics of the deal.  Id.

12        Here, Delano Farms provided a several-acre facility to
13  Contractor, called the Richgrove property, almost from the
14  inception of Delano Farms.  (235:25-236:11.)  The Richgrove
15  property included two to three farmhouses, one of which
16  Contractor used as an office for all of its operations, a tin
17  storage warehouse, and an old cold storage facility used by
18  Delano Farms (Tr. 235:25-238:2).  Contractor stored its equipment
19  on the site.  (Tr. 240:16-22.)

20        Terry Bangi testified that Contractor paid rent on the
21  property for the first year or so, but then stopped paying rent
22  in exchange for maintenance and improvement of the property.
23  (Tr. 238:6-239:8.)  Joe Campbell also testified that Contractor
24  did, in fact, pay rent on the property for a short period of
25  time.  (Tr. 405:12-406:4.)  Campbell also testified that
26  Contractor stopped paying rent on the Richgrove facility, located
27  on the east side of the property, when Contractor agreed to buy a
28  separate house on the west side of the property, approximately

ten miles away.  (Tr. 406:5-407:18.)  Campbell testified that he would offer Mr. Bangi the opportunity to buy the house if Mr. Bangi would keep someone on the property to look after it.[13]  (Tr. 406:9-15.)  Campbell also testified that Mr. Bangi had to maintain the Richgrove property as part of the bargain.

Here, as in <u>Moreau</u>, there appears to have been a deal between the two parties in which Contractor contributed value by maintaining and improving the property in exchange for use of the property.  Sharing the Richgrove Property, therefore, does not indicate that Contractor was an employee of Delano Farms rather than a bona fide independent contractor.

h.   <u>Overall Economic Reality</u>

After considering the factors listed in 29 C.F.R. § 500.20(h)(4) and all relevant circumstances, the court concludes from the totality of the circumstances, considered as a whole, that the economic reality between Contractor and Delano Farms supports a finding that Contractor was not economically dependent on Delano Farms.  Contractor therefore was a bona fide independent contractor.  Since Contractor was not employed by Delano Farms, plaintiffs are not deemed to be employees of Delano Farms through their employment by Contractor.  <u>See</u> 29 C.F.R. § 500.20(h)(4).

2.   <u>Joint Employment</u>

"If it is determined that a farm labor contractor is an independent contractor, it still must be determined whether or

---

[13]   Delano Farms became concerned about the future of the western property when two Rottweilers, apparently left at the property by their previous owners, killed a stray dog on the property.  (Tr. 406:19-407:13.)

1   not the employees of the farm labor contractor are also jointly

2   employed by the agricultural employer/association." 29 C.F.R. §

3   500(h)(5)(i). For the purposes of the AWPA, "[t]he definition of

4   the term employ includes the joint employment principles

5   applicable under the Fair Labor Standards Act." Id. §

6   500.20(h)(5).

7        Unlike the independent contractor analysis, which

8   focuses on the relationship between the agricultural

9   employer/association and the farm labor contractor, the joint

10  employment analysis focuses on the relationship between the

11  agricultural employer/association and the worker. Compare 29 §

12  500.20(h)(4) with id. at § 500.20(h)(5)(iii). In the joint

13  employment analysis, "the ultimate question to be determined is

14  the economic reality--whether the worker is so economically

15  dependent upon the agricultural employer/association as to be

16  considered its employee." Id. § 500.20(h)(5)(iii).

17       In determining economic dependency, the court looks to

18  both regulatory and non-regulatory factors.[14] See Torres-Lopez,

19  111 F.3d at 640. In Torres-Lopez, the court looked to five

20  regulatory factors codified in 29 C.F.R. § 500.20(h)(4)(ii)

21

---

22  [14]   Delano Farms urges this court to apply the four factors
    identified in Bonnette, 704 F.2d 1465 (9th Cir. 1983), which are
23  "whether the alleged employer (1) had the power to hire and fire
    employees, (2) supervised and controlled employee work schedules
24  or conditions of employment, (3) determined the rate and method
    of payment, and (4) maintained employment records." Bonnette,
25  704 F.2d at 1470.
         However, as noted by the court in Moreau v. Air France,
26  the four Bonnette factors "roughly correspond" to the regulatory
    factors applied in Torres-Lopez. Moreau v. AirFrance, 356 F.3d
27  942, 950 (9th Cir. 2003). The regulatory factors considered in
    Torres-Lopez were in turn amended in order to remedy courts'
28  application of an overly-strict interpretation of control in the
    joint-employer context. See Torres-Lopez, 111 F.3d at 641 n.6.

(1996) and eight non-regulatory factors.  Subsequent to the Ninth

Circuit's decision in Torres-Lopez, the relevant regulations were

amended to remedy the overly restrictive definition of joint

employment used by some courts, and the new regulatory factors

adopted many of the non-regulatory factors explored in Torres-

Lopez.  See Charles v. Burton, 169 F.3d 1322, 1328 n.10 (11th

Cir. 1999); Torres-Lopez, 111 F.3d at 641 n.6.[15]  The regulatory

factors under current AWPA regulations include:

> (A)  Whether the agricultural employer association has
> the power, either alone or through control of the farm
> labor contractor to direct, control, or supervise the
> worker(s) or the work performed (such control may be
> either direct or indirect, taking into account the nature
> of the work performed and a reasonable degree of contract
> performance  oversight  and  coordination  with  third
> parties);
>
> (B)  Whether the agricultural employer/association has
> the  power,  either  alone  or  in  addition  to  another
> employer, directly or indirectly, to hire or fire, modify
> the employment conditions, or determine the pay rates or
> the methods of wage payment for the worker(s);
>
> (C)   The  degree  of  permanency  and  duration  of  the
> relationship  of  the  parties,  in  the  context  of  the
> agricultural activity at issue;
>
> (D)   The extent to which the services rendered by the
> workers are repetitive, rote tasks requiring skills which
> are acquired with relatively little training;
>
> (E)   Whether the activities performed by the worker(s)
> are an integral part of the overall business operation of
> the agricultural employer/association;
>
> (F)   Whether the work is performed on the agricultural

---

[15]   In Torres-Lopez, the court applied the following
regulatory factors: (A) the nature and control of the workers;
(B) the degree of supervision, direct or indirect, of the work;
(c) the power to determine the pay rates or methods of payment of
the workers; (D) the right, directly or indirectly, to hire,
fire, or modify the employment conditions of the workers; and (E)
preparation of payroll and the payment of wages.  Torres-Lopez,
111 F.3d at 639-40 (citing former 29 C.F.R. § 500.20(h)(4)(ii)
(1996)).

employer/association's premises, rather than on premises owned or controlled by another business entity; and

(G)   Whether the agricultural employer/association undertakes responsibilities in relation to the workers which are commonly performed by employers, such as preparing and/or making payroll records, preparing and/or issuing pay checks, paying FICA taxes, providing workers' compensation insurance, providing field sanitation facilities, housing or transportation, or providing tools and equipment or materials required for the job (taking into account the amount of the investment).

29 C.F.R. § 500.20(h)(5)(iv).   The regulatory factors "are illustrative only and are not intended to be exhaustive."   Id.

In Torres-Lopez, the Ninth Circuit also considered a number of non-regulatory factors in its analysis, including the following:

(1)  whether the work was a specialty job on a production line;

(2)  whether responsibility under the contracts between a labor contractor and an employer pass from one labor contractor to another without material changes;

(3)  whether the premises and equipment of the employer are used for the work;

(4)  whether the employees had a business organization that could or did shift as a unit from one worksite to another;

(5)  whether the work was piecework and not work that required initiative, judgment or foresight;

(6) whether the employee had an opportunity for profit or loss depending upon the alleged employee's managerial skill;

(7)  whether there was permanence in the working relationship; and

(8) whether the service rendered is an integral part of the alleged employer's business.

Torres-Lopez, 111 F.3d at 640 (internal quotation marks and citations omitted).

1       "No one factor is dispositive of the ultimate question;

2 nor must a majority or a particular combination of factors be

3 found for an employment relationship to exist . . . ."  29 C.F.R.

4 § 500.20(h)(5)(iv).  The Ninth Circuit instructs that "[a] court

5 should consider all . . . factors . . . 'relevant to the

6 particular situation' in evaluating the 'economic reality' of an

7 alleged joint employment relationship."  Torres-Lopez, 111 F.3d

8 at 639 (quoting Bonnette, 704 F.2d at 1470).  The court will not

9 mechanistically apply these factors, see Bonnette, 704 F.2d at

10 1470, nor will it evaluate the factors in a "mathematical

11 formula," Antenor, 88 F.3d at 933.  Ultimately, the

12 "determination of the relationship does not depend on such

13 isolated factors but rather upon the circumstances of the whole

14 activity."  Rutherford, 331 U.S. at 730.

15                   a.   Regulatory Factors

16                     i.   Power to Direct, Control, or Supervise,

17                           Both Directly and Indirectly

18       As discussed above, Delano Farms' power to direct,

19 control, or supervise the activities of the workers was confined

20 to quality control and agricultural decisions that would be

21 expected of a grower.  Unlike Torres-Lopez, however, Delano Farms

22 did not exercise close control over the fieldwork.  See Torres-

23 Lopez, 111 F.3d at 642.  Thus, Delano Farms' power to direct,

24 control, or supervise the work was minimal.

25                     ii.   Power to Hire or Fire, Modify Employment

26                           Conditions, or Determine Rates/Methods

27                           of Pay

28       It is undisputed that Contractor hired and fired the

field workers through its foremen.  (Tr. 121:8-122:24.)  As for
employment conditions, Contractor set the field conditions of the
workers and determined the workers' break periods.  (Tr. 388:15-
389:11.)  While Terry Campbell from Delano Farms suggested that
the workers might benefit from Gatorade, (Tr. 92:3-13, 218-18-
24), there was no evidence that this was anything more than a
suggestion, and Contractor unilaterally decided to stop providing
Gatorade in the fields due to concerns about diabetes, (Tr. 94:3-
16, 219:2-15).  Testimony from Terry Bangi indicates that any
discussion about the timing of the workers' breaks was simply
encouragement from Joe Campbell that Contractor follow the law
regarding break times.  (Tr. 215:19-216:3.)  There is also no
evidence that the policy of removing workers from the fields to
re-pack boxes was instituted by Delano Farms or that Delano Farms
required Contractor to remove certain crews from the fields.
Thus, from the evidence provided it appears that Delano Farms did
not have the power to modify the employment conditions of the
workers.

In Torres-Lopez, the court recognized that the grower
exercised some power over the workers' wages when it increased
the farm labor contractor's compensation during the early harvest
season to allow the workers to draw higher wages.  Torres-Lopez,
111 F.3d at 643.  Here, the terms of the oral contract[16] between
Contractor and Bangi was explicitly based upon the wages earned

---

[16]     The contracts between Delano Farms and Contractor
were entirely oral until June 2011, a date more than two years
into the litigation.  (See Ex. 1.)  Even when the parties did
sign a contract, the payment terms were left blank but were
agreed to orally.  (See Tr. 156:11-14, Ex. 1.)

by Contractor's workers, with Contractor's commission set as a percentage of the overall wages paid to its workers. (Tr. 225:6-25.) Terry Bangi and the Delano Farms management team explicitly discussed the workers' wage rate when setting the terms of their contract--indeed, it seems to be the primary term discussed by the parties. While the parties disagree as to who had the final say over the workers' wages and how much negotiation was involved, it is clear from Delano Farms' testimony that it wanted to exercise some control over the workers' wages. Terry Bangi testified that when Jim Middleton and Joe Campbell discussed the workers' wages with him, both "wanted to be above the industry [standard]." (Tr. 220:7-9, 220:20-23.) Joe Campbell testified that Delano Farms wanted to set the rate above the industry standard "to have the best people" and to be "be known as an . . . employment friendly company." (Tr. 400:13-19.) The testimony therefore reveals that Delano Farms wanted to have, and did indeed exercise, some control over workers' wages in order to gain the benefit of a better reputation.

### iii. Permanency and Duration

In Torres-Lopez, the court found that there was "no permanency in the working relationship because the farmworkers only harvested for [the grower] for thirty-two days during the period at issue." Torres-Lopez, 111 F.3d at 644. While evidence does not disclose how many days the workers performed services for Delano Farms, Terry Bangi did testify that the majority of the employees are seasonal, and that even the foremen and supervisors go on unemployment at the end of a season. (Tr. 177:15-22.) While some workers may have regularly returned to

1  harvest Delano Farms year after year, (see Tr. 91:14-23),

2  Contractor could, and did, assign workers to different growers as

3  needed, (Tr. 200:9-201:4).

4       Thus, the evidence suggests that the permanency and

5  duration of the relationship between the workers and Delano Farms

6  was minimal.

7                    iv.   Remaining Regulatory Factors

8       Workers learned the techniques required for pre-harvest

9  work in fifteen to thirty minutes and often mastered the

10 techniques within a matter of days. (Tr. 416:16-463:15, 526:9-

11 527:21.)  Thus, pre-harvest and harvest work can be quickly

12 learned and is a repetitive, rote task that is similar to

13 production on an assembly line.  See Torres-Lopez, 111 F.3d at

14 644 (holding that the job of picking cucumbers is "piecework that

15 requires no great initiative, judgment, or foresight, or special

16 skill" (internal quotation marks and citations omitted)); Real,

17 603 F.3d at 755 (holding that the fieldwork at issue "consisted

18 primarily of physical labor, requiring no special technical

19 knowledge or skill").  The work is also an integral part of

20 Delano Farms' overall business operation.  Finally, it is

21 undisputed that the work is performed entirely on Delano Farms'

22 premises.

23      However, Delano Farms did not undertake

24 responsibilities which are commonly performed by employers.

25 Delano Farms did not manage the workers' payroll, provide

26 workers' compensation insurance, provide field sanitation

27 facilities, or provide housing or transportation.  (Tr. 403:23-

28 1.)  As for providing equipment required for the job, Craig

Neville testified that Contractor provided shears to plaintiffs,
(Tr. 95:15-16, 96:9-11, Exs. 128 & 130), and plaintiffs did not
produce any admissible evidence to the contrary, (Tr. 96:20-23).
Contractor also provided the white picking trays used by the
workers in the field to collect grapes before bringing them to
the table where they were packed.  (Tr. 262:6-8, 362:9-14.)
Delano Farms provided packing materials, such as boxes and
clamshells, that would be shipped to customers, as well as black
and tan trays that Delano Farms would use to store grapes in the
cold storage.  (Tr. 362:15-363:16, 696:21-699:4.)  These black
and tan trays, however, were not equipment used to conduct the
work of harvest, but were rather equipment used in shipping and
storage, and thus one would not expect Contractor to provide
them.  Therefore Delano Farms did not undertake any
responsibilities commonly performed by an employer.

b.   Non-Regulatory Factors

i.   Whether the Contract Could Pass to
Another Contractor Without Material
Changes

In Torres-Lopez, the Ninth Circuit considered the non-
regulatory factor of "whether responsibility under the contracts
between a labor contractor and an employer pass from one labor
contractor to another without 'material changes[.]'"  Torres-
Lopez, 111 F.3d at 640.  In support of its determination that the
grower constituted a joint employer, the Ninth Circuit
acknowledged that "there were no 'material changes' in the terms
of the oral contracts between [the grower] and farm labor
contractors" when the "contracts were standard for the industry

and involved little negotiation." Id. at 643 (quoting
Rutherford, 331 U.S. at 730) (internal citation omitted).

Here, testimony shows that Delano Farms and Contractor
both endeavored to determine the current industry standard for
wage rates, box bonuses, and commissions before discussing the
terms of the contract. (Tr. 225:8-14, 400:7-12.) The resulting
contracts included terms that deviated only slightly from these
standards. (Tr. 225:15-17, 400:7-12.) For example, the
commission paid to Contractor for a number of years was thirty-
seven-and-a-half percent, (Tr. 225:23-25, 226:20-22, 402:6-11),
well within the industry range of thirty to forty percent, (Tr.
226:23-25, 766:7-13). No evidence suggests that the discussions
ever involved unique terms or contemplated substantial deviation
from the industry standard. Thus, it appears that the contract
between Delano Farms and Contractor could pass from Delano Farms
to another farm labor contractor without any material changes,
thereby supporting a finding of joint employment.

ii. <u>Business Organization that Could Shift
as a Unit From One Worksite to Another</u>

In <u>Torres-Lopez</u>, the farmworkers did not have a
business organization that could or did shift from one worksite
to another because "individual farmers would learn by mouth that
the cucumbers were ready for picking and find their own way to
the cucumber field," where the field labor contractor "then
selected the farmworkers from the labor pool that showed up."
<u>Torres-Lopez</u>, F.3d 111 at 644. Here, in contrast, the workers
were part of organized crews that could shift from one worksite
to another depending on the day. (Tr. 200:9-201:4.)

iii. <u>Opportunity for Profit or Loss</u>

The Ninth Circuit in <u>Torres-Lopez</u> determined that "the farmworkers had no opportunity for profit or loss depending upon their managerial skill [because] [t]hey worked at piece-rate and the amount of they earned depended solely upon the number of cucumbers they themselves picked." <u>Torres-Lopez</u>, 111 F.3d at 644 (internal quotation marks and citation omitted).  Similarly here, plaintiffs were paid by the hour and at times were also paid a box bonus to be split among the three people in a crew depending upon how many boxes they picked in a day.  (Tr. 397:17-22.)  No evidence was presented that a worker's managerial skill could affect the workers' opportunity for profit or loss.

c.   <u>Overall Economic Reality</u>

Looking at all relevant considerations, including both regulatory and non-regulatory factors, in determining the economic reality between Delano Farms and Contractor, the court concludes that plaintiffs had sufficient economic dependence on Delano Farms to support a finding that Delano Farms jointly employed plaintiffs with Contractor.  Accordingly, the court finds that Delano Farms employed plaintiffs under the AWPA.

B.   <u>Employment Under California Law</u>

The California Industrial Welfare Commission ("IWC") has the authority to promulgate regulations known as "wage orders" governing wages, hours, and working conditions in California.  <u>Tidewater Marine W., Inc. v. Bradshaw</u>, 14 Cal. 4th 557, 561 (1996).  In actions to recover unpaid minimum wages pursuant to California Labor Code section 1194, California courts rely on the definitions in the IWC's wage orders in determining

whether an employment relationship exists.  <u>Martinez v. Combs</u>, 49
Cal. 4th 35, 52 (2010).  Wage Order 14 defines the employment
relationships of agricultural workers and provides for certain
minimum wages and employment conditions.  <u>See</u> 8 Cal. Code. Reg. §
11140(1) ("This order shall apply to all persons employed in an
agricultural occupation . . . .").  The IWC's wage orders "do not
incorporate the federal definition of employment."  <u>Id.</u>

Under Wage Order 14, as in other IWC wage orders, there
are three alternative definitions for the term "to employ."
<u>Martinez</u>, 49 Cal. 4th at 64.  "It means: (a) to exercise control
over the wages, hours, or working conditions, <u>or</u> (b) to suffer or
permit to work, <u>or</u> (c) to engage, thereby creating a common law
employment relationship."  <u>Id.</u>  11140.

Under the "suffer or permit to work" definition,
<u>Martinez</u> looked to early twentieth century child labor statutes
and gave the phrase its "historical meaning," which was that "[a]
proprietor who knows that persons are working in his or her
business without having been formally hired, or while being paid
less than minimum wage, clearly suffers or permits that work by
failing to prevent it, while having the power to do so."
<u>Martinez</u>, 49 Cal. 4th at 69.  <u>Martinez</u> held that the basis for
liability under the "suffer or permit to work" definition "is the
defendant's knowledge of and failure to prevent the [illegal]
work from occurring."  <u>Id.</u>  Due to the limited scope of this
trial, the court cannot resolve whether illegal work was
occurring, let alone whether Delano Farms had knowledge of the
work.  In addition, plaintiffs did not argue that Delano Farms is
their employer under the common-law definition.

1       Under the "exercise control over wages, hours, or
2 working conditions" definition, "'control over wages' means that
3 a person or entity has the power or authority to negotiate and
4 set an employee's rate of pay, and not that a person or entity is
5 physically involved in the preparation of an employee's
6 paycheck." <u>Futrell v. Payday Cal., Inc.</u>, 190 Cal. App. 4th 1419,
7 1432 (2d Dist. 2010).  In <u>Martinez</u>, the California Supreme Court
8 held that a strawberry merchant did not have power over
9 plaintiffs' wages because, in part, "[the contractor] alone, with
10 the assistance of his foremen . . . determined [the employees']
11 rate of pay." <u>Martinez</u>, 49 Cal. 4th at 72.  Furthermore, the
12 farm labor contractor "operated a single, integrated business
13 operation, growing and harvesting strawberries for several
14 unrelated merchants and combining revenue from all sources . . .
15 [and] paid his employees out of those combined revenues and
16 assets." <u>Id.</u>

17       Here, rather than Contractor alone setting plaintiffs'
18 rate of pay, Delano Farms and Contractor expressly negotiated and
19 set plaintiffs' rate of pay as part of their contract.  Delano
20 Farms negotiated over the workers' wage rate, and even expressed
21 a desire to control those rates so that it would attract the best
22 workers possible.  Also, unlike the grower in <u>Martinez</u> who pooled
23 his income from various sources and paid employee wages from that
24 fund, Contractor appeared to pay its employees directly from the
25 funds it received from Delano Farms when employees were working
26 for Delano Farms.  Delano Farms had "the power or authority to
27 negotiate and set an employee's rate of pay," <u>Futrell</u>, 190 Cal.
28 App. 4th at 1432, and thus it employed plaintiffs under

1  applicable California law, <u>see</u> 8 Cal. Code. Reg. § 11140(2)(G).

2          For the foregoing reasons, THE COURT HEREBY FINDS that

3  at all times relevant to these proceedings defendant Delano Farms

4  employed plaintiffs within the meaning of the Migrant Seasonal

5  Agricultural Workers Protection Act, 29 U.S.C. § 1801 <u>et</u> <u>seq.</u>,

6  and Wage Order 14 of the California Industrial Welfare

7  Commission, 8 Cal. Code. Reg. § 11140.

8  DATED:  February 5, 2013

9

10  _____

11  WILLIAM B. SHUBB
    UNITED STATES DISTRICT JUDGE