1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SABAS ARREDONDO et al.,

Plaintiffs,

v.

DELANO FARMS CO., et al.,

Defendants.

1:09-cv-01247 MJS

ORDER PARTIALLY GRANTING MOTIONS TO DECERTIFY CLASS

(Doc. Nos. 273, 275)

On April 19, 2011, the Court granted in part Plaintiffs' Sabas Arrendondo, Jose Cuevas, Hilario Gomez, Irma Landeros and Rosalba Landeros (collectively, "Plaintiffs") motion seeking class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure. (ECF No. 85.) On March 22, 2013, Defendants filed separate motions for decertification of the class.[1] (ECF Nos. 273, 275.) On April 29, 2013, Plaintiffs filed a single opposition to both decertification motions. (ECF No. 286.) Defendants filed replies to the opposition on May 13, 2013. (ECF Nos. 293, 295.) The Court has read and considered the pleadings and supporting documents, and it heard oral arguments by counsel on September 27, 2013. Based on the consent of the parties, the matter stands

---

[1] Defendants T&R Bangi Ag Services and Cal-Pacific Farm Management jointly filed a motion to decertify (ECF No. 273), while defendant Delano Farms filed a separate motion to decertify. (ECF No. 275.)

1   ready for adjudication before the magistrate judge. (See ECF Nos. 277-79.)

2   **I.      PROCEDURAL HISTORY**

3       Defendants Cal-Pacific Farm Management, L.P. ("Cal-Pacific") and T&R Bangi's

4   Agricultural Services, Inc. ("T&R Bangi") are both farm labor contractors (collectively the

5   "Employers").[2] Plaintiffs are agricultural workers who have been employed by Cal-Pacific

6   or T&R Bangi during the past four years. Employers contract with entities such as

7   Delano Farms Company ("Delano Farms") which grows and markets table grapes.

8       Plaintiffs filed the instant action on July 17, 2009 alleging federal and state law

9   wage and hour violations against Employers, including claims pursuant to the Migrant

10  and Seasonal Agricultural Worker Protection Act, 29 U.S.C. §1801 et seq. ("AWPA").

11      On January 28, 2011, Plaintiffs filed a motion to certify a class action in this

12  matter. Plaintiffs proposed to represent one class of workers composed of the following:

13      All non-exempt agricultural employees of Delano Farms Company, Cal-
        Pacific Farm Management, L.P., and T&R Bangi's Agricultural Services,

14      Inc. who performed field work at Delano Farms in California from four (4)
        years prior to the filing of this action to the present, excluding irrigators,

15      tractor drivers, swampers and workers employed only in cold-storage.

16  (ECF No. 75, Moving papers p. 2.)

17      Plaintiffs also requested that the Court appoint as class counsel Wasserman,

18  Camdon, Casselman & Esensten and Marcos Camacho, A Law Corporation. Upon

19  briefing, including supplemental briefing regarding potential subclasses, the Court

20  granted the motion to certify in part. (ECF No. 85.) Specifically, the Court authorized

21  Plaintiffs to pursue claims on behalf of the following four subclasses:

22      (1) Field workers who performed uncompensated and unrecorded work
        before the fixed start time in the harvest and pre-harvest work.

23

24      (2) Field workers who performed uncompensated and unrecorded work
        after the fixed stopping time in the harvest work.

25      (3) Field workers who performed uncompensated and unrecorded work

26  _____

27      [2] Cal-Pacific and T&R Bangi refer to themselves in their motion as "Employers." The Court will
    adopt this nomenclature and will also refer to Cal-Pacific, T&R Bangi and Delano Farms as "Defendants."
    Cal-Pacific and T&R Bangi acknowledge they have similar management personnel and policies. (ECF No.

28  76, Opp'n, p.1.)

1    after hours by washing their picking trays at home.

2    (4) Field workers who incurred unreimbursed necessary tools expenses in
     the harvest and pre-harvest work.

3    On May 27, 2011, the Court appointed Plaintiffs as representatives of the

4    subclasses and approved notice to class members. (ECF No. 91.) On February 2, 2012,

5    Delano Farms filed a motion for summary judgment alleging that it was not a joint

6    employer of Plaintiffs or class members. (Mot., ECF Nos. 112-122.) After briefing, the

7    Court denied the motion for summary judgment on April 12, 2012 finding that there were

8    factual disputes regarding whether Delano Farms exercised control over the wages,

9    hours, or working conditions of Plaintiffs or suffered or permitted them to work and that

10   those factual issues precluded summary judgment. (Order, ECF No. 165.)

11   Following the denial of the summary judgment motion, Delano Farms filed a

12   motion to bifurcate the trial. (ECF No. 169.) On June 20, 2012, the Court ordered

13   separate trial of the issue of whether Delano Farms employed Plaintiffs. (ECF No. 175.)

14   The Court held a bench trial on the latter issue from January 15, 2013 to January 30,

15   2013, and on February 5, 2013, found that Delano Farms was a joint employer. (Order,

16   ECF No. 259.)

17   On November 13, 2012, prior to trial on the joint employer issue, Defendants filed

18   motions for decertification of the class. (ECF Nos. 203, 205.) However, the Court

19   vacated the motions until after the first phase of trial. (ECF No. 206.) Defendants re-filed

20   the motions for class decertification on March 22, 2013. (ECF Nos. 273, 275.) Oral

21   arguments were heard on the motions on September 27, 2013, and the matter stands

22   ready for adjudication.[3]

23   **II.    RELEVANT EVIDENCE**

24       **A.    Evidence Presented With Regard to Motion for Certification**

25   In connection with the instant decertification motions, the Court is presented with

26

27       _____
         [3] Delano Farms also filed a motion for the Court to order Plaintiffs to submit a trial plan
     contemporaneously with its decertification motion. (ECF No. 274.) The Court denied the motion at oral
28   argument, but acknowledged that a trial plan would be necessary should the matter remain certified.

1    and considers evidence originally produced  in support of and opposition to the motion

2    for certification and additional evidence provided  post-certification.

3         The Court described the state of the evidence previously presented as follows:

4         In support of this motion to certify the class, plaintiffs submit sixty-
     three (63) declarations and deposition testimony from proposed class
5         members who worked in 28 different crews for the Employers. (See Doc.
     75-3.) Each of plaintiffs' submitted declarations provides the following
6         kinds of testimony: statement of the year/seasons that the employee
     worked for Employers; how many days per week he/she worked; payment
7         scale; equipment purchased, if any; whether the employee was required to
     report to work before the start time; what activities the employee engaged
8         in before or after start time; and estimates of the time the employee
     worked off-the-clock. (See e.g., Doc. 75-4, Rima Arceo Decl. Exh. 11;
9         Magdaleno Castaneda Decl. Exh. 18; Mario Marelos Decl. Exh. 49.) Each
     of plaintiffs' declarants states that they were required to work before
10        official start-time and after official end-time. (The amount of time fluctuated
     generally between 15-30 minutes before and after official start time.) For
11        instance, Rodolfo Gomez testifies that during pre-harvest and harvest, "I
     was required to arrive at the jobsite approximately 15 before the official
12        start time." (Doc. 75-7, Rodolfo Gomez Decl. ¶6-5; Exh. 34.) Each
     declarant further states that the declarant purchased tools to do the work
13        because if the Employers tools were provided, the tools were so inferior
     the work could not be performed. For instance, Estela Izazaga testifies
14        that "I was required to provide my own tools and equipment that I needed
     for my job. The tools and equipment that I was required to take to my job
15        were picking shears that cost me $10.00 and a holster that cost me
     $7.00." (See e.g., Doc. 75-4, Estala Izazaga Decl. ¶5, Exh. 43.)
16
          Employers also present some 89 declarants who testify the
17        opposite of plaintiffs' declarants; that they were not subject to wage and
     hour violations. (Doc. 76.) Each declarant states: the declarant is a current
18        employee; that he/she is required to attend "escuelita," but is paid for that
     time; he/she is never required to perform work off-the-clock; he/she is
19        never permitted to do work before the beginning of the shift or after the
     shift ends; he/she is never required to work at home; he/she is provided all
20        the tools needed to do the job and the tools are adequate; and he/she is
     provided with all meals and rest periods. For instance, Jose Bermudes
21        testifies that he is "never required to do work after my shift has ended,"
     and is "never required to do work at home." (Doc. 76-1, Jose Bermudes
22        Decl. ¶4, 5, Exh.12.) Marta Lucio states that "I am required to attend
     'escuelita' almost every morning at the beginning of my shift . . . It is
23        always held while employees are on the clock and I am always paid the
     time I spend in school." (Doc. 76-3, Marta Lucio Decl. ¶2, Exh. 50.) The
24        declarations state that there have been no violations.

25   Arrendondo v. Delano Farms Co., 2011 U.S. Dist. LEXIS 44134 at 21-25. In addition to

26   the declarations, Plaintiffs submitted the declaration of Kenneth L. Creal. (ECF No. 75-

27   2.) Creal, a certified public accountant, provided a declaration in which he concluded that

28   there was significant evidence that putative class members performed uncompensated

4

1   work, that Employers failed to keep adequate time records, and that there were

2   significant claims by putative class members for reimbursement for tools. (Id.) Plaintiffs

3   also submitted portions of deposition transcripts of putative class members and of

4   persons most knowledgeable for Employers. (See Decl. of Gregory Ramirez, Exs. 73-89;

5   ECF Nos. 75-11 to 75-14.)

6        Defendants, in opposition to the motion to certify, in addition to submitting

7   declarations of employees that stated that violations did not occur, provided declarations

8   of Marife Villar, T&R Bangi's safety manager who was responsible to ensure foremen

9   read company polices to the employees (ECF No. 76-4 at 90-91), declarations of six

10  foremen stating that the alleged practices did not occur (ECF No. 76-4 at 92-100, ECF

11  No. 76-5 at 1-8), and excerpts of depositions of certain employees (ECF No. 76-5 at 9-

12  63). Defendants produced the declaration of Terry Bangi to which were attached several

13  hundred pages of exhibits characterized as invoices for tools purchased for employees.

14  Finally, Craig Neville, the administrative assistant for T&R Bangi, provided a declaration

15  stating that wage violations did not occur.

16       **B.   New Evidence Presented With Regard to Motions for Decertification**

17       In support of the motions for decertification, Defendants have presented thirty

18  nine new declarations of workers and foremen. (See Declaration of Sarah Gohmann

19  Bigelow ("Bigelow Decl.") at ¶ 4, ECF No. 275-2.) Delano Farms, in support of its motion

20  to decertify, provided the declaration of Sarah Gohmann Bigelow. In the declaration,

21  Bigelow provides four graphs showing which declarants, arranged by foremen, asserted

22  violations in each subclass. (See Bigelow Decl., Exs. A, D, G, J.)  In support of the

23  graphs, Bigelow provides "a table supporting the summary chart, which cites the specific

24  declarations or deposition testimony relied upon in the summary chart (Exhibits B, E, H,

25  and K); and a table summarizing the specific allegations made in the declarations

26  submitted by Plaintiffs in support of class certification (Exhibits C, F, I, and L)." (Id. at ¶

27  9.)  The charts were based on 194 declarations from individual employees including 69

28  declarations filed by Plaintiff in support of the motion for certification, 87 declarations

1  submitted by Defendants in opposition to the motion for certification, and 38 new

2  declarations obtained by Defendants and provided with their motions for decertification.[4]

3  (Id. at ¶ 4.) In addition to the charts and new declarations, Delano Farms includes

4  excerpts from twenty (20) depositions of various field workers. (See Id., Exs. UU-NNN.)

5  Finally, Bigelow provides a supplemental declaration in support of Delano Farm's reply

6  brief with revised charts containing further categories of information. (See Supp. Bigelow

7  Decl., ECF No 293.)

8      Employers provide a declaration of Michael Johnson in which he provides both

9  new and old declarations of workers in support of decertification. (See Declaration of

10  Michael Johnson ("Johnson Decl."), ECF No. 273-3.) In his declaration, Johnson

11  provides declarations from ten employees to attempt show that the original declarations

12  provided by Employers, although drafted in the present tense, applied to the entire

13  period that the employee worked at Delano Farms. (Id., Exs. 1-10.) Johnson also

14  provides seven new declarations from workers who decided to opt out of the class upon

15  receiving notice. (Id., Exs. 11-17.) Next, Johnson provides copies of previously filed

16  declarations, and excerpts from their depositions to attempt to show that the declarants

17  gave inconsistent statements. (Id., Exs. 18-47.) Finally, Johnson provides copies of

18  deposition testimony of declarants who admitted to attending union meetings (to attempt

19  to show bias), a copy of the declaration of Marife Villiar, the safety manager for T&R

20  Bangi, that was previously filed in support of the certification motion, and a copy of the

21  certification order. (Id. at 48-50.)

22      Employers also provide a declaration from Terry Bangi, president of T&R Bangi.

23  (Bangi Decl., ECF No. 273-8.)  Bangi previously provided a declaration in opposition to

24  the motion to certify, and, unlike the present motion, attached hundreds of pages of

25  receipts to attempt to show that tools were purchased. (See ECF No. 76-7.)

26

27      [4] Bigelow excluded eight declarations filed by Defendants that were prepared by cold storage
    workers, whom are excluded from the plaintiff class. Also the charts do not take into consideration nine
28  declarations filed by Plaintiff in opposition to the motions for decertification.

6

1    Employers also provide the declaration of David Brashears, a certified public

2    accountant. (See ECF Nos. 273-9 to 273-13.) Brashears reviewed the employment

3    records of Defendants and created spreadsheets showing the time period when each

4    declarant worked, and, when possible, the foreman for whom the declarant worked. (Id.)

5    Craig Neville, an administrative assistant at T&R Bangi, signed an updated declaration

6    describing the policies provided to the workers. (See Neville Decls., ECF Nos. 76-6, 273-

7    14.)

8    Employers provide the declaration of Cesar Trujillo in support of the decertification

9    motion. (Trujillo Decl., ECF Nos. 273-16 to 273-39.) Trujillo presents copies of his

10   reports and interview notes to show that the declarations originally provided in opposition

11   to the certification motion, though phrased in the present tense, actually referred to past

12   employment practices. (Id.)

13   Finally, Employers present the declaration of Michael P. Ward, an economist, who

14   asserts that there is no statistical basis to claim a common policy or practice applied to

15   the class members. (See Ward Decl., ECF Nos. 273-40, 273-41.)

16   In support of their opposition to the motion for decertification, Plaintiffs present

17   declarations of nine fieldworkers who previously filed declarations for Defendants, but

18   who now explain that their original declarations did not accurately reflect the work

19   practices they observed. (See Perero Decl., Exs. B-J, ECF No. 286-1.)

20   **III.    LEGAL STANDARDS FOR CLASS CERTIFICATION AND DECERTIFICATION**

21          **A.    Class Decertification**

22   "District court[s] retain[] the flexibility to address problems with a certified class as

23   they arise, including the ability to decertify." United Steel Workers v. ConocoPhillips Co.,

24   593 F.3d 802 (9th Cir. 2010). "Even after a certification order is entered, the judge

25   remains free to modify it in the light of subsequent developments in the litigation." Gen.

26   Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 160 (1982). Under Federal Rule of Civil

27   Procedure 23(c)(1)(C), a "[a] district court may decertify a class at any time." Rodriguez

28   v. West Publ'g Corp., 563 F.3d 948, 966 (9th Cir. 2009). In deciding whether to decertify,

1  a court may consider "subsequent developments in the litigation," <u>Falcon</u>, 457 U.S. at

2  160, including "previous substantive rulings in the context of the history of the case, and.

3  . . the nature and range of proof necessary to establish the class-wide allegations."

4  <u>Marlo v. UPS</u>, 251 F.R.D. 476, 479 (N.D. Cal. 2008). The standard is the same for class

5  decertification as it is with class certification: a district court must be satisfied that the

6  requirements of Rules 23(a) and (b) are met to allow plaintiffs to maintain the action on a

7  representative basis. <u>Marlo v. United Parcel Serv., Inc.</u>, 639 F.3d 942, 947 (9th Cir.

8  2011). Likewise, Plaintiff, as "[t]he party seeking class certification[,] bears the burden of

9  demonstrating that the requirements of Rules 23(a) and (b) are met." <u>Marlo</u>, 639 F.3d at

10  947; <u>United Steel Workers v. ConocoPhillips Co.</u>, 593 F.3d at 807.

11      Plaintiffs assert that because Defendants are presenting arguments already

12  addressed in the class certification process, the motions should be construed as motions

13  for reconsideration. Given the clarity of the above-cited law governing decertification, this

14  contention by Plaintiff's is rejected.

15          **B.      Law Governing Class Certification**

16      To obtain class certification, Plaintiffs bear the burden of showing they meet each

17  of the four requirements of Federal Rule of Civil Procedure 23(a), together with at least

18  one of the requirements of Rule 23(b). <u>Ellis v. Costco Wholesale Corp.</u>, 657 F.3d 970,

19  979-80 (9th Cir. 2011).

20      The four Rule 23(a) requirements are numerosity, commonality, typicality, and

21  adequacy, i.e., (1) the class must be so large that joinder of all members is

22  impracticable; (2) there must be one or more questions of law or fact common to the

23  class; (3) the named parties' claims must be typical of the class; and (4) it must appear

24  that the class representatives will fairly and adequately protect the interests of other

25  members of the class. Fed. R. Civ. P. 23(a); <u>Ellis</u>, 657 F.3d at 980. Defendants here do

26  not dispute numerosity or adequacy.  Resolution of this motion therefore hinges on the

27  interrelated questions of commonality and typicality. <u>See</u> <u>Gen. Tel. Co. of Sw. v. Falcon</u>,

28  457 U.S. at 157 n.13 ("The commonality and typicality requirements of Rule 23(a) tend

8

1  to merge.").

2         The Court must perform "a rigorous analysis [to ensure] that the prerequisites of

3  Rule 23(a) have been satisfied." Wal–Mart Stores v. Dukes, 131 S. Ct. 2541, 2551

4  (2011) (citation and internal quotation marks omitted). The plaintiff must prove that the

5  proposed class presents common questions of law or fact. Id. at 2550-51. This means

6  that the class members' claims "must depend upon a common contention . . . of such a

7  nature that it is capable of classwide resolution — which means that determination of its

8  truth or falsity will resolve an issue that is central to the validity of each one of the claims

9  in one stroke." Id. at 2551.

10        As for Rule 23(b), Plaintiff contends the proposed class satisfies either its first or

11  third prong, i.e., that prosecuting separate actions by individual class members would

12  create a risk of inconsistent results or "the questions of law or fact common to class

13  members predominate over any questions affecting only individual members, and that a

14  class action is superior to other available methods for fairly and efficiently adjudicating

15  the controversy." Fed. R. Civ. P. 23(b). "While Rule 23(a)(2) asks whether there are

16  issues common to the class, Rule 23(b)(3) asks whether these common questions

17  predominate. Though there is substantial overlap between the two tests, the 23(b)(3) test

18  is 'far more demanding,' and asks 'whether proposed classes are sufficiently cohesive to

19  warrant adjudication by representation.'" Wolin v. Jaguar Land Rover North America, 617

20  F.3d 1168, 1172 (9th Cir. 2010) (quoting Amchem Products, Inc. v. Windsor, 521 U.S.

21  591, 623, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997)). To answer this question, the Court

22  must "probe behind the pleadings." Wal–Mart, 131 S. Ct. at 2551 (citation and internal

23  quotation marks omitted). The plaintiff must "satisfy through evidentiary proof at least

24  one of the provisions of Rule 23(b)." Comcast Corp. v. Behrend, 133 S. Ct. 1426, 185 L.

25  Ed. 2d 515 (2013).

26  ///

27  ///

28

9

1

### 1.  Rule 23(a) Prerequisites

2

#### a.  Numerosity

3

A class must be "so numerous that joinder of all members is impracticable." Fed.

4

R. Civ. P. 23(a)(1). This requires the Court to consider "specific facts of each case and

5

imposes no absolute limitations." General Tel. Co. v. EEOC, 446 U.S. 318, 330 (1980).

6

Courts interpreting the numerosity requirement have identified a variety of factors

7

relevant to whether joinder of all class members would be impracticable.

8
9
10
11

> Though different courts label and group the considerations differently, they include: (1) the number of individual class members; (2) the ease of identifying and contacting class members; (3) the geographical spread of class members; and (4) the ability and willingness of individual members to bring claims, as affected by their financial resources, the size of the claims, and their fear of retaliation in light of an ongoing relationship with the defendant.

12

Twegbe v. Pharmaca Integrative Pharm., Inc., 2013 U.S. Dist. LEXIS 100067 (N.D. Cal.

13

July 17, 2013); see also 7A Wright et al., Federal Practice & Procedure § 1762 (3d ed.);

14

McLaughlin, McLaughlin on Class Actions § 4:6; Rubinstein et al., Newberg on Class

15

Actions § 3:11.

16

#### b.  Commonality

17

Rule 23(a) requires "questions of law or fact common to the class." Fed. R. Civ. P.

18

23(a)(2). This requirement has been construed permissively; not all questions of law and

19

fact need to be common. Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998).

20

"However, it is insufficient to merely allege any common question." Ellis v. Costco

21

Wholesale Corp., 657 F.3d 970, 981 (9th Cir. 2011).

22

The Court granted Plaintiffs certification motion on April 19, 2011. Subsequently,

23

the Supreme Court issued its decision in Wal-Mart Stores v. Dukes, 131 S. Ct. 2541

24

(2011). Defendants assert that Wal-Mart, along with recent Ninth Circuit cases including

25

Marlo v. UPS, Inc., 639 F.3d 942, 944 (9th Cir. 2011) and Wang v. Chinese Daily News,

26

2013 U.S. App. LEXIS 18245 (9th Cir., Sept. 3, 2013) require the Court to re-examine

27

certification in this case.

28

In Wal-Mart, the Supreme Court "recently emphasized that commonality requires

1    that the class members' claims depend upon a common contention such that

2    determination of its truth or falsity will resolve an issue that is central to the validity of

3    each claim in one stroke." Abdullah v. U.S. Sec. Assocs., 731 F.3d 952, 957 (9th Cir.

4    2013); (quoting Wal-Mart, 131 S. Ct. at 2551) (internal alteration omitted); Mazza v. Am.

5    Honda Motor Co., 666 F.3d 581, 588 (9th Cir. 2012).

6        "[T]he key inquiry is not whether the plaintiffs have raised common questions,

7    'even in droves,' but rather, whether class treatment will 'generate common answers apt

8    to drive the resolution of the litigation.'" Abdullah, 731 F.3d at 957 (citing Wal-Mart, 131

9    S. Ct. at 2551.). "This does not, however, mean that every question of law or fact must

10   be common to the class; all that Rule 23(a)(2) requires is "a single *significant* question of

11   law or fact." Abdullah, 731 F.3d at 957 (citing Mazza, 666 F.3d at 589) (emphasis in

12   original).

13                              c.    Typicality

14       The typicality requirement demands that the "claims or defenses of the

15   representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P.

16   23(a)(3). Under Rule 23(a)(3)'s permissive standard, "representative claims are typical if

17   they are reasonably co-extensive with those of absent class members; they need not be

18   substantially identical." Hanlon, 150 F.3d at 1020. Typicality is generally satisfied when

19   "each class member's claim arises from the same course of events, and each class

20   member makes similar legal arguments to prove the defendant's liability." Rodriguez v.

21   Hayes, 591 F.3d 1105, 1124 (9th Cir. 2010).

22       Furthermore "[t]he commonality and typicality requirements of Rule 23(a) tend to

23   merge." Wal-Mart Stores, Inc., 131 S. Ct. at 2551 n.5. The Supreme Court explained

24   how the elements overlap:

25           Both serve as guideposts for determining whether under the particular
             circumstances maintenance of a class action is economical and whether
26           the named plaintiff's claim and the class claims are so interrelated that the
             interests of the class members will be fairly and adequately protected in
27           their absence. Those requirements therefore also tend to merge with the
             adequacy-of-representation requirement, although the latter requirement
28           also raises concerns about the competency of class counsel and conflicts

                                           11

of interest.

Id. (citing General Telephone Co. of Southwest v. Falcon, 457 U.S. 147, 157-158, n.13 (1982)).

#### d.    Fair and Adequate Representation

Absentee class members must be adequately represented for judgment to be binding upon them. Hansberry v. Lee, 311 U.S. 32, 42-43 (1940). Accordingly, this requirement is satisfied if the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Here, Defendants do not challenge whether the class representatives adequately represent the interests of the class members.

### 2.    Rule 23(b)(3) Certification

If an action meets the prerequisites of Rule 23(a), the party seeking class certification must show the action is appropriate under Rule 23(b). Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 614 (1997). Plaintiffs propose certification under Rule 23(b)(3).

Class certification under Rule 23(b)(3) is an "adventuresome innovation," and allows for class certification in cases "in which class-action treatment is not clearly called for as it is in Rule 23(b)(1) and (b)(2) situations." Amchem Prods., 521 U.S. at 615. Thus, a class is maintainable under Rule 23(b)(3) where "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and where "a class action is superior to other available methods for fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem, 117 S. Ct. at 2249; Hanlon, 150 F.3d at 1022. Where the issues of a case "require the separate adjudication of each class member's individual claim or defense, a Rule 23(b)(3) action would be inappropriate." Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1189 (9th Cir. 2001).

///

12

1  ### 3.  Burden of Proof and Evidentiary Submissions

2  Parties seeking class certification bear the burden of demonstrating that each

3  element of Rule 23 is satisfied, and "must affirmatively demonstrate . . . compliance with

4  the Rule." Wal-Mart Stores, 131 S. Ct. at 2551; Doninger v. Pacific Northwest Bell, Inc.,

5  564 F.2d 1304, 1308 (9th Cir. 1977). The Court must conduct a "rigorous analysis,"

6  which may require it "to probe behind the pleadings before coming to rest on the

7  certification question." Wal-Mart Stores, 131 S. Ct. at 2551 (quoting Falcon, 457 U.S. at

8  160-61). The Court has an affirmative duty to consider the merits of an action "to the

9  extent that they overlap with class certification issues." Ellis, 657 F.3d at 981 ("a district

10 court must consider the merits if they overlap with the Rule 23(a) requirements") (citing

11 Wal-Mart Stores, 131 S. Ct. at 2551-52; Hanon, 976 F.2d at 509). As a result, the Court

12 may consider material evidence submitted by the parties to determine Rule 23

13 requirements are satisfied. Blackie v. Barrack, 524 F.2d 891, 901 (9th Cir. 1975).

14 ## IV.    EVIDENTIARY OBJECTIONS

15 While the Court may need to delve into the merits, the inquiry is solely for the

16 purpose of determining if certification is proper under Rule 23. Wal-Mart Stores, 131 S.

17 Ct. at 2552 n.6. Thus, while the Court shall discuss in detail below the parties

18 presentation of conflicting evidence, the analysis of the evidence is merely to determine

19 issues related to certification. The Court, in reviewing declarations submitted by the

20 parties, is not a position to finally determine the credibility of any given declarant or his or

21 her claim.  The Court's focus is on determining whether Plaintiffs have met the burden

22 established under Rule 23.

23 In this vein, each side has alleged bias, and hence incredibility, on the part of the

24 declarants providing declarations on behalf of the other side. For example, Plaintiffs

25 present declarations of farmworkers stating that they were required to meet with

26 investigators or attorneys working for Defendants, that they received money to sign

27 declarations, and that they signed inaccurate declarations out of fear doing otherwise

28 would upset their employers. (See Perero Decl., Exs. B-J.) On the other hand,

1   Employers assert that Plaintiffs used labor unions to influence the opinion of the

2   farmworkers. (Bangi Mot. for Decert. at 18, ECF No. 273-1.) The Court is not in a

3   position to ultimately determine the credibility of each of these witnesses' statements

4   based solely on examination of the anecdotal evidence presented and will not do so. (On

5   the other hand, the merits determination necessarily will involve some weighing of

6   conflicting claims and evidence. For example, Plaintiff's claim some field workers were

7   required to engage in uncompensated work.   Defendant's claim the workers were

8   prohibited from doing uncompensated work. The Court in the course of its merits

9   examination is going to have to make some overall evaluation as to which of these

10  claims is more likely true, and it will do so.)

11      Plaintiffs also filed objections to the declarations and evidence produced in

12  support of Defendants' motions for decertification. (See Objections, ECF No. 287-291.)

13  Since a motion to certify a class is a preliminary procedure, courts do not require strict

14  adherence to the Federal Rules of Civil Procedure or the Federal Rules of Evidence.

15  See Eisen v. Carlisle and Jacquelin, 417 U.S. 156, 178 (1974) (The class certification

16  procedure "is not accompanied by the traditional rules and procedures applicable to civil

17  trials."). At the class certification stage, "the court makes no findings of fact and

18  announces no ultimate conclusions on Plaintiffs' claims." Alonzo v. Maximus, Inc., 275

19  F.R.D. 513, 519 (CD. Cal. 2011) (quoting Mazza v. Am. Honda Motor Co., 254 F.R.D.

20  610, 616 (CD. Cal. 2008). Therefore, the Court may consider inadmissible evidence at

21  this stage. Keilholtz v. Lennox Hearth Prods, Inc., 268 F.R.D. 330, 337 n. 3 (N.D. Cal.

22  2010). "The court need not address the ultimate admissibility of the parties' proffered

23  exhibits, documents and testimony at this stage, and may consider them where

24  necessary for resolution of the [Motion for Class Certification]." Alonzo, 275 F.R.D. at

25  519; Waine-Golston v. Time Warner Entertainment-Advance/New House P'ship, 2012

26  U.S. Dist. LEXIS 179611, 2012 WL 6591610, at *9 (S.D. Cal. Dec. 18, 2012).  The Court

27  finds that the same evidentiary concerns apply to decertification motions. Accordingly,

28  the Court overrules Plaintiffs' evidentiary objections.  It shall review all the evidence

1   presented, whether admissible or not.

2   **V.   DEFENDANTS' CONTENTIONS REGARDING CLASS DECERTIFICATION**

3   Defendants present several arguments as to why the motions for decertification

4   should be granted. First, Defendants assert that Plaintiffs fail to meet the commonality

5   requirements as set forth in <u>Walmart</u>. Defendants contend that "[w]hile 'a common

6   nucleus of operative facts' may have been enough at the time of the Court's certification

7   order, <u>Wal-Mart</u> requires that there be common answers that will resolve issues common

8   to the class 'in one stroke.'" (Delano Farms Mot. To Decert., ECF No. 275 at 10.)

9   Second, Defendants argue that under <u>Walmart</u> and <u>Marlo v. United Parcel</u>

10   <u>Service, Inc.</u>, 639 F.3d 942, 944 (9th Cir. 2011), it is not permissible to allow Plaintiffs to

11   rely on representative testimony where there is no reliable means to extrapolate the

12   testimony to the entire class.

13   Based on these themes, Delano Farms alleges that in the absence of a policy or

14   practice affecting the class as a whole, Plaintiffs have not established commonality

15   under Rule 23(a). Furthermore, Delano Farms alleges that even where there is evidence

16   of violations, the violations "describe a wide variety of practices, from crew to crew and

17   within the same crews" and require individualized inquiries. For example, for pre-shift

18   work claims, Delano Farms asserts that even when there are violations, the amount of

19   time each member worked is based on the class members' anecdotal evidence.

20   Likewise for tool claims, Delano Farms asserts that variation exists because some

21   members were provided tools, others chose to purchase their own tools, and others

22   were provided no tools. (ECF No. 275 at 21-22.) Based on the same arguments,

23   Defendants also assert that questions affecting individual members predominate, making

24   certification inappropriate under Rule 23(b)(3).

25   Finally, Delano Farms asserts that the members of the class are not ascertainable

26   because not all employees suffered violations, and without improperly extrapolating from

27   samples of class members, it would not be possible to determine which employees

28   should be in the class. As an example, Delano Farms asserts that it would not be

1  possible to determine which employees worked early, and if the class included members

2  who did not work early, they would be unfairly compensated, while those who did work

3  early would be undercompensated. (ECF No. 275 at 23-25.)

4      Employers present similar arguments in support of decertification. Specifically,

5  Employers assert that Plaintiffs cannot establish commonality because of variations in

6  each of the subclasses regarding whether any violation occurred and the severity of the

7  violations, if any. Employers focus on the variations in violations between worker crews

8  supervised by different foreman.

9  **VI.    PLAINTIFFS' CONTENTIONS REGARDING CLASS DECERTIFICATION**

10     Plaintiffs argue that Defendants have used the present motions for class

11 decertification to present substantially the same evidence and re-argue the issues raised

12 in certifying the class. Plaintiffs contend that new case-law, including Wal-Mart, does not

13 undermine the original finding granting certification.

14 **VII.   ANALYSIS**

15     **A.    RULE  23(a) REQUIREMENTS**

16         **1.    Numerosity**

17             a.    The Court's Previous Findings

18     In certifying the class, the Court previously found the following:

19     Here, plaintiffs allege that the total number of potential members is near
20     14,000 persons. The Employers do not dispute numerosity. Therefore, the
       requirement of numerosity has been met.

21 Arrendondo v. Delano Farms Co., 2011 U.S. Dist. LEXIS 44134 at *18.

22         b.    Current Findings

23     The Court previously found that Plaintiffs had alleged there were nearly 14,000

24 potential class members. As Employers did not dispute numerosity, the Court found the

25 requirement was met. Arrendondo, 2011 U.S. Dist. LEXIS 44134 at *18. Again

26 Employers do not challenge the numerosity requirement in the instant motions for

27 decertification. If anything, Employers allege that the class might consist of nearly ten

28 thousand more employees than previously alleged by Plaintiff. (See T&R Bangi Opp'n at

1  24 [claiming that 23,766 crew members worked at Delano Farms]; see also Ward Decl.

2  at ¶ 29 ["The class, as I understand it, may consist of approximately 23,756

3  individuals."].)

4       There is no reason to question the Court's prior holding. The Court again finds

5  that the numerosity requirement is met.

6          2.   **Commonality**

7             a.   The Court's Previous Findings

8      (A) Summary of Evidence in Support of and Contrary to Commonality

9       Here, plaintiffs present three kinds of evidence in support of
10  commonality: (a) anecdotal evidence from class members as to their
   experience with wage and hour violations, (b) statistical evidence from
11  expert Kenneth Creal, and (3) evidence disputing that defendants have
   company wide policies against wage and hour violations. Defendants
12  present two kinds of contrary evidence: (a) anecdotal evidence from
   current employees, supervisors and foremen, who testify as to the
13  absence of wage and hour violations, and (b) company wide polices
   against wage and hour violations. Defendants challenge whether plaintiffs
14  have shown "commonality." Defendants offer purported "contradictory"
   evidence that there is no class wide policy of failure to pay wages,
15  reporting time pay, failure to provide meal and rest breaks, and failure to
   reimburse expenses.

16       Here, each party has presented substantial evidence in support of
   their positions. In support of this motion to certify the class, plaintiffs
17  submit sixty-three (63) declarations and deposition testimony from
   proposed class members who worked in 28 different crews for the
18  Employers. (See Doc. 75-3.) Each of plaintiffs' submitted declarations
   provides the following kinds of testimony: statement of the year/seasons
19  that the employee worked for Employers; how many days per week
   he/she worked; payment scale; equipment purchased, if any; whether the
20  employee was required to report to work before the start time; what
   activities the employee engaged in before or after start time; and
21  estimates of the time the employee worked off-the-clock. (See e.g.,
   Doc.75-4, Rima Arceo Decl. Exh.11; Magdaleno Castaneda Decl. Exh. 18;
22  Mario Marelos Decl. Exh. 49.) Each of plaintiffs' declarants states that they
   were required to work before official start-time and after official end-time.
23  (The amount of time fluctuated generally between 15-30 minutes before
   and after official start time.) For instance, Rodolfo Gomez testifies that
24  during pre-harvest and harvest, "I was required to arrive at the jobsite
   approximately 15 before the official start time." (Doc. 75-7, Rodolfo Gomez
25  Decl. ¶6-5; Exh. 34.) Each declarant further states that the declarant
   purchased tools to do the work because if the Employers tools were
26  provided, the tools were so inferior the work could not be performed. For
   instance, Estela Izazaga testifies that "I was required to provide my own
27  tools and equipment that I needed for my job. The tools and equipment
   that I was required  [*24] to take to my job were picking shears that cost
28  me $10.00 and a holster that cost me $7.00." (See e.g., Doc.75-4, Estala

Izazaga Decl. ¶5, Exh. 43.)

Employers also present some 89 declarants who testify the opposite of plaintiffs' declarants; that they were not subject to wage and hour violations. (Doc. 76.) Each declarant states: the declarant is a current employee; that he/she is required to attend "escuelita," but is paid for that time; he/she is never required to perform work off-the-clock; he/she is never permitted to do work before the beginning of the shift or after the shift ends; he/she is never required to work at home; he/she is provided all the tools needed to do the job and the tools are adequate; and he/she is provided with all meals and rest periods. For instance, Jose Bermudes testifies that he is "never required to do work after my shift has ended," and is "never required to do work at home." (Doc. 76-1, Jose Bermudes Decl. ¶4, 5, Exh.12.) Marta Lucio states that "I am required to attend 'escuelita' almost every morning at the beginning of my shift . . . It is always held while employees are on the clock and I am always paid the time I spend in school." (Doc. 76-3, Marta Lucio Decl. ¶2, Exh. 50.) The declarations state that there have been no violations.

(B) Conflicting Evidence Warrants Denial of Certification

Generally, this kind of conflicting evidentiary support may preclude certification. For instance, in Garcia v. Sun Pacific Farming Coop., 2008 U.S. Dist. LEXIS 111969, 2008 WL 2073979 (E.D.Cal., May 14, 2008) (O'Neill, J.), aff'd, 359 Fed.Appx. 724, 2009 WL 4912213 (9th Cir. Nov. 13, 2009), this Court held that conflicting and contrary evidence submitted by each side did not establish a common wage and hour practice. Like this case, Garcia was a AWPA case in which plaintiffs challenged employment practices of working off-the-clock, failure to permit meal and rest periods and failure to reimburse for tool expenses. Plaintiffs presented 7 employee declarations in which they claimed the employment policies had been violated as to them. In opposition to class certification, defendants presented 33 declarations of employees who testified that the employees did not work off-the-clock, were paid minium wage, received meal and rest periods and were provided with necessary tools and equipment. 2008 U.S. Dist. LEXIS 111969, 2008 WL 2073979 at *3-4. This Court held that due to the conflicting anecdotal evidence disputing whether common policies existed, there was inconsistent application of the wage and hour laws among the employees. "The evidence before this Court demonstrates significant differences between the crews and individuals and no commonality. Plaintiff is therefore unable to demonstrate commonality." 2008 U.S. Dist. LEXIS 111969, 2008 WL 2073979 *11.

Similarly, in Washington v. Joe's Crab Shack, 271 F.R.D. 629 (N.D.Cal. 2010), the court denied class certification based upon conflicting anecdotal evidence of discriminatory practices. In Joe's Crab Shack, plaintiff conceded that defendant's written policies required payment of overtime, meal and rest breaks, and prohibited "off the clock" work, but claimed that those written policies were simply "ignored." Plaintiff introduced anecdotal evidence by his own declaration and declarations of six other employees. This evidence was contradicted by evidence presented by defendant. Washington v. Joe's Crab Shack, 271 F.R.D. at 637. The court, nonetheless, found that this anecdotal evidence was sufficient for "common issues to satisfy the requirement of Rule 23(a)(3)." The Court, however, found that the evidence was not "typical of the claims and defenses of the class." "The test of typicality is whether other

18

members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." Joe's Crab Shack, 271 F.R.D. at 629. The Court stated that the claims were not co extensive of the claims of proposed class members who submitted class members who said they had not worked off-the-clock or where denied breaks and overtime.

(C) The Evidence is Not Conflicting

The evidence submitted in this case is different from that submitted in Garcia or Joe's Crab Shack. Plaintiffs note that none of defendants' declarants specifies any time period for which the testimony is applicable. From the Court's review of the defendants' declarations, the Court notes the absence of any time period of the declarant's employment or the time period for which their testimony applies. Each declarant states, "I am currently an employee of T&R Bangi's Agricultural Services." (See Doc. 76, declarations Exh. 1-89.) Each declarant is a current employee, but gives no evidence of the duration of their employment or the time period for which the testimony applies. The implication is that because the declarants are current employees, and the declarants' declarations are worded in the present tense, the testimony applies for the current employment practices. (See Doc.71-1, Exh.1 ("During the school, the foreman gives us directions and talks about safety."); Exh. 17 ("As an employee of T&R Bangi, I attend "escuelita" every morning at the beginning of my shift."); Exh. 77 ("If I arrive at the job site early, I am not required to being work.")). The declarants do not provide sufficient evidence of labor practices during any period other than the current time period.

In their sur-reply, defendants argue absence of a time period in the declarations is irrelevant because "never means never." Defendants argue that certain of their declarations state that employees are "never" required to work off-the-clock, or that the employee is "never" required to take trays home. (Doc. 81, Defendants' Sur-reply, p.3.) Defendants argue that if an employee worked for 10 years for defendants, and the declaration says the employee "never" worked off-the-clock, that statement applies for the 10 year employment history. (Doc. 81, Defendants' Sur-reply, p.4.) Defendants submit additional declarations in connection with their sur-reply which state that "never" means the declarants' entire employment history. (Doc. 81, Defendants' Sur-reply, p.4.)

The difficulty with the court's accepting fully defendants' argument that "never means never" is that the declarations do not state a time period of employment. For instance, declarant Felipe Alvarez states "I am currently an employee of T&R Bangi's." (Doc. 76-1, Alvarez Decl., Exh. 5.) Nowhere in the declaration is the time period of employment referenced. All of the other declarants similarly state they are current employees, but without specifying a time period of employment. (See Doc. 76-1 through 76-4, Exh. 69 ("I am a current employee ...").) A few sur-reply declarations include employment dates, but these are only a minor number of declarants and are mostly supervisory position declarants. (Doc.81-2 and 81-3, declarations.) The Court, therefore, cannot make the evidentiary leap that a current employee has been an employee for any specific period of time.

19

Plaintiffs have presented evidence explaining why current labor practices are different from former labor practices. The labor practices changed in 2010. In their response to defendants' sur-reply, plaintiffs stand by that position - the policies changed in 2010.**[FN4]** Plaintiffs present evidence that in 2010, Employers changed the practice from requiring pre-shift and post-shift work, to prohibiting pre-shift and post-shift work. (See Doc. 77, Reply p.6 n.9) Plaintiffs present evidence that in 2010, Employers changed the practice of requiring work be taken home (to clean trays), to prohibiting work being taken home. (See Doc. 77, Reply, p. 6 n.11 (citing to defendants' declarants which state, "I use to take my trays home to wash.").) Plaintiffs present evidence that in 2010, Employers changed the practice of not providing quality tools for the work. **[FN5]** Thus, plaintiff has explained or offered a reasonable explanation of why, what appears to be conflicting declarant testimony, is not conflicting at all.

**[FN4]** Plaintiffs point to testimony of Craig Neville, Administrative Assistant, who testifies as to the placement of clocks in the fields in 2010. Plaintiffs argue that this evidence shows that time was not adequately being tracked before the clocks were placed in the fields. Mr. Neville states, "In 2010, I decided to place a clock at some crew sites to see if it would help employees with keeping track of time. I introduced these clock as an additional aide to help the crew all take [ ] their breaks at the same time and so that there would be no question about how long their break was or how much time had passed." (Doc. 81-1, Decl. Neville ¶11.) The Court considers this evidence as corroborating evidence that some alteration of policies may have occurred in 2010 such that time keeping policies were not as stringently followed, as is plaintiffs' position.

**[FN5]** This change in practice is partially corroborated by the invoices submitted by Employers of the purchase of over two-thousand tools in 2009, while in prior years, minimal numbers of tools were purchased, or at least the documentary support is not available. (Doc. 76, Bangi Decl. Exh. A (Invoices); Doc. 77-2, Alarcon Decl. (Analyzing Bangi Invoices to show the number of tools purchased in years 2005-2009).) Employers argue that they did not retain invoices from prior years, but this argument carries little weight. Even if the actual invoices were not retained, for business or tax purposes, some documentary corroborating evidence of purchases should be available.

In their sur-reply, defendants argue that the current policies always have been in effect. The policies did not change in 2010. In their sur-reply, defendants present declarations from 28 declarants who say that the policies applied throughout the entirety of their employment. These declarations give a beginning and ending year of employment. (See e.g., Doc.81-2, Alvarez Decl., Exh. 1 (stating term of employment); Castro Decl. Exh. 7 (stating term of employment).) Defendants argue that these 28 employees signed supplemental declarations in which the declarants clarify that their statements applied to the entire employment with Employers — they "never" had to work pre- or post-shift and they "always" were provided with tools. (See Doc. 81, Sur-reply p.4.)

In the response to the sur-reply, plaintiffs parse out the inconsistencies in the sur-reply declarations. Plaintiff note that only 26 of the 28 reference whether they are "required" to work off-the-clock, but are entirely silent on whether the defendants, nonetheless, "permitted" members of the class to perform pre- or post-shift work. (Doc. 83, Plaintiff's Response p.8.) Plaintiffs note that defendants cite to only 10 of the 28 declarations for defendants' proposition that employees are "never required to work off-the-clock." Plaintiffs note that whether the declarants were "required" to work off-the-clock is inadequate to address whether the "workers are owed wages for time they were suffered or permitted to work, whether or not required to do so." (Doc. 83, Plaintiff's Response p. 9.)

The Court agrees with plaintiffs' reply and response to the sur-reply, that plaintiffs evidence is a more accurate representation of past labor practices. Defendants' declarants represent only about 9 different crews, and arguably, mostly for the current labor practices. (See Doc. 77, Reply p.6.) Plaintiffs present declarants spanning 28 different crews. As plaintiffs' reply and response note, and from the court's review of the numerous declarations, over 30 of defendants' declarants fail to identify any crew for which they are employed. Moreover, some of defendants' declarants suggest activity which may encompass past violations of wage and hour laws. For instance, some of defendants' declarations state that the declarants worked pre-shift without pay. (See e.g., Alfredo Aguilar Decl. Exh. 1, ("The harvest season is the only time pre-shift work can be done."); Doc. 76-2, Ortencia Diaz ("I use to begin my work early, but now if I arrive at the job site early, I do not.").) Some of defendants' declarations state that the declarants use to take trays home to clean. (Esperanza Alvarez Decl. "A few years ago I use to take my trays home to clean them.").) The presence of possible past violations, as acknowledged by some of defendants' declarants demonstrate that the "stringent policies" adopted by defendants may not have been followed as defendants attest. Thus, the evidence plaintiffs present appears to be a more accurate representation of past practices, and defendants' declarants do not.**[FN6]**

> **[FN6]** Terry Bangi, President of T&R Bangi, testifies that "We do not allow workers to being work early, to work during their breaks, or to stay late to work. If the foremen see workers doing this, they are supposed to tell them to stop," and that "Workers are not required to clean picking trays at home." (Doc. 76-7, Bangi Decl. ¶19, 27.) These statements are contradicted by defendants' own evidence and evidence presented by plaintiffs.

Here, plaintiffs seek to certify a class for the time period from 3 or 4 years from the filing of the complaint. The complaint was filed on July 17, 2009. Plaintiffs have presented evidence to the court for past potential violations of wage and labor laws. Defendants evidence is varying and contradictory and indicates that some violations existed as to past practices. Thus, any contradictory evidence between plaintiffs' evidence and defendants' evidence does not show lack of commonality. The common question is whether the wages are owed for off-the-clock work performed, whether a policy permitted uncompensated, even if not "required," off-the-clock work. This is a sufficient common question to justify certification.

(D) Written Policies of Defendants

Employers argue that they have written policies which demonstrate that Employers are adhering to the law. Employers argue that they have the "Tool Agreement"[FN7] and the "Right/Exceptions"[FN8] policies which are located in the main office and at every crew location. In their sur-reply, defendants present the testimony of Marife Villar the Safety Manager for T&R Bangi. Ms. Villar's job is to ensure that foremen are given copies of the company policies and that foreman have the crews sign acknowledgment forms. She keep a log where she notes that policies are properly posted.[FN9] Plaintiffs dispute that posting of the policies and also note that had employees signed acknowledgments of these policies, defendant would have and should have provided them as evidentiary support.

[FN7] The Tool Agreement states, "This agreement states you are aware that we have provided you with the tools you need to [do] the job you have been hire [sic] to do. It also informs you that you do not have to use the tool we gave you. You may use your own. Your signature on the last page of this packet confirms that you understand this agreement and that you have made the choice to use our tools or your own." (Doc. 76-6, Neville Decl. Exh. 1.)

[FN8] This policy states in pertinent part:1. Be on time to work, and well rested (8 hours of sleep). 3. Follow your Foreman's instructions. 9. Work at a reasonable rate to get the job done (Keep up with other employees.) 15. Employees are not required to take picking trays home to be cleaned. 17. If you do not have clippers for work, we will provide them for you. 24. Review the binder that has all Federal, state, and company laws, policies and your right to as a [sic] work. The binders are located at each crew's toilet. 26 You will have 2-10 minutes breaks and a 30 minute lunch during an 8 hour day. (Doc. 76-6, Neville Decl. Exh. 2.)

[FN9] Plaintiffs object to this new evidence by Ms. Villor submitted for the first time in the defendants' sur-reply. (See Doc. 83-2, Objections.)

Here, defendants present evidence that they maintain written policies which are contrary to the policies plaintiff allege exist in the field. (See generally Bangi Decl.; Neville Decl.) Defendants maintain policies against working "off-the-clock" and for reimbursement for tool expense. Defendants present evidence that the foreman are trained on these policies and are instructed that no off-the-clock work is permitted.

The Court, however, agrees with plaintiffs that these two policies do not conflict necessarily with plaintiffs' position. Plaintiffs' position is that tools were not provided, or if provided, the tools were inadequate. To do the job for which they were paid, employees purchased their own tools and were not reimbursed.[FN10] The evidence submitted by both sides is supportive of violations of the off-the-clock work policy and the tool policy. As shown above, declarants for both plaintiffs and defendants have stated they have worked off-the-clock and have bought their own tools because the Employer either did not provide tools or the tools were inadequate.

22

1    Thus, there is sufficient evidence that the policies were not followed. The
     presence of what appears to be wholesale workers purchasing tools to
2    perform necessary work is a common question.

3        **[FN10]** Defendants argue individualized inquiries will have to
         be made as to who purchased which tools. They argue that
4        the "adequacy" of the tools is not a violation of the law and
         there is no proof that any of the employees who purchased
5        tools asked to be reimbursed. However, at this point in the
         litigation, the common purchase of tools to perform the
6        necessary work for Employers is a common issue.

7        Further, the evidence does not persuade that the policies were
     given to the employees. Plaintiffs offer evidence that the policies were not
8    provided. For instance, Sabas Arredondo testified that he was not given a
     handbook and when he was asked to sign documents, the documents
9    were typically in English, which he does not read. He was told to just sign.
     (See, e.g., Arredondo Depo. 17:7-17, 20:17-22:15; R. Landeros Depo. p.
10   29:12-32.) The evidence presented by defendants does not include any
     signed receipts of written policies. This Court, in conducting its "rigorous
11   analysis" considers the evidence presented and mentioned in testimony
     and actual and potential corroborating evidence. Even if plaintiffs' theory is
12   ultimately unsuccessful, application of the written policy language in the
     work environment presents a question common to the class.

13   (E) Expert Opinion

14       In addition to the anecdotal evidence plaintiffs present, they also
     offer the declaration of Mr. Kenneth L. Creal, a Certified Public
15   Accountant. He has been an CPA since 1978 and has been retained as
     an expert for plaintiffs. Mr. Creal offers testimony which summarizes the
16   63 different declarations of putative class members who provided
     declarations by plaintiff. He notes that the 63 class members have worked
17   for 28 different foremen during the remedial period. (Doc. 75-2, Creal
     Decl. ¶6.) He then summarizes their testimony as to their complaints for
18   working off-the-clock, and buying tools. Mr. Creal provides as "statistical
     analysis" of the percentage of declarants who make certain claims. For
19   instance, Mr. Creal states that 98% of the declarants make a statement
     that they worked prior to the recorded starts time of their shift and where
20   not paid. (Doc. 75-2, Creal Decl. ¶8.) Mr. Creal offers a table which
     summarizes the statements of violations and assigns a percentage to
21   each statement. He also offers an opinion as to the appropriateness of the
     time keeping methods. For instance, he reviewed daily time sheets and
22   notes that (1) foremen would only write a one time entry across the page
     noting that each employee was credited to have started and ended at the
23   exact same time, (2) foremen would fail to list time started or stopped, (3)
     foremen would not make note of times "in" and times "out," and (4)
24   foremen would not make any time entries. (Doc. 75-2, Creal Decl. ¶17-21.)
     Mr. Creal offers an opinion that the time-keeping methods do not comply
25   with requirements the California Wage Orders. (Doc. 75-2, Creal Decl.
     ¶22.)

26
         Defendants object to Mr. Creal's testimony on numerous bases.
27   Defendants object that Mr. Creal is a CPA, not an expert on labor
     practices and cannot offer opinions on wage and hour laws and violations.
28   They also object that the statistics provided by Mr. Creal statistically are

insignificant because the declarants studied do not encompass the other 89 declarations provided by defendants in opposition to the motion. (See Doc. 76-76, Objection p.1.) In those declarations, defendants stated that the employees did not work off-the-clock without pay and were not required to provide their own tools. Defendants object because their declarants offer testimony that no violations of wage and hour laws occurred. Defendants object that various statements offer legal conclusions, are improper assumptions and lack foundation, among other objections. It is well established that plaintiffs may demonstrate commonality by presenting statistical evidence, which survives a "rigorous analysis," sufficient to raise a common question concerning whether there is class-wide discrimination. See General Telephone Co. of Southwest v. Falcon, 457 U.S. 147, 159 n. 15, 161, 102 S.Ct. 2364, 72 L. Ed. 2d 740 (1982).

At this stage in the litigation, "robust gatekeeping of expert evidence is not required; rather, the court should ask only if expert evidence is 'useful in evaluating whether class certification requirements have been met.' " Ellis v. Costco Wholesale Corp., 240 F.R.D. 627, 635 (N.D.Cal.2007). In Ellis v. Costco, plaintiffs allege that Costco's promotion system has a disparate impact on female employees, that Costco's management discriminates against women in promotions. The plaintiffs offered an expert in statistical analyses as to potential gender discrimination. The expert provided a statistical benchmarking analyses comparing defendants' gender management positions to other retailers and also a regression analysis based upon a feeder pool of qualified female candidates. The court found that the expert declaration, while contradicted by defendant's experts, was "strong enough to establish commonality."

Here, unlike the experts in Ellis v. Costco, Mr. Creal offers a statistical evaluation solely of the declarations submitted by plaintiffs. He does not consider market or other information in assigning the statistical probability of certain conduct. Further, he does not consider the declarations submitted by defendants in which each declarant said that no violations of wage and hour law were imposed upon them. He extrapolates statistically based upon a limited pool of information, but offers no foundation as to why such extrapolation would be warranted. This information is not assistive of the issue of commonality. Further, the Court does not reach the issue of whether Mr. Creal is qualified to opine on issues of labor practices and labor violations.

Arrendondo, 2011 U.S. Dist. LEXIS 44134, at *18-43.

b.     Review of Case Law Presented by Defendants

Clearly, the Wal-Mart decision is a primary impetus and basis for Defendants' motions for decertification.   Defendants assert that significant variation in treatment of class members prevents Plaintiffs from showing that the entire class was subject to the same employment practices. Based on the alleged variations, Defendants claim that Plaintiffs fail to meet the commonality requirement which "requires that the class

1  members' claims depend upon a common contention such that determination of its truth

2  or falsity will resolve an issue that is central to the validity of each claim in one stroke."

3  Abdullah v. U.S. Sec. Assocs., 731 F.3d 952, 957 (9th Cir. 2013).

4      Delano Farms contends that Plaintiffs' argument is the same as that made by the

5  plaintiffs, and rejected by the Supreme Court, in Wal-Mart: "that a class can be certified

6  to adjudicate the failure of Defendant's policies to prevent what they allege were

7  widespread unlawful practices." (Delano Farms Reply at 4 (internal citation omitted).)

8  Due to variations of employment practices, Defendant alleges that it is impossible to

9  establish answers regarding pre-shift work "in one  stroke." (Id.)

10      Defendants also rely upon Wang v. Chinese Daily News, a case in which the

11  Supreme Court and Ninth Circuit remanded a class action wage and hour violations

12  claim to the district court to determine commonality under Rule 23(a)(2) in light of Wal-

13  Mart. 737 F.3d 538, 2013 U.S. App. LEXIS 18245 *11 (9th Cir. 2013). In discussing the

14  commonality standard, the Wang court reiterated that "[i]f there is no evidence that the

15  entire class was subject to the same allegedly discriminatory practice, there is no

16  question common to the class." Id. at *11 (citing Ellis v. Costco Wholesale Corp., 657

17  F.3d 970, 983 (9th Cir. 2011)). Here, the question is not discrimination, but whether the

18  entire class was subject to the same allegedly unlawful wage and hour practice.

19      Plaintiffs argue that Wal-Mart does not control certification in this matter because

20  Wal-Mart applied to a class several magnitudes greater (1.5 million employees working

21  in several thousand stores) and that it involved a gender discrimination case, rather than

22  wage and hour violations. (See Opp'n at 21-22.) However, neither Wal-Mart nor Ellis

23  gave any indication that their decisions were based on the fact that the substantive

24  claims involved employment discrimination. On the contrary, both cases plainly

25  emphasized the obligation of the trial court to conduct a "rigorous analysis" to insure that

26  Rule 23's commonality requirement was met. This principle applies in all cases, not just

27  discrimination cases. As the Supreme Court remanded Wang, a wage and hour case

28  brought under the Fair Labor Standards Act and the California Labor Code, for further

1   consideration in light of Wal-Mart, it is clear that Wal-Mart applies to wage and hour

2   cases just as it would apply to any other class action lawsuit. Chinese Daily News, Inc. v.

3   Wang, 132 S. Ct. 74, 181 L. Ed. 2d 1, 2011 WL 1237957 (2011); see also York v.

4   Starbucks Corp., 2011 WL 8199987, 2011 U.S. Dist. LEXIS 155682, 68-69 (C.D. Cal.

5   Nov. 23, 2011). However, beyond ordering the case remanded, neither the Supreme

6   Court nor the Ninth Circuit provides guidance regarding how wage and hour violations

7   should be analyzed under the Wal-Mart standard.

8        The Court here concludes that while Wal-Mart applies, portions of the decision

9   were specific to the discrimination claim and may not be applicable to other claims. For

10   example, the Supreme Court explained:

11        Quite obviously, the mere claim by employees of the same company that
          they have suffered a Title VII injury, or even a disparate-impact Title VII
12        injury, gives no cause to believe that all their claims can productively be
          litigated at once. Their claims must depend upon a common contention--
13        for example, the assertion of discriminatory bias on the part of the same
          supervisor.
14

15        ...

16        in resolving an individual's Title VII claim, the crux of the inquiry is "the
          reason for a particular employment decision," Cooper v. Federal Reserve
17        Bank of Richmond, 467 U.S. 867, 876, 104 S. Ct. 2794, 81 L. Ed. 2d 718
          (1984). Here respondents wish to sue about literally millions of
18        employment decisions at once. Without some glue holding the alleged
          reasons for all those decisions together, it will be impossible to say that
19        examination of all the class members' claims for relief will produce a
          common answer to the crucial question why was I disfavored.

20   Wal-Mart Stores, Inc., 131 S. Ct. 2541 at 2551-52 (emphasis in original). This Court is

21   bound to apply "rigorous analysis" and ensure that the common contention can be

22   determined in one stroke as prescribed by the Supreme Court in Wal-Mart. However,

23   issues relating to Title VII discrimination claims (such as the reason for making

24   employment decisions, establishing the existence of discriminatory policies, or relying on

25   the discretion of lower level supervisors) may not be relevant to Plaintiffs' claims.

26        Defendants, in attempting to argue that there is not a common question that

27   affects the class as a whole, compare the instant case to several other wage and hour

28   class action decisions in which certification was denied or the class was decertified. See

1    Cole v. CRST, Inc., 2012 U.S. Dist. LEXIS 144944, 2012 WL 4479237 (C.D. Cal. Sept.

2    27, 2012), Ordonez v. Radio Shack, Inc., 2013 U.S. Dist. LEXIS 7868, 2013 WL 210223

3    (C.D. Cal. Jan. 17, 2013); Cortez v. Best Buy Stores, LP, 2012 U.S. Dist. LEXIS 15190,

4    2012 WL 255345 (C.D. Cal. Jan. 25, 2012); Boelk v. AT&T Teleholdings, Inc., 2013 U.S.

5    Dist. LEXIS 20606, 2013 WL 261265 (W.D. Wis. Jan. 10, 2013); Bolden v. Walsh Const.

6    Co., 688 F.3d 893, 896–98 (7th Cir. 2012); York v. Starbucks Corp., 2011 WL 8199987,

7    at *27 (C.D. Cal. Nov. 23, 2011); Rosales v. El Rancho Farms, 2012 U.S. Dist. LEXIS

8    11069, 2012 WL 292977 (E.D. Cal. Jan. 31, 2012); and Rojas v. Marko Zaninovich, Inc.,

9    2012 U.S. Dist. LEXIS 51787, 2012 WL 1232273 (E.D. Cal. April 12, 2012).

10          Before reviewing the issues presented in these cases, the Court notes, and

11   emphasizes, that certification is a highly fact-specific inquiry.  Even if similar claims are

12   presented in different cases, the outcome of each will hinge on the evidence of a

13   common unlawful practice presented by the Plaintiffs in the particular case at issue.

14          Defendants assert that the claims here are akin to those in Cole v. CRST, Inc. in

15   which a class of truck drivers was decertified because there was no proof of a general

16   policy that defendant failed to pay minimum wage to drivers. 2012 U.S. Dist. LEXIS

17   144944, 22 (C.D. Cal. Sept. 27, 2012). The drivers were paid by the mile, and plaintiffs

18   could not show that the payment policy was unlawful. Additionally, individual

19   determinations of each driver's compensation were required just to determine if there

20   was a viable liability claim.  In the instant case the mere fact that a worker performed

21   uncompensated work and the employer knew or should have known of it affords a basis

22   for liability. Here, the analysis of potential liability involves much simpler common factual

23   questions than in Cole.

24          In Ordonez v. Radio Shack, Inc., the plaintiffs alleged that to control overtime

25   costs, store managers were forced to pressure sales associates to work off-the-clock

26   when making bank deposits or picking up and dropping off sales merchandise at other

27   stores. 2013 U.S. Dist. LEXIS 7868. The Court found that the off-the-clock subclass

28   lacked commonality as the violations, if any, were "a product of the vagaries of the store

1    an employee worked in, the time of year, or the manager who was in charge." Id.

2    Further, the court relied on the fact that defendant maintained a lawful policy prohibiting

3    off-the-clock work and that it paid more than 57,000 hours of over-time during the

4    proposed class period. Id. While violations may have occurred, the court's holding was

5    premised on plaintiff's failure to present sufficient evidence that violations were based on

6    a common policy. In the present case, there is evidence of common violations within the

7    specific subclasses. Further, unlike Ordonez, Defendants have not provided evidence

8    that Plaintiffs were given additional pay for extra time worked.

9        In Cortez v. Best Buy Stores, LP, the court held that for class treatment to be

10   appropriate, plaintiffs would either have to show that oral requests to employees to

11   perform uncompensated work were standardized or that some common method of proof

12   could establish that such conduct occurred. 2012 U.S. Dist. LEXIS 15190. Plaintiffs

13   alleged that computer records could provide common proof of editing to cover up

14   uncompensated work.  The Court rejected that argument because it concluded that edits

15   to time records could just as easily have been to correct errors and make them accurate.

16   Id.  Those facts and that conclusion offer us no guidance here.

17       Commonality was lacking in Boelk v. AT&T Teleholdings, Inc. There the evidence

18   showed that multiple varying  circumstances determined whether meal break restrictions

19   foreclosed a technician's use of his break for his own purposes and that the "differences

20   between the technicians' experiences and supervisor discretion make it impossible to

21   generate common answers on a class wide basis." 2013 U.S. Dist. LEXIS 20606 (W.D.

22   Wis. Jan. 10, 2013). The court noted that the relevant question was "whether the meal

23   break restrictions resulted in field technicians' engaging in activities that predominantly

24   benefited defendants during their meal breaks." Boelk, 2013 U.S. Dist. LEXIS 20606, at

25   *25. That inquiry required examination of the particular action engaged in by each

26   plaintiff during the meal break to see if those acts primarily benefited defendants. The

27   inquiry here is much simpler and narrower, namely whether uncompensated work was

28   performed or tool purchases went unreimbursed. The same distinction may be made

between the instant case and <u>Bolden v. Walsh Const. Co.</u> which presented Title VII racial discrimination claims applicable only to certain supervisors and not others. 88 F.3d 893.

In <u>York v. Starbucks Corp.</u>, another fact-specific case, the court held in light of the "strongly worded policy that employees and managers would be disciplined and even terminated for off-the-clock work, that plaintiffs were required to present evidence of a "systematic corporate-wide practice of forcing employees to work off-the-clock to meet Rule 23's 'commonality' requirement." 2011 U.S. Dist. LEXIS 155682, *86-88. The court found that the factual record did not support such a finding. <u>Id.</u> Plaintiff could not explain why off-the-clock time was not recorded in time logs and she did not show that her managers had any knowledge that she was working off the clock. <u>Id.</u>

Defendants also rely on certification denial decisions from this district involving similar fieldworker claims. In <u>Rosales v. El Rancho Farms</u>, the court found that the evidence of pre-shift work revealed contradictory claims.  Significantly, three times as many declarants stated they were not required to work off the clock as those that said they did. 2012 U.S. Dist. LEXIS 11069, 2012 WL 292977. Of further note, in the findings and recommendation in both <u>Rosales v. El Rancho Farms</u> and <u>Rojas v. Marko Zaninovich, Inc.</u>, the judge compared and contrasted the anecdotal evidence with the evidence presented in this case. 2012 U.S. Dist. LEXIS 16043. The court held that unlike the present tense declarations Defendants originally presented here, defendants' declarations in <u>Rosales</u> and <u>Rojas</u> applied to the entire period at issue and were of such credibility as to create an evidentiary conflict sufficient to defeat commonality. <u>Rosales</u>, 2011 U.S. Dist. LEXIS 142779 at *75-76. Moreover, in <u>Rojas</u>, the court concluded that "whether some employees were required to perform pre-shift work is not a proper question where the class is comprised of all harvest employees." 2012 U.S. Dist. LEXIS 16043, *84-86. The subclasses in this case only apply to employees who performed uncompensated work or were not compensated for tool purchases, not all employees.

Review of decisions in these and other similar cases is almost always

1   enlightening, and it has been here. However, the most enlightened conclusion to which it

2   leads us is that this Court must apply the rigorous commonality test set forth in <u>Wal-Mart</u>

3   to the unique facts set forth by the parties.

4                                      c.      <u>Evaluation</u>

5                                      (1)     *Pre-shift Work*

6                                      (a)     Review of Evidence

7          The parties presented extensive evidence in the form of declarations of

8   employees and otherwise in support of and in opposition to the motion for certification.

9   The Court discussed the evidence at length in granting certification. As required, the

10  Court shall look at all the evidence, both old and new, in determining if the pre-shift work

11  subclass should now be decertified.

12         In support of the motions for decertification, Defendants have presented thirty

13  nine (39) new declarations of workers and foremen. (<u>See</u> Bigelow Decl. at ¶ 4, Ex.

14  OOO.[5]) Defendants also provide a wide array of evidence and argument in the form of

15  declarations of counsel, supervisory employees of Defendants, and expert witnesses.

16  Plaintiffs, in opposition, present nine declarations of workers who previously provided

17  declarations for Defendants. (Perero Decl., ECF No. 286-1.)

18         Employers provide a declaration of Michael Johnson in which he provides both

19  new and old declarations in support of decertification. (Johnson Decl., ECF No. 205-3.)

20  First, Employers include declarations from ten employees to attempt to show that

21  Employers' original declarations, although drafted in the present tense, applied to the

22  entire period that the declarant worked at Delano Farms. With their reply to the motion

23  for certification, Employers then provided ten supplemental declarations setting out the

24  dates when the declarants worked and stating that the original declarations applied to

25  their entire period of employment. (<u>See</u> Johnson Decl at ¶¶ 2-24.) In an attempt to

26  explain why supplemental declarations were not provided for all of the original

27  _____

        [5] The Court relies on the numbers of declarations as described in Ex. OOO. The Court has

28  extensively reviewed the substantive contents of the declarations.

1   declarants, Employers explain that they could not communicate with them (the other 77

2   declarants) once the class was certified and the declarants became represented by

3   counsel in the action. (See Id. at ¶ 25. ["we contacted as many declarants as we could

4   with the time we had between the receipt of the opposition and the date the reply was

5   due."].)

6        The Court reviewed the ten declarations presented by Employers when it granted

7   class certification.  It found them insufficient to show that all of the original declarations

8   applied to the entire period of employment for each employee. The Court based this

9   finding on the fact that most of the declarations did not include employment dates, so it

10  was not possible to determine when each was employed.  Further, the supplemental

11  declarations only stated that the class members were not required to perform off the

12  clock work, and remained silent on whether they were permitted to do so. Accordingly,

13  the Court found that Plaintiffs' evidence was a more accurate representation of past

14  labor practices.

15       Upon further review of the ten new declarations, two state that they were

16  permitted to do pre-shift work. (See Johnson Decl., Exs. 5, 9. [Rene Lopez states,

17  "However, during the harvest season I sometimes began setting up my packing table

18  before the shift started." Floriberto Sanchez states, "However, I begin setting up my

19  packing table up before my shift starts if I am going to earn a bonus."].) Since the

20  supplemental declarations state that that statements in the original declaration "refer to

21  the entire time [the worker has] have been employed by T&R Bangi", defendants' own

22  evidence shows that at least these two declarants engaged in pre-shift work during their

23  entire employment.

24       For the reasons discussed above, the Court does not find the ten declarations

25  sufficient to rehabilitate the declarations Defendants originally provided in opposition to

26  class certification.

27       Employers argue that construing "never means never" and "always means

28  always" logically, the declarations show that no violations occurred during the duration of

the declarant's employment. (See Johnson Decl. ¶ 29-30.) The declarations, as provided, remain stated in the present tense. Even assuming that the declarants were employed for the periods of times described in Brashears' spreadsheets, the declarations only state that the declarants were never required to perform off-the-clock work during their employment. However, as this court previously held, the declarations are silent as to whether the class members were permitted to work before the shift. Arrendondo, 2011 U.S. Dist. LEXIS 44134 at *32-33. As described below, declarations provided by Employers reflect that potential class members were permitted to do pre-shift work.

Employers next provide seven new declarations from workers who opted out of the class. (See Johnson Decl., Exs. 11-17.) The declarants state that they "decided to opt-out of the class action lawsuit because [they] have not had any problems with Bangi." (See e.g., Johnson Decl., Ex. 11 at ¶ 6.) That these seven employees did not feel that they had been treated unlawfully by T&R Bangi does not rule out whether they or others were subject to unlawful treatment. Even though the declarations are presented to show that pre-shift work did not occur, two of the new declarations from employees who opted out reflect that they did in fact engage in pre-shift work. (See Id., Ex. 13, ¶ 6 ("Occasionally during the picking season I would set up my table early…"); Ex. 17, ¶ 9 ("During the years I worked for T&R Bangi, I sometime started setting up my table before the official start time.").) This evidence is consistent with the evidence previously provided that a large number of workers engaged in pre-shift work.

Employers also present evidence that certain class members provided inconsistent testimony and that variations in workers' claims mean individualized analysis is necessary, and hence class certification improper. (See Johnson Decl. ¶¶ 62-111.)

Focusing on the just the allegedly inconsistent testimony, It is not clear that the deposition testimony regarding pre-shift work is inconsistent with statements in the declarations. For example, Employers assert that Froilan Garcia's deposition testimony

32

1    shows he was called to work by the foreman at the start time but liked to show up early

2    to set up his table to be ready to start picking as soon as the shift started.  Employers

3    characterize this testimony as inconsistent with his declaration that he was required to

4    work early. (Johnson Decl. at  ¶ 100, Ex. 23.) Admittedly, the deposition testimony does

5    not state that the foreman required him to be there early.  It does say, however, that the

6    foreman 'wanted' him there twenty minutes early and that he would arrive and set-up

7    prior to the start of the shift. (Decl. of Froilan Garcia, p. 11:1-6., 25:14-18.) Despite

8    arguable inconsistencies, the deposition testimony does indicate that Garcia was

9    performing uncompensated pre-shift work.

10        Employers next refer to class member Hilaro Gomez who stated in his declaration

11   that he was required to be at work 15-30 minutes early to set-up and attend school. He

12   first testified in his deposition that he was instructed to arrive a half hour early but later

13   testified in the same deposition that the foreman only instructed him to arrive on time.

14   (Johnson Decl. at  ¶¶ 101-103.) Reading the deposition testimony in context leaves open

15   a consistent  explanation:

16       Q. So Amadeo told you to show up 30 minutes before the start time?
         A. Yes.
17       Q. Why did he tell you to show up 30 minutes before the start time?
         A. I think -- well, he would tell us to arrive because he -- he was requiring
18       that schedule so that we would all be present.
         Q. Okay. So he wanted -- he basically said, "Hey, show up early because I
19       want to make sure everybody is here when it's time to start work"?
         A. Yes.
20       Q. So he basically said, "Hey, we have to start on time"?
         A. Yes.
21

22   (Id. at Ex. 37.) This creative, leading questioning produced Gomez's agreement that his

23   foreman "basically" said "Hey, we have to start on time." It does not truly call into doubt

24   the credibility of his earlier repeated testimony that he was told to show up a half hour

25   early. (Id. at Ex. 37. [citing pp. 16-17 of Gomez's Decl.]) Employers, to their credit, do

26   point out that Gomez later testified that school started 5-10 minutes before the shift. (Id.,

27   Ex. 37 [Gomez Decl., p. 44.]). But even that acknowledgement tends to obscure

28   Gomez's testimony in significant detail about performing uncompensated work and

1   attending school during the half hour preceding shifts. (See Gomez Decl., pp. 41-45.)

2   The Court finds no clear conflicts in the sworn evidence from Gomez or other reason to

3   challenge the credibility of the evidence presented by him. The same cannot be said of

4   Employers' efforts to encourage the Court to do otherwise.

5          Defendant asserts that, contrary to her declaration that she was required to start

6   work early, Estela Izazaga testified she was not told that she had to set up prior to the

7   start of the shift, just that she preferred to do so. (Johson Decl. at ¶ 105.) The apparent

8   conflict notwithstanding, her statements are quite consistent in showing she performed

9   uncompensated pre-shift work.

10          Similarly, Employers claim that Lourdes Ramirez's declaration that she was

11   required to show up twenty minutes early is impeached by her testimony that she was

12   never actually told by her foreman to arrive early. (Johnson Decl. at ¶ 108.) However, not

13   specifically being told to be there early may well have resulted from the facts, as alleged,

14   that she did always arrive early. It does not rule out that her foreman expected her to

15   arrive early or condoned it. (Id. at Ex. 29.)

16          Finally, T&R Bangi notes that Isaac Munos testified during his deposition that he

17   was required to arrive thirty minutes early and that he had school four days a week

18   during the pruning season. (Id. at ¶ 111, Exs. 32-33.) This testimony appears wholly

19   consistent with his declaration that he was required to arrive a half hour early and that

20   during the pre-harvest season he had schooling approximately three times a week.

21          Employers also attempt to contrast the testimony of the above-referenced workers

22   with that of workers Carmen Palacios, Maria Venegas, and Issac Munos who

23   consistently testified that they were required to work early.  No such contrast appears

24   clear to the Court.

25          Employers present the declaration of Michael P. Ward, an economist, who asserts

26   that the evidence does not establish a statistical basis to claim that a common policy or

27   practice applied to the class members. (See Ward Decl., ECF Nos. 273-40, 273-41.)

28   First, Ward notes that the declarations obtained by both parties were obtained on an ad

hoc basis, not randomly, and therefore do not enable one to extrapolate statistically and determine the rates of violations of all workers. (See ECF No. 273-40 at ¶ 12.) The Court has no disagreement with this proposition. It is clear that neither the declarations from Plaintiffs nor those from Defendants are randomly obtained. However, that is the evidence the Court has before it, namely nearly uniform declarations from Plaintiffs that the violations did occur and contrasting declarations from Defendants stating that they did not occur. The evidence may have statistical flaws, but it is evidence, and the Court will consider it while keeping its shortcomings in mind.

The majority of Ward's declaration is focused on whether the declarations and other evidence can be used to determine if there was a common, company-wide policy implemented through the forepersons. (See Ward Decl. at ¶¶ 17-18.) Ward compiled the data provided in the declarations and prepared a table showing the percentage of the workers per foreman crew that alleged each subclass of violation. (See Ward Decl., Table 1, ECF No. 273-40 at 8.). Based on the evidence, Ward concludes that "there is no evidence of a common or systematic policy transmitted by [a given] foreperson" and that "there is no evidence of a common or systematic policy transmitted by the company to all of their forepersons." (Id. at ¶ 26.) Finally, Ward comments that even if statistics could be used to show that a significant number of the class members suffered a violation, they would not reveal which class members suffered the violation and which did not. (Id. at ¶¶ 27-33.) Ward suggests that the Court thus will end up having to either compensate class members who did not suffer the violation or spend effort to determine which class members were harmed. (Id.)

Employers argue that the anecdotal evidence varies greatly as to whether pre-shift work occurred. This argument relies heavily upon Ward's above-referenced table showing the percentage of declarants per crew alleging a particular violation. (See Ward Decl. Table 1, ECF No. 273-40 at 8.) At the outset, the court notes that Ward separated claims of uncompensated schooling before the shift with claims of other pre-shift work. (See Id.) However, as noted, uncompensated work can create liability regardless of its

1   nature. Also, here the percent of workers Ward characterizes as presenting claims for

2   schooling are nearly the same as those with claims for other work. Accordingly, the

3   distinction is not relevant to the Court's analysis.

4       The Court has considered Employers' contention that there are wide and

5   conflicting variations in the evidence presented by class members.  However, on review

6   and considering the nature and circumstances in which statements were made and

7   recorded and the fact that many reflected simple lay approximation of times spent

8   working, the Court cannot find they reflect significant inconsistencies.

9       Terri Bangi and Craig Neville previously provided declarations. They now provide

10  revised declarations in support of the motion to decertify. However, the Court finds

11  nothing in the present motions to alter the analysis and reasoning previously relied upon

12  in certifying the class. Both Bangi and Neville state that Employers had policies

13  prohibiting uncompensated work and those policies were to be enforced by the foremen.

14  The Court previously acknowledged evidence that Defendants had such policies in

15  place, but also found that the polices were disregarded. <u>Arrendondo</u>, 2011 U.S. Dist.

16  LEXIS 44134 at 34 n.6, 37-38 ("[D]eclarants for both plaintiffs and defendants have

17  stated they have worked off-the-clock and have bought their own tools because the

18  Employer either did not provide tools or the tools were inadequate. Thus, there is

19  sufficient evidence that the policies were not followed." Bangi's declaration "'contradicted

20  by defendants' own evidence and evidence presented by plaintiffs."). Since much of the

21  anecdotal evidence presented is the same, the parties will not be surprised that even

22  with the statements of Bangi and Neville, the evidence shows that the policies were not

23  followed.

24      To further attempt to rehabilitate their declarations, Employers provide the

25  declaration of David Brashears. (<u>See</u> ECF Nos. 273-9 to 273-13.) Brashears, a certified

26  public accountant, reviewed the employment records of Defendants and created

27  spreadsheets showing the time period when each declarant worked, and, when possible,

28  the foreman for which the declarant worked. (<u>Id.</u>) Employers assert that the

spreadsheets conclusively show when the declarants were employed and that, viewing the declarations in light of the spreadsheets, they show that none of the workers who provided declarations for Employers describe any unlawful practices during their time of employment. As discussed in the certification order, the evidence shortcoming was not just a result of the declarants' failure to state when they were employed, but the fact they were not clearly addressing anything beyond the current practice of Defendants.

Employers also offer the declaration of Cesar Trujillo, the personal investigator who conducted interviews of fieldworkers, to attempt to establish that the declarations applied to the entire employment history of the workers. (Trujillo Decl., ECF No. 273-16.) Trujillo described the process in which he interviewed farmworkers and prepared reports based on the interviews. While the declarations were phrased in the present tense, Trujillo asserts that he questioned the farmworkers regarding their experiences through their entire employment history with Defendants. (Id. at ¶ 10.) He asserts that most of the crew members that he interviewed told him that they did not perform uncompensated work and were provided tools. (Id. at ¶ 13.) However, some did report violations, and Trujillo listed those violations on his reports. (Id.) He further explains why, even though the declarants made statements in the present tense, they should be interpreted to extend for the declarant's entire employment history.[6] (See Id. at ¶ 13.) Trujillo provided copies of his summary reports of his interviews, his handwritten notes from the interviews, and the copies of declarations "derived from" the interviews. (See Id. at ¶¶ 18-105, Exs. 1-27.) It was Trujillo's "understanding that declarations would be drafted from the information [he] obtained in [his] investigation." (Id. at ¶ 9.) However, Trujillo provides no further information regarding how his notes were transferred to the declarations or whether he was involved in the process of preparing the declarations.

_____

[6] "The workers I interviewed identified time periods when there were issues with their working conditions. Some workers told me that at a certain point in the past, they were required to take their trays home to wash them. Therefore, the answers provided to me by the workers do not apply solely to the present tense. Specific dates were pointed out by the workers I interviewed, and I included this information in my reports. If no issues were reported by the workers, their testimony applied to their entire working experience with Defendants." Id.

1    A review of the evidence presented raises questions about the reliability of the

2    information presented, the reliability of Trujillo's assertions that relatively few workers

3    reported having performed uncompensated work, and the reliability of the claim that the

4    declarations covered the entire work experience of each declarant.

5    Although many declarants stated that they are not required to perform

6    uncompensated work, Trujillo's reports and notes indicate many workers indicated they

7    had performed uncompensated work in the past.

8    For example, Marta Lucio declared, in the uniform language found in Defendant's

9    declarations, that she presently is "never required to perform work off the clock." (See

10   ECF No. 273-20 at 25.) However, Trujillo's interview notes state that although Lucio is

11   never required to work off the clock, she used to be able to start work early. (See ECF

12   No. 273-37 at 24. "This year no longer allowed to start working before shift. Some

13   people start to get bigger checks… Foreperson tells them to stop now.")

14   Jose Mata's declaration states that he has never been required to work off the

15   clock. (See ECF No. 273-19 at 19.) However, Trujillo's notes reflect Mata stating that

16   until two years earlier, he used to start work early nearly every day during harvest

17   season. (See ECF No. 273-37 at 51.)

18   Alejandro Vaca, despite stating in his declaration that he is not required to do pre-

19   shift work, nonetheless explained to Trujillo that he sometimes moves boxes before the

20   shift even though doing so is not allowed. (See ECF No. 273-18 at 10-11; ECF No. 273-

21   37 at 58.)

22   Antonio Mariano states in his declaration that school is always held on the clock,

23   but he noted during his interview that until two years ago he had not been paid for school

24   time.  (See ECF No. 273-18 at 23-24; ECF No. 273-37 at 60.) Trujilllo did not include this

25   reference to the past practice in his report. (ECF No. 273-18 at 5.)

26   Jose Orihuela, stated in his declaration that he is not required to do pre-shift work,

27   but explained to Trujillo that he sometimes moves boxes before the shift even though

28   doing so is not allowed. (See ECF No. 273-29 at 32-33; ECF No. 273-38 at 63.)

1    Jose S. Bermudes's declaration says that he used to start work early.  It does not

2 contain his interview comments to the effect that until a year ago, Defendants started

3 school early. (See ECF No. 273-17 at 10-11; ECF No. 273-39 at 11-12.)

4    Maria Elvia Ruiz states in her declaration that she was required to take trays

5 home to wash, but was not required to begin work early. (See ECF No. 273-17 at 22-23.)

6 However, Trujillo's notes show she used to start work early, but stopped two weeks ago

7 and was told not to do it anymore. (See ECF No. 273-39 at 30.)

8    Rita Garcia also stated in her interview with Trujillo that she started work early

9 until she was not permitted to do so this season. (See ECF No. 273-39 at 32.) Her

10 declaration only states that she is not required to begin work early. (See ECF No. 273-17

11 at 43.)

12    Jesus Paniagua stated in his interview with Trujillo that he was allowed to, and

13 did, start work early until this year. (See ECF No. 273-39 at 64.) He further stated that if

14 they start work early now, they will be suspended. (Id.) His declaration only states that

15 he is not required to begin work early. (See ECF No. 273-23 at 15-16.)

16    Similarly, Trujillo's notes and reports reflect that several workers did not perform

17 pre-shift work even thought their signed declarations say they did. Argelia Reynoso

18 states in her declaration that she sets up early during packing season. (See ECF No. 76-

19 3 at 99-100.) Trujillo's notes do not reflect this. (See ECF no. 273-39 at 1.) The same

20 applies for Alfredo Aguilar and Rene Lopez. (See ECF No. 273-17 at 25-26, 28-29; ECF

21 No. 273-39 at 3, 9.)

22    Furthermore, several of the workers interviewed by Trujillo described that there

23 was a policy change regarding pre-shift work. Salvador Vega stated that this year the

24 workers are no longer allowed to start early, but he did not provide a declaration. (See

25 ECF No. 273-38 at 69.) Joaquin Ibarra stated workers used to start work before the shift

26 but they were told this week that they would be suspended if they start early. (See ECF

27 No. 273-39 at 58.) Adelina Gutierrez stated workers used to start work before the shift

28 even though they were not supposed to, but this year they were told that they would be

1    suspended if they were caught. (See ECF No. 273-39 at 52.) Adrian Vasquez stated that

2    he prepared his work area before the shift until two weeks ago, but is no longer allowed.

3    (See ECF No. 273-39 at 60.) He provided a declaration in which he stated that he used

4    to start work early; it does not include his statement that starting work early is no longer

5    allowed. (See Johnson Decl., Ex.86, ECF No. 76-4 at 71-75.) Victoria Rosales stated

6    that she used to set up before the start of the shift, but as of a week before, workers

7    were told they would be suspended if they started early. (See ECF No. 273-39 at 62.)

8    Esperanza Alvarez provided a declaration stating that she did not perform pre-shift work,

9    but omitted that she told Trujillo that only days before she was interviewed, workers

10   were told that they would be suspended if they started early. (See ECF No. 273-39 at

11   67.)

12       Other declarants described a policy shift to prohibiting pre-shift work. Juan

13   Mendoza's declaration states that he used to start work early. Trujillo notes indicate that

14   two weeks prior to the interview Mendoza's supervisor told him that working early was no

15   longer allowed. (See ECF No. 273-19 at 5, 27-28, ECF No. 273-37 at 45.) The

16   information regarding the change in policy was not included in the declaration.

17       In light of the evidence included in Trujillo's notes and reports that indicate pre-

18   shift work was performed and  the many declarations provided by Defendant indicating

19   that pre-shift work was performed[7], Defendant's contentions that there is conflicting

20   evidence on the issue is far less than persuasive. While some fieldworkers may not have

21   performed uncompensated work, a large number did. This reflects, at the least, a failure

22   to enforce a policy prohibiting off-the-clock work. Trujillo's report does not accomplish the

23   purpose for which defendant submitted it.

24       Delano Farms, in support of its motion to decertify, provided the declaration of

25   Sarah Gohmann Bigelow ("Bigelow Decl."). ECF No. 275-2. In the declaration, Bigelow

26

27       [7] See Johnson Decl. in support of Opp'n to Mot. Class Cert., ECF No. 76-1 to 76-5, Exs. 1, 2, 7,
     10, 11, 12, 14, 17, 18, 27, 32, 44, 45, 49, 53, 58, 64, 68, 76, 78, 86 (performed pre-shift work), Exs. 3, 16,

28   23, 28, 40, 46, 70, 71, 83, 84, 94, 95 (witnessed pre-shift work being performed).

1  contends that the "declaration and accompanying exhibit summarizing testimony reveal

2  the diverse and varied employment practices at issue which render this case unsuitable

3  for class treatment. The policies as applied and actual practices varied tremendously not

4  only by foreman, but also by individual fieldworkers, with members of the same crews

5  providing contradictory evidence." (Bigelow Decl. at ¶ 3.) In her declaration, Bigelow

6  provides charts reflecting declarants who asserted violations for pre-shift work arraigned

7  by foreman along with tables describing the evidence supporting the information found

8  on the table. (See Bigelow Decl., Exs. A-C.) In the chart, Bigelow consolidates the

9  information provided by the declarants to show the number of allegations broken down

10  by foremen. While there were 194 workers who provided testimony, many of the workers

11  performed work for more than one foremen, and Bigelow counted the worker's testimony

12  multiple times. Accordingly from 194 workers, the chart resulted in 275 possible worker-

13  to-foreperson matches. (See Bigelow Decl. at ¶ 12.)

14      In determining whether a declarant's testimony showed that an activity was

15  performed, Bigelow omitted declarants that claimed that the violations occurred prior to

16  the relevant time period. (Id. at ¶ 17.) With regard to the pre-shift claims, the chart does

17  not account for declarants who present allegations of witnessing other workers perform

18  pre-shift work. (Id. at ¶ 18.) Bigelow counted any worker who performed pre-shift work of

19  any kind, regardless of activity (i.e., attending school, setting up, picking grapes). (Id. at

20  ¶ 22.) However, she did not count workers who voluntarily performed pre-shift work, or

21  workers who performed a de minimis amount of pre-shift work. (Id.) Bigelow did not

22  define the amount of work she considered de minimis, but gave as an example a worker

23  who started one or two minutes before the shift. (Id.)

24      Based on her determinations, 133 of the 275 declarant matches alleged that a

25  foreman required pre-shift work without pay, 137 alleged that a foreman imposed no

26  such requirement, and five did not specify. (Id. at ¶ 33.) Further, Bigelow contends that

27  there were wide variations regarding whether pre-shift work was required by each crew.

28  (Id. at ¶ 34.) Specifically, Bigelow points to the evidence that shows that pre-shift work

1    was not required on 14 of the 57 crews represented, and on the remaining crews there is

2    conflicting testimony from declarants as to whether pre-shift work was required. (Id.)

3    Furthermore, Bigelow contends that of the assertions made in the 68 declarations

4    provided by Plaintiffs, that significant variation of practices are described, including

5    differences in the amount and frequency of pre-shift work performed during pre-harvest

6    and harvest seasons, the amount of pre-shift work performed (varying between five or

7    ten minutes to thirty minutes), variation in the type of pre-shift work performed (including

8    school, preparing the work area, preparing labels and packing materials), and that the

9    practices in pre-shift work changed over time (including allegations that after some time

10   in 2009 or 2010, pre-shift work was no longer allowed). (Id. at ¶¶ 36-46.)

11       In response to the evidence provided by Defendants, Plaintiffs provide nine

12   declarations to show that Trujillo did not ask declarants about previous season practices,

13   that employment practices changed in 2010, and that declarants were required by

14   Defendants to participate in the interview process. (Opp'n at 9-11.) For example,

15   Plaintiffs provide the declaration of Anastacio Arellano. (Perrero Decl., Ex. B.) She states

16   that the information contained in the declaration she signed for Defendants in September

17   2010 was true for the 2010 "harvest" season. (Id. at ¶ 2.) In March 2011, she was called

18   to the T&R Bangi office and signed a declaration stating that her 2010 declaration

19   reflected the practices of all previous seasons.[8] (Id. at ¶ 15.) Arellano states that she

20   signed the declaration "without knowing that the declaration included all of my years

21   working for the company" and that her present declaration provides a more accurate

22   description of her working conditions for the prior seasons. (Id. at ¶ 16.)

23       In her most recent declaration, Arellano states that for seasons 2005 through

24   2009, she was required to arrive and start work 10-15 minutes before the official start

25   time and was not paid for that time. (Id. at ¶ 3.) She notes that when she was

26

27           [8] This declaration was provided by T&R Bangi in support of the motion for reconsideration as one
     of the ten declarations showing that the original declarations, although stated in the present tense, applied
28   to the declarant's entire work history.

1    interviewed, the questions were asked in the present tense, and that she therefore

2    answered truthfully regarding the practices during the 2010 season. (Id. at ¶ 8.) Had the

3    interviewer asked, she would have truthfully told him that the earlier practice had been to

4    require workers to arrive early to prepare the work area and that school was held before

5    the start time. (Id.) Further, she says, her foreman was always present when workers set

6    up before the start time and did not reprimand workers for working ahead of time. (Id.)

7    Roberto Rocha's declaration describes the same. (Id., Ex. I.) His first declaration

8    asserted there were no violations, but he thought it applied only to the 2010 harvest

9    period. He then signed a second declaration stating that the first declaration applied to

10   his entire employment history, but only because he wanted to leave the T&R Bangi office

11   and "did not want any problems at work." (Id. at ¶¶ 15-16.)  However, upon reflection, he

12   notes that he was required to perform both pre- and post-shift work, wash trays, and

13   purchase tools as described in his present declaration. (Id.)

14        Consuelo Cabrera, Jose Manriquez, Beatriz Rodriguez, and Sandra Rocha

15   similarly note that the declarations that they signed in 2010 were based on interviews

16   which they understood to have only encompassed conditions at the time of the 2010

17   harvest. If asked, they would have told the interviewer that they were required to set up

18   early and that school commenced before the official start time in prior seasons. (Id., Exs.

19   C, G, H, J.)

20        Lourdes Camacho signed an election to be excluded from the class action and a

21   declaration provided by Delano Farms in support of its motion for decertification. (Perero

22   Decl., Ex. D; Bigelow Decl., Ex. S.)  She states that when interviewed at the Delano

23   Farms office in connection with the latter declaration, she answered questions and

24   signed the declaration quickly so she could return home, even though the facts stated in

25   the declaration were incorrect. (Perero Decl., Ex. D. ¶ 8 & 13.) She now asserts that the

26   foreman conducted school and she and other crew members would prepare work areas

27   prior to the start of work. (Id. at ¶¶ 9-13.)

28        Guadalupe Hernandez declares that she was not aware of, and did not sign, the

1   September 15, 2010 declaration in her name stating that no violations occurred. (Id., Ex.

2   E.) Instead she asserts that she was required to engage in pre- and post-shift work,

3   wash trays, and purchase tools in the harvest seasons prior to 2010. (Id.) Manuel

4   Rodriguez also asserts in his declaration that he was unaware of and did not sign the

5   November 3, 2010 declaration attributed to him stating that no violations occurred. (Id.,

6   Ex. F.)

7                                    (b)      Analysis

8          The Court previously framed the common question with regard to pre-shift work

9   as follows: "The common question is whether the wages are owed for off-the-clock work

10  performed, whether a policy permitted uncompensated, even if not 'required,' off-the-

11  clock work" and defined the subclass as "field workers who performed uncompensated

12  and unrecorded work before the fixed start time in the harvest and pre-harvest work."

13  Arrendondo, 2011 U.S. Dist. LEXIS 44134 at 35, 56. The Court previously found

14  Defendants' evidence to be inconsistent and showing some violations in the past. It

15  found that the question of whether uncompensated, albeit 'not required', pre-shift work

16  was performed was sufficiently common to justify certification. Id. at 35. Neither party

17  argues that the scope of the subclass should be modified.  The Court finds that the

18  subclass presents a prima facie claim for wage and hour violations.

19         Under California law, an employer must pay an employee for all "hours worked."

20  Hours worked are defined as "the time during which an employee is subject to the

21  control of an employer, and includes all the  time the employee is suffered or permitted

22  to work, whether or not required to do so." Morillion v. Royal Packing Co., 22 Cal. 4th

23  575, 94 Cal. Rptr. 2d 3, 995 P.2d 139, 141 (Cal. 2000) (quotation omitted). Under this

24  rule, an employer is deemed to have "suffered or permitted [an employee] to work" if it

25  knew or should have known that its employees were working off-the-clock. Id. at 145.[9]

26  _____

27         [9] "[T]he California Labor Commissioner notes that the time the employee is suffered or permitted
    to work, whether or not required to do so can be interpreted as time an employee is working but is not
    subject to an employer's control. This time can include work such as unauthorized overtime, which the

28  employer has not requested or required. Work not requested but suffered or permitted is work time. For
                                                                                    (continued…)

1    Accordingly, the common question relating to whether Defendants' polies or practices

2    permitted uncompensated pre-shift work is congruent with the relevant legal standard for

3    uncompensated work.

4        In a further attempt to emphasize variations in practice on pre-shift work,

5    Employers stress the differences in type of work performed before the start of the shift,

6    that Plaintiffs have provided no evidence as to their motive for starting work early, and

7    that the evidence is unclear as to whether foremen knew that work was being performed

8    early. The Court finds very little variance in the type of work the declarants stated they

9    performed prior to the shift. The vast majority say they were either setting up or attending

10   school. Regardless, the common question presented is whether uncompensated pre-

11   shift was being performed.  The particular task being performed is irrelevant to potential

12   liability under California law. So too is the worker's motive for working prior to the shift.

13       Defendants contend, correctly, that the issue of whether the foremen were aware

14   of the pre-shift work is relevant because an employer is deemed to have "suffered or

15   permitted [an employee] to work" if it knew or should have known that its employees

16   were working off-the-clock. <u>Morillion</u>, 995 P.2d at 145. However, many of the

17   declarations either describe the foreman as requiring uncompensated work or, in the

18   cases where declarants stated that they voluntarily started working before the shift, they

19   show the foreman was aware as he or she would tell the declarant to stop. (<u>See</u>

20   Johnson Decl., ECF No 76, Exs. 1 ["However, during the harvest season I sometimes

21   began setting up my packing table before the shift started... if the foreman saw me, he

22   would make me stop.], 2 [same], 5 ["I have seen some employees try to begin work

23   early, but if anyone starts working early, the foreman will tell them to stop."], 7, 10, 1, 12,

24   14, 18 ["If my foreman sees me working before the shift, he tells me to stop, but I

25

26   (...continued)
     example, an employee may voluntarily continue to work at the end of the shift. The employer knows or has
27   reason to believe that he is  continuing to work and the time is working time. <u>Morillion</u> at 145 (citations and
     internal punctuation omitted).

28

1    continue working anyway."], 23, 28, 40, 44, 45, 46, 49, 53, 70, 78, 86, 94 ["I have never

2    seen anyone picking early, just gathering boxes and opening their packing table. When I

3    see them do this, I tell them to stop."], 95 ["Even though I told them twice, Hilario insisted

4    on continuing work."]; but see Ex. 76 ["I used to start preparing my table before my shift

5    started... I knew that I was not supposed to work early, so I did  it in a way that the

6    foreman did not see me."]; Johnson Decl., ECF No. 273.) The evidence presented to the

7    Court illustrates that there is strong evidence that the forepersons knew or should have

8    known that workers were setting up prior to the shift. Defendant has not presented

9    evidence that the forepersons were not reasonably aware of the conduct. Accordingly,

10   alleged lack of knowledge it is not a legitimate basis to defeat a showing of commonality.

11        This is not to suggest that the employers are here being held accountable for

12   trying to get the workers to stop pre shift work. While evidence at trial may enlighten as

13   to whether the efforts to stop it were genuine, implicit in the act of stopping workers from

14   continuing uncompensated work is the fact that they had performed such work.

15   Employers present no evidence that they recorded or compensated the employees for

16   that work. The warning of the employees does not relieve the employer of the duty to

17   pay for the pre-shift work.

18        The Court holds that the subclass presents "a common contention such that

19   determination of its truth or falsity will resolve an issue that is central to the validity of

20   [the] claim in one stroke" as required under Wal-Mart. See Abdullah v. U.S. Sec.

21   Assocs., 731 F.3d at 957. Here, the common question is whether the class members

22   performed uncompensated and unrecorded work before the start time. At trial, should

23   Plaintiffs prove the truth of the contention that uncompensated pre-shift work was

24   performed, they will have established the central common issue on liability for the claim.

25        Defendants present various arguments why commonality does not exist. First,

26   they argue that field workers were organized into crews directed by a foreperson and

27   assistant foreperson who used personal discretion when directing fieldworkers and

28   handling personnel matters. (Delano Farms Mot. For Decertification at 3-5.) Second,

1    Defendants allege that that the large variations in practice from crew to crew (as shown
2    in Defendants' compilation and charting of the information in the parties 194
3    declarations) are inconsistent with a policy or practice adversely affecting the
4    farmworkers. (Id. at 6-8.) Third, Defendants allege that it is inappropriate to rely on
5    representative testimony and to extrapolate the anecdotal evidence of some of the
6    members of the class to each subclass as a whole. Fourth, Defendants allege that since
7    there are no records of the violations in the form of accurate time records or receipts for
8    tools, an individualized inquiry would be required to determine if a violation occurred.
9    Fifth, Defendants claim that the application of certain defenses will require individual
10   determinations of each claim, forcing the court to face with an unmanageable set of mini
11   trials.[10] (Delano Farms Mot. at 22.)

12          Though Defendants' contentions may raise other issues, not every question of law
13   or fact must be common to the class; "all that Rule 23(a)(2) requires is a single
14   *significant* question of law or fact." Abdullah, 731 F.3d at 957 (citations omitted;
15   emphasis in original). Here the single significant question is whether Plaintiffs can show
16   that uncompensated and unrecorded pre-shift work was performed. That alone
17   establishes commonality for the subclass.

18          It is beyond dispute that to the extent Plaintiffs engaged in voluntary pre-shift
19   work, Defendants are liable under relevant California law for additional wages or
20   overtime for that work. The distinction between those declarants who allege that the pre-
21   shift work was required and those who allege that it was permitted is immaterial to the
22   common question:  was pre-shift work performed?  Likewise, whether different tasks --
23   setting up tables and work areas, attending school, or applying labels – were performed
24   is immaterial to whether Plaintiffs did do pre-shift work.

25          Furthermore, Defendants' attempt to rely upon a *de minimis* rule to avoid liability

26

27          [10] Defendant Delano Farms presents these arguments as grounds for showing that both
     commonality and predominance have not been met, without distinguishing which, if either, element is more
28   appropriately addressed by this argument.

is not well articulated. First, it is unclear if the rule applies to state wage claims. Regardless, "the de minimis rule is concerned with the practical administrative difficulty of recording small amounts of time for payroll purposes." <u>Lindow v. United States</u>, 738 F.2d 1057, 1062 (9th Cir. 1984). The *de minimis* rule applies:

> only where there are uncertain and indefinite periods of time involved of a few seconds or minutes duration, and where the failure to count such time is due to considerations justified by industrial realities. An employer may not arbitrarily fail to count as hours worked any part, however small, of the employee's fixed or regular working time or practically ascertainable period of time he is regularly required to spend on duties assigned to him.

29 C.F.R. § 785.47. "Employers, therefore, must compensate employees for even small amounts of daily time unless that time is so minuscule that it cannot, as an administrative matter, be recorded for payroll purposes." <u>Lindow</u>, 738 F.2d at 1062-63. The Ninth Circuit applies the *de minimis* rule by considering the following factors: "(1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work." <u>Rutti v. Lojack Corp., Inc.</u>, 596 F.3d 1046, 1057 (9th Cir. 2010) (citing <u>Lindow</u>, 738 F.2d at 1063). "[T]here is no precise amount of time that may be denied compensation as de minimis." <u>Id.</u> at 1058.

Defendants make no claim that the uncompensated time resulted from a failure or inability to keep proper payroll records of pre-shift work. Moreover, though the duration that some of the declarants worked pre-shift is short, Defendants have not alleged that it was not administratively possible to record such time. Even if a *de minimis* defense is presented at trial, it does not undermine commonality based on the common question of fact regarding whether uncompensated work was performed.

The Court finds implausible Defendants' claim that they lacked knowledge that pre-shift work was occurring. The majority of the claims of pre-shift work described setting up the work area and attending school. Since this activity surely would be done in areas under a foreperson's management, it is not credible to suggest that supervisors were unaware. The declarations made clear that many foremen were aware of the pre-shift work: declarants testified that foremen told workers to stop when they saw pre-shift

1    work.

2           Finally, Defendants assertions that not all workers performed pre-shift work and

3    that the amount of pre-shift performed varied shall be addressed in the predominance

4    and ascertainability inquires. See Leyva v. Medline Indus., 716 F.3d 510, 514 (9th Cir.

5    2013) ("[T]he presence of individualized damages cannot, by itself, defeat class

6    certification under Rule 23(b)(3).").

7           In determining whether there is sufficient commonality, the Court must review and

8    rely upon the declarations provided by each party. The Court is not attempting to

9    determine the underlying merits of the matter, but at times it must address determinative

10   issues to resolve certification issues. With that said, it is noted that there are general

11   credibility concerns with regard to all the anecdotal evidence. Plaintiffs provided

12   declarations supportive of their claims, and Defendants' declarations generally tend to

13   show the contrary. Clearly, the declarations were not taken at random.  Because of the

14   state of the evidence, it is also not particularly helpful to combine and statistically

15   analyze the information in the declarations. Because of the differences in number of

16   declarations submitted by the opposing parties, any attempt to calculate the percentage

17   of workers suffering violations based on the number of violations reflected in declarations

18   is not likely to lead to an accurate result. The same problems arise when attempting to

19   show the percentage of violations that occurred in each crew. In many instances only

20   one person in the crew provided a declaration. In the case of some crews, all the

21   declarations were provided by only Plaintiffs or only Defendants.

22          Upon review of the evidence, including the new evidence provided by the parties,

23   the Court reaffirms the earlier conclusions regarding the lack of credibility of the

24   declarations presented by Defendants in opposition to the original certification motion.

25   As previously noted, the majority of the declarations were presented in the present

26   tense, and the Court was not willing to take the 'evidentiary leap' required by Defendants

27   to assume that the description of practices applied to the entire period that each

28   declarant worked. Arrendondo, 2011 U.S. Dist. LEXIS 44134, at *28-29. The Court found

1   that since the declarants did not indicate the period of time that they were employed, it

2   was not possible to determine the period covered by Defendants' assertion that no

3   violations occurred.

4       Many of the original declarations indicate that a significant number of declarants

5   either performed or witnessed other workers perform pre-shift work. The Court's

6   previous order noted that "some" declarants stated that they performed pre-shift work.

7   Upon further review, the Court finds that a significant number of Defendant's original

8   declarations reflect that pre-shift work was performed or witnessed.  See Arrendondo,

9   2011 U.S. Dist. LEXIS 44134, at *33-34; see also Johnson Decl. in support of Opp'n to

10  Mot. Class Cert., ECF No. 76-1 to 76-5, Exs. 1, 2, 7, 10, 11, 12, 14, 17, 18, 27, 32, 44,

11  45, 49, 53, 58, 64, 68, 76, 78, 86 (performed pre-shift work),   Exs. 3, 16, 23, 28, 40, 46,

12  70, 71, 83, 84, 94, 95 (witnessed pre-shift work being performed).

13      Further, though trying to persuade the Court that the original present tense

14  declarations described the declarant's entire employment history, several of the notes

15  and reports prepared by Trujillo reflect a distinct change in practice in 2010 from allowing

16  pre-shift work to disallowing it.

17      Even the new declarations presented by Employers reflect that uncompensated

18  pre-shift work was performed. (See Johnson Decl., Exs. 5, 9, 13, 17 [Declarants

19  describe that they engaged in pre-work by setting up tables early.]) Furthermore,

20  Plaintiffs provide additional declarations rebutting claims in several of the new Employer

21  declarations about whether the entire employment history was covered by them.

22      As noted, much of the anecdotal evidence presented was previously provided.

23  For example, Bigelow bases her charts and analysis on 194 statements taken by

24  fieldworkers and foremen. Of those 194 declarations, 156 had already been presented

25  to, and analyzed by, this Court in the original certification motion. Defendants have

26  presented an additional 38 declarations. The combined the information therefore

27  consists of the 69 declarations presented by Plaintiffs and 125 declarations presented by

28

1    Defendants. [11] Even though the evidence contains significantly more defense

2    declarations and those declarations, like Plaintiffs', favor the position of the party who

3    submitted them, Bigelow finds a nearly even split between declarants required to

4    perform pre-shift work without pay and declarants not required to do pre-shift work.

5    Moreover, Defendants' charts limit affirmative answers to declarants who alleged that

6    were required to perform pre-shift work and omits those who voluntarily performed

7    uncompensated pre-shift work. The charts also omit declarants who were deemed to

8    have performed *de minimis* pre-shift work. Accounting for these factors, the number of

9    declarants who performed uncompensated work is larger than indicated in the charts,

10   and this is without accounting for the significant number of declarants who stated they

11   had observed other workers performing uncompensated pre-shift work. While such

12   declarations do not add to the number of subclass members, they further corroborate the

13   claim that workers did begin work early.

14        Employers stress the great variation in testimony between those who say they

15   never had to attend school before the official start time and those who say they had to

16   do so on rare occasions. While it is true that some defense declarants stated that they

17   did not perform pre-shift work, nearly all of Plaintiffs' declarations, and a significant

18   number of Defendant's declarations, assert that they did.

19        Employers describe the percentage of violations per crew in an attempt to show

20   that either no violation occurred or that there was wide variation in violations. Defendant

21   first points out that of the 58 crews listed, 18 crews reported no violations with regard to

22   pre-work school. However, of those 18 crews, 15 had only one or two declarants. Such a

23   sample size cannot produce a reliable conclusion.  Likewise, of the 21 crews that report

24   a 100% violation rate, fourteen have only one or two declarants. This produces equally

25

26        [11] The Court notes that the numbers appear to total 192 declarations, rather than the 194
     purported by Delano Farms. It should be noted that Delano Farms did not count certain declarations as
27   being duplicative, or worked in cold storage rather than field work. Finally, Plaintiffs presented ten
     additional declarations with their opposition to the motion for decertification which were not considered in
28   Delano Farms' analysis of the evidence.

1   unreliable conclusions. Indeed, the one conclusion that may be drawn is that the

2   projected violation rate for any given crew is simply a reflection of whether Plaintiffs or

3   Defendants provided the supporting declarations.

4       Defendant also points out that seven crews reported less than a 50% violation

5   rate for pre-shift school and ten crews a greater than 50% violation rate. No matter what

6   else may be gained from these numbers, they do indicate that a significant number of

7   declarants performed pre-shift work.

8       As discussed "the key inquiry is not whether the plaintiffs have raised common

9   questions, 'even in droves,' but rather, whether class treatment will 'generate common

10  answers apt to drive the resolution of the litigation.'" Abdullah, 731 F.3d at 957 (citing

11  Wal-Mart, 131 S. Ct. at 2551.) In addition, all that Rule 23(a)(2) requires is "a single

12  *significant* question of law or fact." Abdullah, 731 F.3d at 957 (citing Mazza, 666 F.3d at

13  589) (emphasis in original). Plaintiffs assert that "[t]his lawsuit has nothing to do with

14  proving why certain events occurred, and everything to do with whether certain events

15  occurred." (Opp'n at 21 (emphasis omitted).) While this may be a bit of an

16  oversimplification, it is a instructive. The common issue is whether plaintiffs performed

17  uncompensated work for which Defendants may be liable.

18      Cases relied upon by Defendants mostly involve harassment and misclassification

19  claims. In such cases, individualized inquiries regarding intent or the specific job duties

20  of the employee were necessary to determine liability. In this case, it is immaterial

21  whether the foreperson exercised discretion and required fieldworkers to arrive early, or

22  alternatively, simply permitted them to work early. Regardless, Defendants face potential

23  liability. Defendants raise several issues to indicate wide variation in practice, including

24  the motivation of the employee to work early, the discretion of the foreperson, the tasks

25  performed, and the amount of time spent. None of the issues are relevant to establishing

26  liability.

27      In conclusion, given the specific factual inquiry to be made in the present case,

28  the Court again finds from the evidence that there is a common question as to whether

uncompensated work was performed and that resolution of this common question adversely to Defendants may be the basis for potential liability.

(2)    *Post-shift Work*

In attempting to argue that Plaintiffs have not presented sufficient evidence to establish commonality for the post-shift work subclass, Employers argue that the anecdotal evidence is conflicting and shows that some declarants say they performed uncompensated work post-shift, while others say they did not. Employers again rely on the table prepared by Michael Ward showing the percentage of declarants per foreman who alleged violations. Employers note that of the 58 crews with declarants, 30 crews report no violations, 11 have less than 50% of the declarants reporting violations,  8 have 50% or greater, and 7 have 100% of the declarants reporting post-work violations. (Opp'n at 14.)

Delano Farms presents similar evidence. Bigelow created a chart of the responses of declarants regarding post-shift violations broken down by foreperson. (See Bigelow Decl., Ex. D.) As with the chart of pre-shift violations, Bigelow omitted claims of workers who voluntarily performed work or workers who performed *de minimis* work. (Id. ¶ 23.) Bigelow also provided a chart breaking down potential variations in post shift work, attempting to show: (1) who instructed the declarant to work post-shift, (2) how long the declarant worked, (3) how often the declarant engaged in post-shift work, (4) how many minutes before the end of the shift the foreman warned that the end of the shift was approaching, (5) why the declarant worked after the shift, and (6) the type of work performed including picking, labeling, packing, cleaning-up and putting away tables. (Id., Ex. H.)

Bigelow also notes conflicting evidence; some of the declarants alleging violations while others in the same crews did not, and variations in the duration of post-shift work, frequency of post-shift work, the conduct of the foreman in causing the post-shift work, the type of post-shift work performed and the manner in which the foreman concludes shifts. (Bigelow Decl. ¶¶ 50-62.) For example, Bigelow describes differing

1    testimony regarding whether the foreman provided sufficient warning that the shift was

2    ending, gave no warning, or required the declarant to work late. (Id. at ¶ 56.) Finally,

3    Bigelow describes issues regarding workers finishing work early.   She refers to the

4    declarants who alternatively describe early finishers helping others so they can all leave

5    on time, others being ordered to continue picking, and others hiding or leaving before the

6    end of the shift. (Id. at ¶ 64.)

7         The Court's review of the evidence shows that unlike the anecdotal evidence on

8    pre-shift work claims, far less than all of Plaintiffs' declarants indicate that post-shift work

9    was performed. Only 40 of the original 68 declarations present post-shift work

10   allegations. (See Gregory Decl., Exs. 15, 17, 19-20, 25, 28, 33-34, 36, 38, 44, 47-48, 52-

11   53, 55, 57, 60, 63, 67, 70-71, 116-19, 121, 122, ECF No. 75-3 to 75-15 [declarations not

12   presenting post-shift work claims].)   Only one defense declarant describes post-shift

13   violations, and she says she rarely performed post-shift work. (See Johnson Decl., Ex.

14   70, ECF No, 76-4 at 7 ["However, on very rare occasions, I have had to stay late to finish

15   packing grapes. The longest I have ever had to stay is 10 minutes."].)

16        Considering all of the evidence presented, the Court cannot find that commonality

17   is met by the post-shift work subclass. The evidence shows that to the extent post-shift

18   work was performed, the violations were much more varied, they were not as pervasive

19   and they involved far fewer farmworkers. Plaintiffs have not established that post-shift

20   work was a common issue affecting an entire sub-class. Accordingly, the Court shall

21   grant Defendants' motion to decertify this subclass.

22        In originally certifying the sub-class, the Court addressed the evidence presented

23   by the parties, but did not attempt to differentiate regarding the number of violations

24   alleged for each sub-class. Given the more detailed review here and the fewer number

25   of declarants alleging violations for this sub-class, the Court cannot maintain the prior

26   finding granting certification.

27                          (3)    *Tray Washing Class*

28        Both Defendants present further evidence to support their claims that Plaintiffs

54

1    have not established commonality with regard to the tool washing class. Employers,

2    relying on the table presented by Ward, explains that of the 58 crews, 31 had no

3    declarants setting forth tray-washing claims, 9 crews had less than 50% of the

4    declarants alleging washing trays at home, 18 crews had more than 50% of the

5    declarants stating tray-washing claims, and 11 crews had 100% of the declarants

6    alleging tray washing claims.

7        Delano Farms presents similar evidence. Bigelow created a chart of post-shift

8    violations broken down by foreman. (See Bigelow Decl., Ex. G.) As with her other charts,

9    Bigelow omitted claims of workers who voluntarily performed work or workers who

10   performed de minimis work. (Bigelow Decl., ¶ 25.) Bigelow also separated claims of

11   declarants who stated that they washed trays until the policy for tray-washing was

12   discontinued. (Id.) Finally, Bigelow charts potential variations in tray-washing claims,

13   including: (1) who instructed the declarant to wash trays at home, (2) number of trays

14   taken home, and (3) frequency with which trays were taken home. (Id., Ex. I.)

15       According to Bigelow, of the declarants who described violations, 12 alleged

16   violations without describing a policy and 48 allege that they had washed trays in the

17   past but since discontinued the practice. (Bigelow Decl. at ¶ 63.) In addition to variations

18   as to whether declarants washed trays or not, Bigelow points out variations in the polices

19   of each foreman regarding tray washing, the frequency of tray washing, the number of

20   trays washed, and the picking seasons in which washing was required. (Id. at ¶¶ 64-73.)

21       In reviewing the evidence, the Court notes that only 20 of the original 69

22   declarations provided by Plaintiff in support of certification allege tray washing claims.

23   Generally, the claims of those declarants are consistent in alleging that tray washing

24   occurred until around 2007. (See Ramirez Decl., Exs. 14, 23, 24, 32, 46, 50, 61, 64-65.)

25   Several of the original declarations provided by Defendants also admitted tray washing

26   claims, but the majority did not. (See Johnson Decl., ECF No. 76, Exs. 4 [took trays

27   home "a few years ago"], 7 [declarant amended declaration by hand to add that he took

28   trays home two years ago], 28 [takes trays home to wash once a season], 41 [same], 51

1 [general practice three years ago was to have workers wash trays at home], 54 [stopped

2 washing trays at home two years ago]; 62 [took trays home to wash three years ago]; 77

3 [same]; 80 [same]; 83 [washed trays when started working].)

4       Furthermore, Trujillo's reports and notes provide evidence of other workers who

5 washed trays. (See Trujillo Decl. ¶¶ 34, [Maria Ayon reported washing trays, but

6 allegations were not included in her declaration], 46, 63, 86, 98, 103 [Jose Riambon, Lilly

7 Bravo, Erie Anguiniga Susan Antonio, Marcelino Simeon, Irma Aranjo, Amanda Martinez

8 Ruby Garcia, Rolando Antipuesto, and Maria Villa reported washing trays. Defendant did

9 not obtain declarations from these workers.].)

10       Finally, virtually all of the new declarations provided by Defendants state that

11 workers did not wash trays, while some of Plaintiffs' new declarations state the contrary.

12       Having weighed, and re-analyzed, all of the evidence, the Court cannot find

13 commonality met with regard to the post-shift work subclass. The more detailed analysis

14 of the evidence made here shows that to the extent that tray washing occurred, it was far

15 less pervasive, involved far fewer farmworkers, and was much more varied than can

16 support a finding that it was a common issue affecting an entire class. As Plaintiffs have

17 not established commonality, the Court shall grant Defendants' motion to decertify with

18 regard to this subclass.

19                     (4)     *Unreimbursed Necessary Tool Expenses*

20                          (a)     Legal Questions

21       Cal. Labor Code § 2802(a) states "An employer shall indemnify his or her

22 employee for all necessary expenditures or losses incurred by the employee in direct

23 consequence of the discharge of his or her duties." The Court previously found that "[t]he

24 evidence submitted by both sides is supportive of violations of... the tool policy" and

25 "[t]he presence of what appears to be wholesale workers purchasing tools to perform

26 necessary work is a common question." Arrendondo, 2011 U.S. Dist. LEXIS 44134 at

27 37-38. Like uncompensated work, if Plaintiffs can establish that they were not

28 reimbursed for necessary tool expenses, then liability shall follow. The Court continues

1  to find that Plaintiffs have presented a common question that can be resolved in a single

2  stroke. Whether the claims predominate is a separate inquiry.

3                              (b)      Review of Evidence

4        Employers argue that there are large variations in testimony regarding

5  unreimbursed tool claims. They claim variations in the frequency and reason for

6  purchasing tools even among those declarants who stated that they had purchased

7  tools. Some declarants state they were never issued tools, some say that sometimes

8  they were issued tools, and others state that they saw other employees using company

9  issued tools.  (Employers' Opp'n at 15.) Some class members testified that tools were

10  given but broke easily; others testified that they were adequate. (Johnson Decl. ¶¶ 117-

11  136.) Some class members testified that foremen would give each worker one set, but if

12  the tools broke or the worker was not present when tools were distributed, the worker

13  would have to buy his or her own tools. (Id.)  Ward's table shows 23 of the 58 crews had

14  no declarants alleging they were provided inadequate tools, 8 crews had less than 50%

15  alleging the same, and 18 crews had 100% of declarants alleging tool violations. (Ward

16  Decl. Page 8, Table 1). Employers also provide examples of differences in testimony

17  regarding tools: Some workers testified they were provided inferior quality tools they

18  preferred not to use; some said there were not enough tools for all the fieldworkers;

19  some said workers were given the option of purchasing tools from the foremen.

20  (Johnson Decl. ¶¶ 117-136.)

21        Delano Farms presents similar evidence. Bigelow created a chart of declarant tool

22  reimbursement violations broken down by foremen. (See Bigelow Decl., Ex. J.) Bigelow

23  counted declarants who alleged they were not provided tools, those who said they were

24  not provided replacement tools, those who said they were not provided tools they

25  needed if the employer deemed them unnecessary, and those who said the foreman

26  provided deficient tools. (Bigelow Decl., ¶ 26.) On the other hand, Bigelow deemed the

27  following as not alleging violations: declarants who alleged they were provided all

28  necessary tools; declarants who stated that they were provided tools but preferred their

                                          57

1  own; and declarants who were provided adequate tools, but then bought replacements

2  without asking Defendants to do so. (Id.) Of the 275 possible matches between

3  fieldworkers and foremen, 120 alleged violations, 126 did not, and 29 did not specify.

4  (Bigelow Decl. ¶ 77.) Bigelow also provides a chart breaking down potential variations in

5  the tool reimbursement claims into those showing variations as to: (1) whether the

6  declarant purchased his or her own tools, (2) who instructed declarant to purchase tools,

7  (3) the type of tools purchased by declarant, (4) whether the declarant asked for a

8  reimbursement for the tools, (5) and the stated reason for not using the tools issued by

9  Defendants. (Id., Ex. L.)

10      In discussing the evidence, Bigelow submits that there are many factual issues in

11  play. (Bigelow Decl. ¶¶ 74-92.) In addition to those above (e.g., whether the foreman ran

12  out of tools, whether the worker was present on the day the tools were issued, whether

13  the worker requested replacement tools or reimbursement for purchasing tools), Bigelow

14  notes disputes about which tools are necessary to do the work. (Id. at ¶ 75.) For

15  example, some declarants believe that gloves are required; others believe they are

16  optional. (Id.) Also, the type of tools purchased by each declarant varied. (Id. at ¶ 81.

17  ["Of the 63 Plaintiff declarants, 58 allege they purchased gloves; 34 allege they

18  purchased sharpening files; 3 allege they purchased sunglasses; 5 allege they

19  purchased clippers; 36 allege they purchased pruning shears; 48 allege they purchased

20  a holster; 5 allege they purchased blades; 54 allege they purchased picking shears; 6

21  allege they purchased rubber stoppers; 2 allege they purchased scissors; 7 allege they

22  purchased goggles; 1 alleges she purchased handkerchiefs; and 6 allege they

23  purchased knives."]).

24      In reviewing the declarations previously presented, the vast majority of those

25  provided by Plaintiffs allege tool reimbursement violations. While the majority originally

26  presented by Defendants denied tool reimbursement violations, some did describe

27  violations. (See Johnson Decl., ECF No. 76, Exs. 18 [purchased replacement tools], 23

28  [only started to provide tools in last three years, had to purchase tools in prior years]; 25

[bought clippers because not there on first day when issued]; 41 [purchased own clippers when issued clippers broke]; 47 [not present on first day when tools were issued and had to purchase his own] ; 62 [company only started issuing tools three years ago, had to purchase tools in prior years]; 70 [not present on first day when tools were issued and had to purchase her own].)

To the evidence provided at certification Defendants have added 39 new declarations and Plaintiffs have presented nine. Defendants' new declarations provide substantially uniform fieldworker and foremen statements to the effect that adequate tools were provided. These declarations do not suffer the problematic wording of Defendants' earlier declarations.  They describe practices in place for the duration of the fieldworkers' employment. On the other hand, several of the new declarations from Plaintiffs indicate workers were required to purchase tools. (Perero Decl., Exs. C, E, G, I.)

The Court in granting certification also relied upon documentary evidence, including receipts for the purchase of tools, as indicating a change in the practice "of not providing quality tools for the work." Arrendondo, 2011 U.S. Dist. LEXIS 44134 at *30. The Court explained:

> This change in practice is partially corroborated by the invoices submitted by Employers of the purchase of over two-thousand tools in 2009, while in prior years, minimal numbers of tools were purchased, or at least the documentary support is not available. (Doc. 76, Bangi Decl. Exh. A (Invoices); Doc. 77-2, Alarcon Decl. (Analyzing Bangi Invoices to show the number of tools purchased in years 2005-2009).) Employers argue that they did not retain invoices from prior years, but this argument carries little weight. Even if the actual invoices were not retained, for business or tax purposes, some documentary corroborating evidence of purchases should be available.

Id. at *30, n.5.

Further review leaves unclear the issue of whether this documentary evidence is supportive of Plaintiffs' claim. Other receipts show purchases of large quantity of sheers[sp] purchased from the same company in 2005, 2006 and 2007. (See Bangi Decl., Ex. A, ECF No. 76-24 at 14-17.) In reviewing the evidence provided by the parties,

1  distinctions were made by declarants regarding the purchase of clippers for harvesting

2  and shears for pruning. Many declarants describe pruning shears as being more

3  expensive (roughly $25). The receipts for tools purchased in prior years indicate they

4  were relatively inexpensive, suggesting they were perhaps purchases of clippers, not

5  shears. Without further information, the Court considers this documentary evidence too

6  equivocal to be of probative value.

7      The last piece of evidence relevant to this issue is Trujillo's declaration and

8  related evidence of his interviews with fieldworkers. These show that many fieldworkers

9  were not issued tools. Of greater concern, many of the declarations fail to accurately

10  reflect this fact. For example, in interviewing eight of Martin Casteneda's crew, Trujillo

11  reported that five had tool reimbursement claims. Roberto Rocha had never been issued

12  scissors[12] or shears and had to purchase his own. Jamie Gasper had only been issued

13  one pair of scissors in five years, and he stated that crew members had to be present on

14  the first day of work in order to be issued scissors. Alejandro Vaca always bought his

15  own scissors, and does not know if the company would issue him a pair. Antiono

16  Mariano stated that each crew is issued about 25 scissors, thus leaving half the crew

17  without a pair. Luz Chavez has not been present when scissors were issued and so

18  bought her own. (See Trujillo Decl., ¶ 29, Ex. 3.) The above notwithstanding, Rocha's

19  declaration does not reflect the fact, noted above, that he had never been issued

20  scissors; it just says he buys his own clippers. Similarly, Gasper's declaration omits the

21  fact he has only been issued one pair of clippers in five years; it just says employees

22  need to be present on the first day of tipping to receive tools. (Id., Ex. 4.)

23      Other omissions are troublesome. Trujillo notes that Irma Arciga stated the

24  company stopped issuing tools for a four to five year period, but started issuing them

25  again about three years ago. (Id., ¶ 47.) She had to purchase her own tools during that

26  interim period. (Id.) Defendants did not obtain a declaration from Arciga. Likewise,

27

28      [12] It appears that Trujillo uses the term scissors rather than clippers.

1  Manuel Cantorna stated that the company did not issue tools in the last year, and had to

2  purchase his own. (Id. ¶ 64.) Defendants did not obtain a declaration from Cantorna.

3  Jorge Barajas stated that he had only been issued one pair of clippers during his

4  employment and has purchased a pair each year. (Id. ¶ 75, Ex. 17.) Defendants did not

5  obtain a declaration from Barajas. Roberto Aguilar stated that he was never issued tools,

6  but never requested tools from the company. (Id. ¶ 87, Ex. 21.) Defendants did not

7  obtain a declaration from Aguilar. Santos Ramirez stated that he was not issued and had

8  to pay for clippers this harvesting season. (Id.) Defendants did not obtain a declaration

9  from Ramirez. Adelina Espino stated that she purchased her own clippers because the

10  foreman ran out. (Id. ¶ 99, Ex. 25.) Defendants did not obtain a declaration from Espino.

11  Amanda Martinez stated that the company does not replace clippers if they break. (Id.)

12  Defendants did not obtain a declaration from Martinez. Erica Cortez stated that she was

13  never issued clippers, and so had to purchase her own. (Id. ¶ 104, Ex. 26.) Defendants

14  did not obtain a declaration from Cortez. Jesus Vasquez stated that he had been

15  employed for 12 years, and had only been issued tools the first two years. (Id.) In

16  addition, he said that when equipment broke, the company would not replace it. Vasquez

17  also stated that the foreman requires him to sign a form saying he had received all

18  required equipment when he had not. (Id.) Defendants did not obtain a declaration from

19  Vasquez. Melissa Felix stated she was not issued tools on her first day even though she

20  signed a document stating that she did. (Id.) Defendants did not obtain a declaration

21  from Felix. Oliva Mora sated she was not issued and had to purchase clippers this year.

22  (Id.) Defendants did not obtain a declaration from Mora. Rosalia Silva stated in her

23  declaration that she was provided with the tools necessary to do her job, but  notes of

24  her interview indicate that she was not issued scissors and had to purchase them each

25  year.  (See ECF No. 273-26 at 11-12; ECF No. 273-38 at 29.) Trujilllo did not include the

26  past practices in his report. (ECF No. 273-26 at 5.) Manuel Lara stated in his interview,

27  and Trujillo's report reflects, that Lara was not provided clippers. (See ECF No. 273-26

28  at 5; ECF No. 273-38 at 33-34.) However, Lara's declaration omits the fact that he was

1   not provided tools. (ECF No. 273-26 at 29-31.)

2   (c)   Analysis

3   From the information provided by Trujillo, it appears that there were significantly
4   more tool violations than revealed in Defendants' declarations. Accordingly, the Court
5   must base its decision on an evaluation of the competing evidence provided by the
6   parties.

7   Several cases in this district have analyzed similar tool reimbursement claims with
8   regard to certification. In Munoz v. Giumarra Vineyards Corp., 2013 U.S. Dist. LEXIS
9   77839, *25-31 (E.D. Cal. May 31, 2013), the court found sufficient evidence of
10  commonality even though the declarations presented a "mixed picture," with the "vast
11  majority" of plaintiff declarations and a "majority" of defendants declarations supporting
12  the assertion that workers had to pay for replacement tools. Id. Plaintiffs also provided
13  significant evidence of a policy to that effect - defendant's person most knowledgeable
14  admitted that workers had to pay a deposit to use company tools and that pay was
15  deducted if workers lost tools. Id. Finally despite other changes, defendants still did not
16  provide replacement tools. Id. Based on such evidence the court found that plaintiff
17  established commonality and certified the subclass. Id.

18  On the other hand in Soto v. Castlerock Farming & Transp., Inc., 2013 U.S. Dist.
19  LEXIS 179899, 68-73 (E.D. Cal. Dec. 20, 2013), Rosales v. El Rancho Farms, 2012 U.S.
20  Dist. LEXIS 11069, 14-15 (E.D. Cal. Jan. 30, 2012), and Garcia v. Sun Pac. Farming
21  Coop., 2008 U.S. Dist. LEXIS 111969 (E.D. Cal. May 14, 2008), the courts declined to
22  certify subclasses due to the nature of the conflicting evidence.

23  In Soto v. Castlerock Farming & Transp., Inc., the plaintiff was the only individual
24  who asserted he had to purchase a replacement tool. 2013 U.S. Dist. LEXIS 179899,
25  *68-73. The other putative class members reported only other wage-and-hour violations.
26  Id. Declarations from defendant included foremen who stated that they provided tools
27  and from workers who stated that they were not required to purchase tools. Id. Given the
28  conflicting evidence, the court found that Plaintiff did not satisfy the commonality

1   requirement of Rule 23.

2          In <u>Rosales v. El Rancho Farms</u>, plaintiff provided declarations of eight workers

3   who stated that they were required to purchase tools, but defendant provided 71

4   declarations to the contrary. 2012 U.S. Dist. LEXIS 11069, *14-15. The court found that

5   such evidence defeated a finding of commonality, and it denied certification. <u>Id.</u>

6          Similarly, in <u>Garcia v. Sun Pac. Farming Coop.</u>, the court found conflicting

7   evidence precluded a commonality finding when seven plaintiff declarations alleged

8   violations and 33 defendant declarations stated that no violations occurred. 2008 U.S.

9   Dist. LEXIS 111969.

10         Here, unlike in <u>Munoz</u>, Defendants' written policy was to provide tools.

11  Nevertheless, the Court still finds the evidence in his case to be more akin to that in

12  <u>Munoz</u> than that in <u>Soto</u>, <u>Rosales</u>, and <u>Garcia</u>. Plaintiffs provide nearly uniform

13  declarations to the effect that they were not provided tools other than those which were

14  of such an inferior quality as to leave them no choice but to purchase their own.

15  Furthermore, several of the declarations provided by Defendants, and many of the

16  fieldworkers interviewed by Defendants, acknowledge tool reimbursement violations.

17  While there is evidence Defendants purchased some tools during the relevant period,

18  Plaintiffs have presented substantial evidence that many workers were required to

19  purchase necessary tools and were not reimbursed.

20         Plaintiffs have established commonality under Rule 23(a) for this subclass.

21             **3.      Typicality**

22                  a.      <u>The Court's Previous Findings</u>

23         The Court, in certifying the class action, provided the following

24  determination with regard to typicality under Rule 23(a)(3):

25         The claims of the named plaintiffs and the putative class members are the
26         same. Plaintiffs and the class claim they are required to work off-the-clock
           and are required to take work home. Plaintiffs and the class claim that
27         they were not reimbursed for tools necessary to perform their jobs.

28         Defendants argue the same position for commonality and typicality.

1
2
3

Defendants argue that the commonality and typicality in this particular case merge. "The commonality and typicality requirements ... tend to merge" because both focus on the similarities in claims across the class. Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).

4
5
6
7
8
9
10

As this Court has addressed the commonality supra, and found commonality, the Court will not repeat the analysis. The representatives' claims are typical of the proposed class members. Each of the proposed representatives claims that he/she was denied full compensation in violation of labor laws. The representatives claim that they were required to work pre-shift and post-shift, not permitted or allowed to take meal or rest periods, among other violations. Additional proposed class members submitted declarations which state that, they too, were denied these rights. For these and possibly other proposed members, they were not paid for their work and given breaks. Thus, the representatives claims are typical of all of the proposed class members.

11

Arrendondo, 2011 U.S. Dist. LEXIS 44134 at 43-44.

12

                b.     Analysis

13
14
15
16
17

Delano Farms asserts that since there is no common policy or practice uniformly applied to all class members, the claims of any one class member fail to typify those of the class. In support of its argument, Delano Farms relies upon Rosales v. El Rancho Farms, 2012 U.S. Dist. LEXIS 11069 (E.D. Cal. Jan. 30, 2012) for the proposition that the absence of commonality also means that there is no typicality.

18
19
20

The fact that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge" is not a new concept. Wal-Mart Stores, Inc., 131 S. Ct. at 2551 n.5. However, the inquiry hinges upon the specific facts presented in a given case.

21
22
23
24
25
26
27

In Rosales, the judge compared and contrasted the anecdotal evidence presented in this case to that presented in Rosales. Unlike the declarations presented by Defendants in this case, the Rosales court found defendants' declarations there credible. Those declarations showed a significant number of the field workers contended that no wage violations occurred.  The court held that commonality and typicality did not exist. Rosales, 2012 U.S. Dist. LEXIS 11069, at 13-14 ("[N]early three times the number of people who make these claims, were not required to work off-the-clock.") Due to the

28

1   differences in anecdotal evidence presented, the Court finds Rosales distinguishable

2   from the present case.

3        Delano Farms also relies upon Munoz v. Giumarra Vineyards Corp., 2012 U.S.

4   Dist. LEXIS 93043. However, in Munoz, the court held that plaintiffs met their burden to

5   show commonality and typicality for a non-compliant meal period and tool

6   reimbursement class, but that plaintiffs did not establish typicality for the overtime/piece-

7   rate and off-the-clock work claims. Munoz, 2012 U.S. Dist. LEXIS 93043 at 59-60, 65-67,

8   86-87, 93. The court found that the same unlawful meal policy applied to all fieldworkers,

9   including the class representatives, and as a result the plaintiffs had the same or similar

10  injuries as putative class members and, thus, typicality. Id. at 59-60. The Court also

11  found that class representatives were subject to the policies that either required workers

12  to pay a deposit for tools or replace any which were lost, and that their claims were

13  typical of the putative class members. Id. at 93.

14       On the other hand, the court did not find typicality with regard to the piece rate

15  pay and overtime claim. The court based its decision on the fact that plaintiffs failed to

16  identify any putative class members, paid on a pure piece rate, who worked overtime

17  without compensation. Id. at 65-67. Finally, the court held that typicality was not

18  established for the uncompensated off-the-clock work claim because of the conflicting

19  anecdotal evidence presented by the parties. Id. at 86-87 ("Plaintiffs do not appear 'to

20  have the same or similar injury' as many of the putative class members who assert off-

21  the-clock work was neither required nor permitted by Defendant.").

22       In response, Plaintiffs argue that Defendants' argument "piggy-backs" on their

23  arguments against commonality and therefore fail for the same reasons as did

24  commonality. (Opp'n at 21, fn 34.)

25       The Court finds that the reasoning of the original certification order regarding

26  typicality remains intact. The commonality and typicality requirements of Rule 23(a)

27  merge and rely on the factual inquiry as to whether Plaintiffs can show common

28  questions permeate the case. Wal-Mart Stores, Inc., 131 S. Ct. at 2551 n.5.   As

described above, with respect to the pre-shift and tool subclasses, Plaintiffs have shown that the totality of the evidence, including all the anecdotal evidence presented by the parties, establishes that Plaintiffs have presented common issues of law and fact. Unlike the evidence presented in Rosales and Munoz, Defendants' declarations lack credibility and many describe the exact violations that Defendants claim did not occur. As the class representatives have presented claims that they were not compensated for pre-shift work and for tool purchases, their claims are typical of the putative class members.

### 4. Adequacy of Representation

#### a. The Court's Previous Findings

In determining the adequacy of representation by class counsel, the Court previously held:

> The person representing the class must be able "fairly and adequately to protect the interests" of all members in the class. Fed. R. Civ. P. 23(a)(4). The representation is "adequate" if the attorney representing the class is qualified and competent and the class representatives are not disqualified by interests antagonistic to the remainder of the class. Lerwill v. Inflight Motion Pictures, Inc., 582 F.2d 507, 512 (9th Cir.1978). Because the parties do not dispute the adequacy of class counsel, the Court's analysis focuses on the adequacy of the class representatives.

> A class may not be appropriate where the class representatives claim a different type of injury from that being asserted on behalf of the other class members. Plaintiffs' claims and the class claims must be so interrelated that the interests of the class members will be fairly and adequately protected in their absence. Falcon, 457 U.S. at 157-58. A representative is not adequate if that party is antagonistic or has conflicts with other potential class members. Amchen Products, Inc. v. Windsor, 521 U.S. 591, 626, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997). The class representative must not seek relief that favors some class members at the expense of others. Payne v. Travenol Labs., Inc., 673 F2d 798, 810-11 (5th Cir. 1992).

> Defendants do not challenge the adequacy of the representation by the named plaintiffs. Further, defendant does not dispute that counsel is an experienced wage and hour attorney.

> Plaintiffs demonstrate that they are adequate representatives for the putative class members. Plaintiffs demonstrate that counsel will be adequately represent the interests of the class. From the Court's review of potential class counsel's declaration, counsel is an experienced wage and hour attorney with over 20 years of litigation and class action experience and a member of the American Board of Trial Advocates. (Doc. 75-3, Gregory Ramirez Decl.) Accordingly, class counsel will provide adequate

representation.

Arrendondo, 2011 U.S. Dist. LEXIS 44134, at 45-46.

        b.     Analysis

Defendants do not challenge the adequacy of representation. The Court noted in the original certification order that Plaintiffs' counsel "is an experienced wage and hour attorney with over 20 years of litigation and class action experience and a member of the American Board of Trial Advocates." Arrendondo, 2011 U.S. Dist. LEXIS 44134 at 46. Plaintiffs are still represented by the same counsel, and nothing counsel has done since the original certification decision has made this Court question whether counsel is capable of providing adequate representation.

## B.    RULE 23(b) REQUIREMENTS

If Plaintiffs satisfy their burden under Rule 23(a), the Court must also find that at least one of the following three conditions of Rule 23(b) is satisfied:

(1) the prosecution of separate actions would create a risk of:

> (a) inconsistent or varying adjudications or (b) individual adjudications dispositive of the interests of other members not a party to those adjudications;

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class; or

(3) the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

In moving for certification, the Plaintiffs proposed, and the Court granted, certification under Rule 23(b)(3). Defendants now challenge whether questions of law or fact common to the members of the class predominate over any questions affecting only individual members.

### 1.    The Court's Previous Findings

In finding that predominance was met, the Court provided the following reasoning:

> Under Rule 23(b)(3), the predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation. See Local Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc., 244 F.3d 1152, 1162 (9th Cir.), cert.

denied, 534 U.S. 973, 122 S. Ct. 395, 151 L. Ed. 2d 299 (2001). "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." Id. The existence of certain individualized or deviating facts will not preclude certification if most class members were subjected to a company policy in a way that gives rise to consistent liability or lack thereof. See, e.g., Kurihara v. Best Buy Co., Inc., 2007 U.S. Dist. LEXIS 64224, 2007 WL 2501698, *9-10 (N.D.Cal.2007) (predominance requirement satisfied where plaintiff provided substantial evidence of the existence of a company-wide policy even if in practice there are deviations from the policy).

Here, the evidence shows some discrepancy in application of the employment practices. The evidence shows that some of the class suffered from the same discriminatory practices, while others did not. For instance, some class members may have been required to report early to work for pre-shift work, while others workers may not have been required to report pre-shift. Some workers may have been required to purchase their own tools, and others were not, while still others were provided tools but provided inadequate tools. For these reasons, the class as it is composed by plaintiffs may be too broad. The evidence does not show that the employment practice pervades the prospective class members. The evidence, rather, shows some diversity of the employer's employment practices among the workers.

In their reply brief, plaintiffs suggested possible "subclasses":

(1) Field workers who performed uncompensated and unrecorded work before the fixed start time in the harvest and pre-harvest work.

(2) Field workers who performed uncompensated and unrecorded work after the fixed stopping time in the harvest work.

(3) Field workers who performed uncompensated and unrecorded work after hours by washing their picking trays at home

(4) Field workers who incurred unreimbursed necessary tools expenses in the harvest and pre-harvest work.

On March 14, 2011, the Court requested supplemental briefing as to whether subclasses are appropriate in this case. The parties filed their supplemental briefing, but neither party addressed the appropriateness of these subclasses. Defendants continued to argue no class is appropriate. Plaintiffs did not further address the subclasses. Regardless, in the interest of judicial economy to not further expand the time and effort employed by the Court in this motion, the Court turns to whether the subclasses are appropriate in this case. See Fed.R.Civ.P. 23(c)(5) (the court may divide a class into subclasses, and thereafter treat each subclass separately).

From the Court's review of the totality of the evidence submitted in moving and opposition papers, including in replies, sur-replies and

1
2
3
4
5
6
7
8
9

responses thereto, wage violations occurred in all of these categories. A common nucleus of facts and common legal questions dominates this litigation if the class is split into the proposed subclasses. Each subclass has common questions of law and fact which predominate within the subclass. Subclass 1 has common questions of the policy application to pre-shift, and whether class members received the pay for pre-shift work. Subclass 2 has common questions of the policy application to post-shift work, and whether class members received pay for post-shift work. Subclass 3 has common questions whether class members received the pay for at home work. Subclass 4 has common questions of the policy application to tool purchases, and whether class member received the pay for tool purchases. There may be some variance among the individual employees which may result in difficulty of proof in demonstrating which employees fall within which subclass. For instance, each person who suffered "pre-shift" work off-the-clock, may not also fall into the subclass of persons who purchased their own tools without reimbursement. Nonetheless, given the common issues, the variance does not defeat predominance. [fn11]

10
11
12

**FN11**: The Court is confident that the parties can fashion methods of common proof to ensure members are properly classified within a subclass. For instance, one possibility is a randomly selected sample of claimants coupled with expert statistical analysis based upon Employer records and survey results.

13    Arrendondo v. Delano Farms Co., 2011 U.S. Dist. LEXIS 44134, at 46-51.

14              **2.      Defendant's Contentions**

15    Defendants rely heavily upon Marlo v. UPS, Inc., for the proposition that the

16    evidence in the present case is insufficient to show that common claims predominate

17    over individual issues affecting the class. 639 F.3d 942, 948 (9th Cir. 2011). Specifically,

18    Defendants assert that "without a reasonable basis for extrapolation (such as might be

19    provided by a company-wide policy or practice), the testimony of a few class members

20    cannot be said to represent the experience of the whole," and without such common

21    proof Plaintiffs have failed to show predominance. (Delano Farms Opp'n at 16-17.)

22    In Marlo, the Ninth Circuit reviewed a decision of the district court decertifying a

23    class of supervisors at UPS who alleged that they were wrongfully classified as exempt

24    and therefore not provided overtime and other wages. The district court, in the

25    certification order, described the difficulties in showing that exemption classification

26    wrongfully classified all the members of the class.

27
28

The existence of a uniform policy classifying the [Full-Time Supervisors] as exempt does not necessarily establish that the policy was misclassification. It is possible to have a classification policy that properly

1

2

classifies some employees as exempt and improperly classifies others as exempt. See, e.g., Dunbar, 141 Cal. App. 4th at 1427. An exemption policy is different from a facially unconstitutional policy of discrimination, for example, in that something more must be shown to establish that the policy was wrongful. In other words, a class-wide determination of misclassification generally cannot be provided from the existence of an exemption policy alone.

3

4

5

6

7

8

9

10

11

To show that an exemption policy resulted in widespread misclassification, there has to be some common proof that allows a fact-finder to make a class-wide determination. Sav-On, 34 Cal. 4th at 329-330. In the Sav-On decision, the California Supreme Court explained that class certification should be supported by "substantial evidence" of misclassification, id. at 329, referring to a plaintiff's "common proof" or "common evidence", id. at 330 n.4, 336. The need for common proof recognizes that a plaintiff's evidence should have some common application to class members in order to provide a basis for the jury to find that "misclassification was the rule rather than the exception." See id. at 330. Otherwise, there is a risk that without common proof the inquiry will raise individualized issues since that inquiry focuses "first and foremost, [on] how the employee actually spends his or her time." Ramirez v. Yosemite Water Co., 20 Cal.4th 785, 802, 85 Cal. Rptr. 2d 844, 978 P.2d 2 (1999).

12

13

14

15

Marlo v. UPS, 251 F.R.D. 476, 484 (C.D. Cal. 2008). The district court went on to explain why plaintiffs did not make a sufficient showing of commonality and predominance of the alleged practice. The court explained that individual inquiries become central to the case when:

16

17

18

19

20

21

22

a plaintiff brings a claim on a class-wide basis that raises individualized issues, but fails to provide common proof that would have allowed a jury to determine those issues on a class-wide basis. This is Plaintiff's failure in this case - Plaintiff has not provided common proof to support a class-wide judgment as to liability. In the absence of common proof, the jury may have sufficient evidence to make judgments as to particular individuals, but lacks a basis to extrapolate from those findings to a class-wide judgment.[fn7] This is a situation where a class action is neither efficient nor appropriate as the record is limited to evidence of individual claims. As there is no common proof of misclassification in this case, there is no basis to adjudicate class-wide misclassification and the result is that individualized issues predominate over common ones.

23

24

25

FN.7: Common proof could involve simple reference to policies in some cases, but will often require individual employee testimony, expert testimony, generalized surveys, statistical analyses, or some combination of all this evidence. The type of common proof needed will vary based upon the factual circumstances and alleged legal wrong.

26

27

28

Marlo v. UPS, 251 F.R.D. 476 at 485. In light of the factual and legal circumstances of the case, the court found that "[t]he exempt/non-exempt inquiry focuses on what an employee actually does" and the evidence "submitted by the parties suggest variations

in job duties that appear to be a product of employees working at different facilities, under different managers, and with different customer bases." Id. at 486. Accordingly the Court concluded that:

> [w]ithout more than this individual testimony, the Court cannot conceive how the overtime exemption will be presented to the jury as a common issue for class-wide adjudication, as opposed to a number of individualized inquiries. There is a significant risk that the trial would become an unmanageable set of mini-trials on the particular individuals presented as witnesses.

Id. at 486. On appeal, the Ninth Circuit agreed that "[t]he existence of a policy classifying [plaintiffs] as exempt from overtime-pay requirements does not necessarily establish that [plaintiffs] were misclassified, because the policy may have accurately classified some employees and misclassified others." Marlo v. UPS, Inc., 639 F.3d 942 at 948. And, upon review of the analysis of the district court, the Ninth Circuit affirmed that plaintiffs did not present sufficient evidence to support a finding of predominance. Id. at 948-949. ("To the extent Marlo argues that UPS's policies and procedures establish sufficient evidence of predominance, his argument fails." Additionally, "Marlo's remaining evidence similarly does not support predominance.").

Defendants also rely on several district court cases to support the proposition that Plaintiffs have not established predominance. Defendants refer to Cruz v. Dollar Tree Stores, Inc., 2011 U.S. Dist. LEXIS 73938, 2011 WL 2682967 (N.D. Cal. July 8, 2011), in which a  court decertified a class of store managers who, like the supervisors in Marlo, claimed that they were misclassified as exempt and thereby denied overtime pay and breaks. Id. at *3. Dollar Tree required store managers to complete weekly payroll certification forms indicating whether they spent more than fifty percent of their actual work time each week performing 'managerial' tasks. Id. at *5. Initially, the court held that the payroll certifications provided common proof of how the managers spent their time, obviating the need for significant individual testimony, and certified the class. Id. at *7. Upon subsequent review, the court became doubtful whether the certifications were accurate. Id. at *12 ("Both parties have repeatedly attacked the reliability of the

1  certification forms."). Based on the state of the evidence, and the decisions of other

2  courts in overtime exemption cases, the court found certification improper. Id. at *26

3  ("Because it is no longer viable to consider the payroll certifications reliable common

4  proof of how class members were spending their time, there is no basis for distinguishing

5  this case from those in which this district has found certification improper. As in those

6  cases, the failure of Plaintiffs here to offer a basis for extrapolation of representative

7  testimony to the class as a whole is fatal to continued certification.").

8  Defendants also rely upon Pryor v. Aerotek Scientific LLC, 278 F.R.D. 516 (C.D.

9  Cal. 2011), to demonstrate that the present class must be decertified because individual,

10  rather than common questions, predominate. In Pryor, the plaintiff sought to certify a

11  class consisting of all employees of a call center in California who allegedly were denied

12  compensation under a policy requiring employees to arrive ten minutes early and work

13  without compensation while they logged into their computers. Id. While the existence of a

14  common policy satisfied the commonality requirement, the court found the following

15  issues with determining liability and whether the claims of the class predominated in the

16  litigation.  The Court stated:

17
18
19
20
21
22
23
24
25
> Here, while the policies about which Pryor complains are common, how those policies affect members of the class depends on the individual circumstances of each Aerotek employee. Once the factfinder determines what Aerotek's policies are, that does not answer the ultimate question in the case — whether Aerotek's time reporting policies resulted in the undercompensation of and failure to pay overtime to putative class members. This is not merely a question of damages, it is a question of liability. Jimenez v. Domino's Pizza, Inc., 238 F.R.D. 241, 253 (C.D. Cal. 2006) ("[T]his is not the typical case where a class can be certified because the class members' duties are, or can be determined to be, roughly identical, despite the need for individual damage determinations based on the number of hours worked. Here the variability goes to whether an individual class member has any claim at all"). If Aerotek's records accurately reflect the time worked by a putative class member, and if the company compensated the employee worker accordingly, then (at least as respects that employee), it did not violate the California labor laws on which Pryor's claims rest.

26  Id. at 532.

27  Thus, notwithstanding the common policy, "the factfinder would still have to

28  determine the arrival and departure time of each employee on each day, compare that to

the time the employee recorded in [the time entry system], and determine whether that time… resulted in under-compensation of the employee." Id. at 533. Based on this, the court concluded that "Pryor has given the court no reason to believe that if a class were certified, hundreds of mini-trials on the issues necessary to determine if Aerotek underpaid employees would not be required" and that individual questions predominate over common ones. Id. at 536.

Finally, Defendants cite to Ordonez v. Radio Shack, Inc., in which the court found that individual inquires predominated the question as to whether employees failed to receive rest breaks thereby creating liability on behalf of Defendant. 2013 U.S. Dist. LEXIS 7868, 36-39 (C.D. Cal. Jan. 17, 2013). The court described the difficulty in establishing liability:

> In light of this competing testimony, whether putative class members were actually provided or deprived of the rest breaks owed to them requires individualized inquiries. There is evidence in the record that putative class members were granted the opportunity to take rest breaks in accordance with California law. See Gonzalez v. Millard Mall Servs., Inc., 281 F.R.D. 455, 2012 WL 684590, at *8 (S.D. Cal. 2012) ("The conflicting evidence reveals that Millard did not have a uniform practice of denying employees their meal breaks and/or rest breaks."). Because of the competing testimony before the Court, plaintiff's evidence that defendant may have an illegal, written rest break policy is insufficient for this Court to find that common issues predominate. Unlike other cases where a defendant had a purportedly illegal rest or meal break policy and courts found that common issues predominated, there is substantial evidence in this case that defendant's actual practice was to provide rest breaks in accordance with California law, as discussed previously.

Ordonez, at 36-39.

### 3. Plaintiffs' Response

In opposition, Plaintiffs dispute Defendants' contention that the failure to follow a consistent policy in treatment of farmworkers makes this action unsuitable for class treatment. Plaintiffs note that Judge O'Neill recently said as much with regard to wage violation claims. See Adoma v. University of Phoenix, Inc., 270 F.R.D. 543, 548 fn.4 (E.D. Cal. 2010) ("In opposing class certification, defendants argue that there is no evidence that defendants had a widespread practice of requiring [employees] to work off-the-clock. . . . [S]uch a policy is neither necessary to the individual plaintiffs' claims

1  nor for a showing of predominance.").

2        Further, Plaintiffs contend that Defendants' arguments confuse the analysis

3  concerning ultimate liability with the analysis concerning whether common questions of

4  law or fact predominate. Plaintiffs allege that Defendants improperly urge this Court to

5  make merits-based decisions that need not be made at this time. Plaintiffs caution the

6  Court that "an inquiry into the merits of the claims of the representatives or the class is

7  inappropriate when making the decision whether the action should be certified under

8  Rule 23." Citing O'Connor v. Boeing North Am., Inc., 184 F.R.D. 311, 318 (C.D. Cal.

9  1998); Blackie v. Barrack, 524 F.2d 891, 901 (9th Cir. 1975); Eisen v. Carlisle &

10  Jacquelin, 417 U.S. 156, 177-178 (1974).

11        Plaintiffs counter Defendants contentions that individual damages and individual

12  defenses prevent this Court from continuing to treat this case as a class action. For

13  instance, Plaintiffs refer to several cases, including Schulz v. Qualxserv, LLC, 2012 U.S.

14  Dist. LEXIS 58561, 18-22 (S.D. Cal. Apr. 26, 2012). In Schulz, the court certified a wage

15  and hour class and explained why individual claims did not predominate the analysis:

16        The Court rejects these arguments because Plaintiffs challenge the
   uniform policy not to compensate service technicians for the specified
17        activities. Defendants require the technicians to perform these daily tasks
   yet they do not record the time or pay the technician's for the time it takes
18        to review calls on the computer; decline or accept calls; schedule
   appointments; drive to the facility to pick up required parts; close calls at
19        the end of the day; or re-package parts. The application of the "control
   rule" is a common question that can be answered on a classwide basis. In
20        addition, Defendants do use a system to record the time devoted to these
   daily duties by employees in other categories as well as by technicians
21        who perform an early service call before driving to the parts pickup facility.
   The common question is whether these tasks and travel time can be
22        excluded from the calculation of whether employees are entitled to be
   paid, whether they qualify for overtime, and whether they have been paid
23        minimum wage. Adoma, 270 F.R.D. at 548-51 (certifying class claim on
   off-the clock hours and employer's knowledge of uncompensated work);
24        Ortega v. J.B. Hunt Transp., Inc., 258 F.R.D. 361, 371-73 (C.D. Cal. 2009)
   (certifying class challenging piece rate compensation system for truck
25        drivers); Cervantez v. Celestica Corp., 253 F.R.D. 562, 576-77 (C.D. Cal.
   2008) (certifying class on common question of whether workers must be
26        paid for time waiting time in security line at shipping facility). Differences in
   the amount of an individual's damages caused by the allegedly unlawful
27        policy does not defeat class certification. Stearns, 655 F.3d at 1026;
   Yokoyama, 594 F.3d at 1089; Blackie, 524 F.2d at 905.

28

1  Schulz, 2012 U.S. Dist. LEXIS 58561 at 18-22. Based on the facts presented here,

2  Plaintiffs argue that individual issues regarding liability do not predominate the analysis.

3  **4.     Analysis**

4  As described above, the legal standard at issue under Rule 23(b)(3) is whether

5  "questions of law or fact common to the members of the class predominate over any

6  questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The Rule 23(b)(3)

7  predominance inquiry tests whether proposed classes are sufficiently cohesive to

8  warrant adjudication by representation." Amchem, 117 S. Ct. at 2249; Hanlon, 150 F.3d

9  at 1022.

10  Despite Defendants urging, the Court does not find that the Ninth Circuit in Marlo

11  set forth new law regarding the predominance standards. While Marlo presents a

12  significant discussion of the evidence presented and how it impacts the predominance

13  inquiry in that case, nothing there changes the highly factual specific predominance

14  inquiry the Court must make here. Much of the extensive discussion regarding whether

15  predominance of questions of law or fact existed in Marlo revolved around showing that

16  the putative class members were improperly classified as exempt. The court was

17  concerned that individual inquiries were required to determine if an employee was mis-

18  classified – a showing that was required to establish liability. As each employee had

19  varied job duties, the court found that exempt/non-exempt inquiry did not present

20  common issues that could establish that common issues predominate. To the extent that

21  Defendants assert that Marlo stands for the proposition that anecdotal evidence of class

22  members cannot be sufficient to represent the experience of the whole and establish

23  predominance, Defendants read too far.

24  Here, there is little individualized inquiry required to establish liability. If a

25  farmworker performed uncompensated work, or was not reimbursed for purchasing

26  necessary tools, those facts alone will establish liability. Unlike cases involving

27  discrimination or misclassification, there is no individualized inquiry required apart from

28  whether the work was performed or the tools were purchased.

1    Defendants have presented several district court cases in an attempt to show that

2    individual issues predominate.  Those cases are distinguishable. Cruz v. Dollar Tree

3    Stores, Inc. is another misclassification case involving individualized inquiries regarding

4    whether store managers spent the majority of their time performing managerial tasks.

5    2011 U.S. Dist. LEXIS 73938, 2011 WL 2682967 (N.D. Cal. July 8, 2011). Without

6    establishing how each manager spent his or her time, misclassification of the workers as

7    exempt and the resulting liability could not be established. Once again, here, if Plaintiffs

8    can prove on the merits that they performed uncompensated work, there is no need to

9    perform individual inquiries. Defendants have not provided sufficient reasons why

10   determining whether uncompensated work was performed could not be determined on a

11   class-wide basis.

12   While Defendant's also rely on Pryor v. Aerotek Scientific LLC, a wage and hour

13   case, the facts of the case are materially different. 278 F.R.D. 516 (C.D. Cal. 2011). A

14   company policy required each employee to arrive ten minutes early to log into his or her

15   computer. However, in determining if the employee performed uncompensated work, or

16   of the amount of work was accurately recorded involved individual inquires as to whether

17   the employee was not properly compensated. This was made more complicated by the

18   fact that many employees logged in but did not perform other work before the start time,

19   and that most work time was rounded to 15 minute intervals which would also affect

20   whether pre-shift work was properly compensated. Pryor, 278 F.R.D. 516 at 535 ("This is

21   particularly problematic because some putative class members have stated that they

22   logged into their computers upon arriving at work but then spent time eating breakfast or

23   socializing with friends before logging onto VCC and accepting calls. This testimony

24   suggests that the computer logins time may differ significantly from the time an

25   employee actually began work for which he or she was entitled to be compensated.").

26   Finally, Defendants cite to Ordonez v. Radio Shack, Inc., in which the court found

27   that individual inquires predominated where the liability issue was whether employees

28   failed to receive rest breaks. 2013 U.S. Dist. LEXIS 7868, *36-39. However, in Ordonez,

1   the court's decision was predicated on the fact that there was "substantial evidence" that

2   defendants' actual practice was to provide rest breaks as required. Id. at *37-39. Here,

3   substantial evidence indicates that workers engaged in unpaid pre-shift work.

4        Delano Farms also relies heavily upon the Seventh Circuit opinion in Espenscheid

5   v. DirectSat USA, LLC, for the proposition that a class action should be decertified if

6   there are variations and difficulty in calculating damages. 705 F.3d 770 (7th Cir. 2013).

7   There the court found that, even assuming liability could be established,  determining

8   damages was not a mechanical, formulaic task as it might be if class members were

9   denied a lunch break, but instead would require an individual evidentiary hearing for

10  each class member. Id. at 773. However, the resolution in Espenscheid was significantly

11  influenced by plaintiff's failure to present a realistic method of presenting representative

12  testimony as to the damages suffered by class members. The Court explained:

13         The plaintiffs responded rather truculently by opposing bifurcation and
           subclasses and refusing to suggest a feasible alternative, including a
14         feasible method of determining damages. Eventually they expressed
           grudging acquiescence in dividing the class into subclasses but insisted
15         that all the technicians were in all the subclasses and that their
           unrepresentative "representative" witnesses could therefore testify about
16         the violations challenged by all three subclasses. Yet they acknowledged
           that it would "be difficult for Plaintiffs to provide an objective framework for
17         identifying each class member within the current class definitions without
           making individualized findings of liability."
18
           They continue on appeal to labor under the misapprehension that
19         testimony by 42 unrepresentative "representative" witnesses,
           supplemented by other kinds of evidence that they have been unable to
20         specify, would enable a rational determination of each class member's
           damages. They must think that like most class action suits this one would
21         not be tried—that if we ordered a class or classes certified, DirectSat
           would settle. That may be a realistic conjecture, but class counsel cannot
22         be permitted to force settlement by refusing to agree to a reasonable
           method of trial should settlement negotiations fail. Essentially they asked
23         the district judge to embark on a shapeless, freewheeling trial that would
           combine liability and damages and would be virtually evidence-free so far
24         as damages were concerned.

25  Espenscheid, 705 F.3d at 775-776.

26        Here, The Court agrees that Plaintiffs shall be required at trial to present concrete

27  and reliable methods for determining liability and damages. However,  Espenscheid

28  does not stand for the proposition that individual inquires and potential variances in

damages should result in de-certification.

In contrast to Espenscheid, the Ninth Circuit has held that "damage calculations alone cannot defeat certification." Leyva v. Medline Indus., 716 F.3d 510, 513 (9th Cir. 2013) (citing Yokoyama v. Midland Nat'l Life Ins. Co., 594 F.3d 1087, 1094 (9th Cir. 2010)). The Ninth Circuit explained:

> The district court denied certification because for each sub-class "the damages inquiry will be highly individualized." But damages determinations are individual in nearly all wage-and-hour class actions. Brinker Rest. Corp. v. Superior Court, 53 Cal. 4th 1004, 139 Cal. Rptr. 3d 315, 273 P.3d 513, 546 (Cal. 2012) ("In almost every class action, factual determinations of damages to individual class members must be made. Still we know of no case where this has prevented a court from aiding the class to obtain its just restitution. Indeed, to decertify a class on the issue of damages or restitution may well be effectively to sound the death-knell of the class action device.") (internal citation and quotation marks omitted). Thus, "[t]he amount of damages is invariably an individual question and does not defeat class action treatment." Blackie v. Barrack, 524 F.2d 891, 905 (9th Cir. 1975); see also Yokoyama, 594 F.3d at 1089 ("The potential existence of individualized damage assessments . . . does not detract from the action's suitability for class certification."). In deciding otherwise, the district court abused its discretion by applying the wrong legal standard. See Hinkson, 585 F.3d at 1263.

> Indeed, the Supreme Court clarified in Dukes that "individualized monetary claims belong in Rule 23(b)(3)." 131 S. Ct. at 2558. Thus, the presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3).

Leyva, 716 F.3d at 513-514. The Ninth Circuit agreed that plaintiffs in a class action must be able to show that their damages stemmed from the actions of defendants that created the legal liability. See Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1435 (2013). But the Ninth Circuit did not read further into Comcast as to requirements for a workable damages model. Leyva, 716 F.3d at 514. In light of Leyva, at least one court in this district has found that even when "wide divergence on the question of damage calculations for proposed class members" is expected, the divergence did not defeat a finding of predominance under Rule 23(b)(3). See Gripenstraw v. Blazin' Wings, Inc., 2013 U.S. Dist. LEXIS 179214, 21-23 (E.D. Cal. Dec. 19, 2013) (Ishii, J.).

Other courts from within the Ninth Circuit have held that Comcast does not act as a bar to class actions where the plaintiffs provide a workable damages model. See Giles

1  v. St. Charles Health Sys., 2013 U.S. Dist. LEXIS 152695 (D. Or. Oct. 22, 2013) (listing

2  cases). Further, nothing in Comcast indicates that a common methodology requirement

3  is applicable to wage and hour claims under federal and state law. Id.; see also, Harris v.

4  comScore, Inc., 2013 U.S. Dist. LEXIS 47399, 2013 WL 1339262, *11 n.9 (N.D.Ill. Apr.

5  2, 2013) (language in Comcast indicating that "damages must be measurable based on

6  a common methodology applicable to the entire class . . . is merely dicta and does not

7  bind this court") (citing Justices Ginsburg and Breyer, dissenting: "the decision should

8  not be read to require, as a prerequisite to certification, that damages attributable to a

9  classwide injury be measurable on a class-wide basis").

10         Defendants raise a number of arguments based on variation in amount of pre-shift

11  work performed by individual Plaintiffs. However, as explained recently by the Ninth

12  Circuit, such variation does not preclude a finding of predominance under Rule 23(b)(3).

13  Leyva, 716 F.3d at 513-514. This Court is aware of the need for Plaintiffs to provide a

14  reasonable method of calculating damages at trial. However, as Plaintiff's note in

15  opposition to Delano Farm's motion for a trial plan, the parties have to date been

16  prevented from engaging in merits based discovery. (See Opp'n to Trial Plan at 4, ECF

17  No. 292.) While the parties shall be required to provide a trial plan prior to trial, Plaintiffs'

18  failure to describe a method for determining damages without being provided the

19  opportunity to conduct discovery on the issue shall not prevent the Court from

20  establishing predominance. Accordingly, Defendants' arguments that individual issues

21  predominate due to the variation in the amount of uncompensated work and resulting

22  damages attributed to each worker fails.

23         Defendants' other claims that variances prevent a finding of predominance also

24  fail. Plaintiffs need not show a common policy requiring unpermitted work or a policy

25  prohibiting reimbursement for tool purchases to establish predominance.  See Adoma v.

26  Univ. of Phoenix, Inc., 270 F.R.D. 543, 548 (E.D. Cal. 2010) ("Although such a policy, if

27  proven, would provide evidence in support of the test identified above, such a policy is

28  neither necessary to the individual plaintiffs' claims nor for a showing of predominance.").

1   For each of the claims, Defendants' assert that there was a policy prohibiting all

2   violations. However, Plaintiffs have presented sufficient evidence that such polices were

3   not followed. Furthermore, Defendants face the same potential liability from fieldworkers

4   who were required to perform uncompensated work and those who voluntarily performed

5   uncompensated work. Claims that such variation defeat predominance are without merit.

6        Defendants also argue that the exercise of discretion by foremen in charge of the

7   various crews produced variations. While it is true that the actions of a foreman could

8   affect whether workers in his or her crew performed uncompensated work, the fact that

9   one foreman might have required fieldworkers to perform uncompensated work and

10  another merely permitted it is irrelevant to the present inquiry. The pre-shift work

11  subclass is limited only to those workers that performed pre-shift work, and the reason

12  why the work performed is not relevant to the analysis. As discussed above with regard

13  to commonality, even where the foreperson did not require pre-shift work to be

14  performed, most of the claims entailed setting up packing tables, something any

15  reasonably observant foreperson would have or should have known. Accordingly, issues

16  with regard to the forepersons' discretion do not discredit Plaintiffs' showing that

17  questions of law or fact common to the members of the class predominate individual

18  questions. Defendants' arguments regarding the difficulty in determining who is a class

19  member are properly addressed with regard to ascertainability, discussed below.

20       As described above, the parties presented extensive evidence in the form of

21  declarations of employees, supervisors, and expert witnesses in support of and

22  opposition to the motion for certification. The Court discussed the evidence at length in

23  granting certification. However, as required the Court shall again look at all the evidence,

24  including that already reviewed, and evidence newly presented with the motion for

25  decertification, with regard to Plaintiffs' pre-shift work and unreimbursed tool claims.

26       As discussed with regard to the commonality inquiry, Defendants have presented

27  thirty nine (39) new declarations of workers and foremen. (See Bigelow Decl. at ¶ 4, Ex.

28  OOO.) Plaintiffs present nine new declarations. (See Petero Decl.)  While the new

1    declarations present some conflicting evidence as to whether pre-shift work occurred,

2    the common question and inquiry regarding whether Defendants suffered or permitted

3    Plaintiffs to engage in pre-shift work predominate individual claims. Having found that a

4    significant number of declarants have alleged that pre-shift work occurred, Plaintiffs' trial

5    evidence will have to focus on proving that assertion. While the Court has discounted

6    Defendants' earlier declarations for failing to show applicability to past practices, the

7    Court acknowledges that Defendants have filed additional declarations in connection

8    with this motion which describe declarants' experiences in prior seasons.   Defendants'

9    argue that the updated evidence illustrates great variation in practice with regard to pre-

10   shift work. That is, indeed, one conclusion which could be drawn from the evidence.

11   However, it is entirely possible that the trier of fact may at trial find the evidence of one

12   party more credible and conclude that there is no significant variation in practice.

13        Take for example forewoman Andrea Natangcop's crew. T&R Bangi filed

14   Natangcop's declaration when opposing certification. (See Johnson Decl., Ex. 92, ECF

15   No. 76-4.) Natangcop stated in her February 28, 2011 declaration that "employees used

16   to be required to show up 15 minutes before the start time" but that practice stopped

17   about two years earlier. (Id.) This would suggest a policy change took effect for the 2010

18   season. In support of its motion for decertification Delano Farms attaches the declaration

19   of Johhy Sablas, the assistant foreman to Natangcop since 2005. (Bigelow Decl., Ex.

20   RR.) In direct contradiction to Natangcop's statements, Sablas states that Natangcop

21   "has always started [the] crew each day at the scheduled start time… and I have never

22   heard her tell the workers to arrive before the start of the shift." (Id.) While conflicting

23   testimony can be read to show there is no common practice, here it is clear one of these

24   two declarants' statements is flat wrong. Natangcop either required workers to arrive

25   early or she did not. Interestingly, the majority of her crewmembers who provided

26   declarations allege that they were required to work early. (See Bigelow Decl., Exs A-B.)

27   The resolution of such conflicts will depend on the fact-finders weighing of the evidence

28   supporting those competing factual contentions, and will not likely be mired down in

1    individual inquires.

2          Plaintiffs present evidence supporting the claim that other crews followed similar

3    practices in requiring pre-shift work. The majority of the evidence Defendants rely on in

4    opposition are previously-filed declarations that the Court determined did not properly

5    address Plaintiff's contentions. The Court does acknowledge that Defendants have

6    presented nearly forty new declarations that discuss both current and past practices and

7    allege that no pre-shift violations occurred. These declarations create questions as to

8    whether pre-shift work occurred that can only be resolved on the merits of the competing

9    evidence to be produced at trial. Plaintiffs have presented significant evidence that pre-

10   shift work occurred.  Defendants have rebutted with contrary evidence and evidence that

11   significant variation in practice occurred.  However, the issues regarding variability that

12   Defendants raise do not predominate the common question of whether Plaintiff's

13   performed uncompensated pre-shift work. Likewise, the inquiry of whether Plaintiffs'

14   were not reimbursed for tools is relatively simple and not predominated by individual

15   inquires.

16         C.    **ASCERTAINABILITY**

17         Defendants contend that though not an explicit requirement of Rule 23, the

18   inability to precisely ascertain the members of the subclasses here prevents certification.

19   "A class definition should be precise, objective, and presently ascertainable, though the

20   class need not be so ascertainable that every potential member can be identified at the

21   commencement of the action." Mazur v. eBay, Inc., 257 F.R.D. 563, 567 (N.D. Cal.

22   2009) (citation omitted). "A class is not ascertainable when the proposed definition

23   includes individuals who were never injured by the defendant's conduct, or if the

24   proposed definition would require the Court to determine whether a person is a member

25   of the class by evaluating the merits of the individual claims. Gonzales v. Comcast Corp.,

26   2012 U.S. Dist. LEXIS 196, 61 (E.D. Cal. Jan. 3, 2012) (citations omitted).

27         Defendants refer us to the opinion of economist Michael Ward that a statistical

28   sample cannot establish which members of the subclasses suffered a violation and are

1    entitled to compensation. (Ward Decl. ¶ 30.) Defendants further rely upon Cortez v. Best

2    Buy Stores, LP, in which the court found that a class that alleged rest break violations

3    was not ascertainable without individual inquiry because there were no time records

4    showing whether rest breaks were provided. 2012 U.S. Dist. LEXIS 15190, 11 (C.D. Cal.

5    Jan. 25, 2012). Defendants also point to Gonzales v. Comcast Corp., a class action

6    challenging defendant's policies and practices relating to its post-cancellation billing

7    procedures. 2012 U.S. Dist. LEXIS 196, (E.D. Cal. Jan. 3, 2012). The Court in Gonzalez

8    found that the class was not ascertainable because the class was over-broad and

9    contained individuals that were not injured and because plaintiffs had failed to establish

10   a method to calculate injury.  Id.

11        On the other hand, Plaintiffs point out that the class "need not be so ascertainable

12   that every potential member can be identified at the commencement of the action."

13   O'Connor v. Boeing North Am., Inc., 184 F.R.D. 311, 319 (C.D. Cal. 1998) (citation

14   omitted). "As long as the general outlines of the membership of the class are

15   determinable at the outset of the litigation, a class will be deemed to exist." Id.; see also

16   In re : Cathode Ray Tube (CRT) Antitrust Litig., 2013 U.S. Dist. LEXIS 137945 (N.D. Cal.

17   June 20, 2013) (citing In re OSB Antitrust Litigation, 2007 U.S. Dist. LEXIS 56584, 2007

18   WL 2253418 at *9 (E.D. Pa. August 3, 2007) ["Because the proposed class need only be

19   ascertainable by some objective criteria, not actually ascertained, challenges to

20   individual claims based on class membership may be resolved at the claims phase of the

21   litigation"]). Furthermore Plaintiffs assert that in the instant case, class members are

22   readily identifiable by "payroll records and can be further identified by other criteria such

23   as simple questionnaires or surveys." (Opp'n at 44.)

24        In granting certification, the Court addressed the issue of conflicting evidence and

25   the difficulty of ascertaining claim members if not all workers suffered wage violations:

26        There may be some variance among the individual employees which may
          result in difficulty of proof in demonstrating which employees fall within
27        which subclass. For instance, each person who suffered "pre-shift" work
          off-the-clock, may not also fall into the subclass of persons who purchased
28        their own tools without reimbursement. Nonetheless, given the common

issues, the variance does not defeat predominance. FN11

> **FN11**: The Court is confident that the parties can fashion methods of common proof to ensure members are properly classified within a subclass. For instance, one possibility is a randomly selected sample of claimants coupled with expert statistical analysis based upon Employer records and survey results.

Arrendondo, 2011 U.S. Dist. LEXIS 44134 at 50-51.

Here, the Court finds Plaintiffs arguments persuasive. While concerns about acertainabilty of class members are ongoing, Plaintiffs have described the "general outlines" of each subclass, and the determination regarding how to ascertain class members will be driven by the evidence supporting the resolution of the merits of the case. See e.g., Astiana v. Kashi Co., 291 F.R.D. 493, 500 (S.D. Cal. 2013) ("If class actions could be defeated because membership was difficult to ascertain at the class certification stage, there would be no such thing as a consumer class action.") (citation omitted). Defendants' assertion that survey or representative evidence is not allowable in this action is not accurate. The Ninth Circuit itself has, at least in theory, suggested that use of questionnaires to effectively and efficiently identify and manage class litigation is permissible. Walker v. Life Ins. Co. of the Southwest, 2012 U.S. Dist. LEXIS 186296 (C.D. Cal. Nov. 9, 2012) (citing Vinole v. Countrywide Home Loans, Inc., 571 F.3d 935, 947 (9th Cir. Cal. 2009) (noting that the decision to use "innovative procedural tools" suggested by plaintiffs, "such as questionnaires, statistical or sampling evidence, representative testimony, separate judicial or administrative mini-proceedings, [and] expert testimony" rested within the discretion of the district court).

Finally, the Court cannot ignore that one large reason it may be difficult to ascertain class members is Defendants' failure to record and keep accurate time records and records as to whether workers were provided with necessary tools. As the Sixth Circuit recently stated:

> Equally—if not more—persuasive is the district court's practical rationale: "[T]he need to manually review files is not dispositive. If it were, defendants against whom claims of wrongful conduct have been made could escape class-wide review due solely to the size of their businesses or the manner in which their business records were maintained." We find this reasoning compelling. It is often the case that class action litigation

1
2

grows out of systemic failures of administration, policy application, or records management that result in small monetary losses to large numbers of people. To allow that same systemic failure to defeat class certification would undermine the very purpose of class action remedies. We reject Defendants' attacks on administrative feasibility...

3
4

Young v. Nationwide Mut. Ins. Co., 693 F.3d 532, 540 (6th Cir. 2012).

5
6

For the foregoing reasons, the Court rejects Defendants request that the class be decertified based on alleged lack of ascertainability.

7

### D.   **SECTIONS 203 AND 226**

8
9
10
11
12
13
14
15
16
17
18
19
20

In a footnote Delano Farms asks the Court to confirm that Plaintiffs' claims arising from California Labor Code §§ 203 and 206 are not certified as they were not specifically described in the subclasses when the court originally granted certification. (Delano Farms Decert. Mot. at 6, n.12.) The state labor claims were alleged as the fourth and fifth causes of action of the complaint. While noting these claims, the order granting certification did not create subclasses directly relating to them. (See Compl. at ¶¶ 56-64, ECF No. 2.) Plaintiffs assert that while the claims were not specifically discussed in the certification order, similar such claims have been routinely considered derivative of the underlying state law claims upon which class certification is based. (Opp'n at 38.) Plaintiffs provide persuasive authority in support of their position. See Avilez v. Pinkerton Government Servs., 286 F.R.D. 450, 464 (C.D. Cal. 2012); White v. Starbucks Corp., 497 F.Supp.2d 1080, 1085, 1089-90 (N.D. Cal. 2010); Dilts v. Penske Logistics, LLC, 267 F.R.D. 631, 640 (S.D. Cal. 2010).

21
22
23
24
25
26
27

Under California Labor Code sections 201 and 202, employers are required to pay employees unpaid earned wages immediately upon termination, upon resignation if the employees resign after giving at least a 72-hour notice of resignation, and within 72 hours of giving notice of resignation if the employees do not give at least a 72-hour notice. Cal. Lab. Code §§ 201, 202. Under California Labor Code section 203, employees are awarded a penalty if the employer willfully fails to pay unpaid wages as required by several statutory provisions, including sections 201 and 202. Cal. Lab. Code § 203.

28

1      With regard to Section 203, Defendants assert that waiting time penalties require

2   individualized determinations that will predominate the claims because section 203

3   requires a finding that an employer willfully failed to pay wages, and a willfulness finding

4   is negated if there is a good faith dispute whether wages are due. In the context of

5   section 203, "willful" has been defined as an employer "intentionally fail[ing] or refus[ing]

6   to perform an act which was required to be done." Rodriguez v. SGLC, Inc., 2012 U.S.

7   Dist. LEXIS 164383 (E.D. Cal. Nov. 15, 2012); Amaral v. Cintas Corp. No. 2, 163 Cal.

8   App. 4th 1157, 1201, 78 Cal. Rptr. 3d 572 (2008). "The employer's refusal to pay need

9   not be based on a deliberate evil purpose to defraud workmen of wages which the

10  employer knows to be due." Id. (internal quotation marks omitted). Pursuant to 8 Cal.

11  Code. Reg. § 13520: "A willful failure to pay wages within the meaning of Labor Code

12  Section 203 occurs when an employer intentionally fails to pay wages to an employee

13  when those wages are due. However, a good faith dispute that any wages are due will

14  preclude imposition of waiting time penalties under Section 203." "A 'good faith dispute'

15  that any wages are due occurs when an employer presents a defense, based in law or

16  fact which, if successful, would preclude any recovery on the part of the employee." Id.;

17  see also Telles v. Su Juan Li, 2013 U.S. Dist. LEXIS 132932, 20-21 (N.D. Cal. Sept. 16,

18  2013).

19      In the present case, the issue of whether a failure to pay was willful will turn on

20  whether Defendants intentionally failed to pay wages due. This inquiry will be

21  substantially similar to the inquiry for uncompensated work. See Morillion.  22 Cal. 4th

22  575. Under Morillion, an employer is deemed to have suffered or permitted an employee

23  to work if it knew or should have known that its employees were working off-the-clock.

24  The inquiry of whether the employer knew or should have known an employee was

25  working off the clock involves nearly identical factual issues as the inquiry into whether

26  the employer had the requisite knowledge that it was failing to pay employees wages

27  when due. Further, the only good faith defense that Defendants raise is that the unpaid

28  work was de minimis. (Trial Plan Mot. at 11.) As described above, a de minimis defense

1    notwithstanding, defendants have not shown they were administratively unable to record

2    the hours employees worked. Rutti v. Lojack Corp., 596 F.3d 1046, 1057 (9th Cir. Cal.

3    2010) (applying de minims defense to FLSA claims); Lindow v. United States, 738 F.2d

4    1057, 1062. Moreover, Plaintiffs have presented evidence that Employers made little

5    effort to attempt to accurately record the time of individual workers. (See Creal Decl., ¶¶

6    13-22, Exs. 2-6, ECF No. 75-2. [Indicating review of daily timesheets kept by foremen

7    did not attempt to tack individual worker's hours.])

8         Defendants assert that Section 226 obligates Plaintiffs to prove that the failure to

9    comply with wage statement rules was knowing and intentional and that Plaintiffs

10   suffered injury as a result. (Trial Plan Mot. at 9-11.) For certification Plaintiffs must show

11   that class members suffered the same injury as a result of receiving non-complaint wage

12   statements. "The injury requirement in section 226, subdivision (e), cannot be satisfied

13   simply if one of the nine itemized requirements in section 226, subdivision (a) is missing

14   from a wage statement." Price v. Starbucks Corp., 192 Cal. App. 4th 1136, 1142, 122

15   Cal. Rptr. 3d 174 (2011). "By employing the term 'suffering injury,' the statute requires

16   that an employee may not recover for violations of section 226, subdivision (a) unless he

17   or she demonstrates an injury arising from the missing information. [internal citations

18   omitted] Thus, the deprivation of that information, standing alone is not a cognizable

19   injury." Id. at 1142-43. However, a "mathematical injury that requires computations to

20   analyze whether the wages paid in fact compensated [the employee] for all hours

21   worked" is sufficient to establish injury. Id. (citing Jaimez v. DAIOHS USA, Inc., 181 Cal.

22   App. 4th 1286, 1306, 105 Cal. Rptr. 3d 443 (2010) ). "While there must be some injury in

23   order to recover damages [under § 226(e)], a very modest showing will suffice." Jaimez,

24   181 Cal. App. 4th at 1306; see also Elliot v. Spherion Pac. Work, LLC, 572 F. Supp. 2d

25   1169, 1181 (C.D. Cal. 2008)

26        "Lost wages is a form of 'all actual damages,' which is recoverable under that

27   statute." Abdullah v. U.S. Sec. Assocs., 2011 U.S. Dist. LEXIS 156685, 26-28 (C.D. Cal.

28

1  Jan. 11, 2011) (citing <u>Cornn v. United Parcel Service</u>, 2006 U.S. Dist. LEXIS 9013, at *9

2  (N.D. Cal. Feb. 22, 2006)). Therefore, if the violations identified in the certified pre-shift

3  work class occurred, class members did not receive their full wage and have suffered

4  injury. As Plaintiffs assert that they were not compensated for pre-shift work, the inquiry

5  into uncompensated wages will be the same factual inquiry for showing actual damages

6  under section 226.

7       The claims under section 203 and 226 are derivative claims of the pre-shift work

8  subclass. Like the claims of the pre-shift work subclass, the legal and factual issues

9  relating to these claims are not predominated by individualized inquiries. To prevent

10  further confusion, the Court shall certify the claims as separate subclasses.[13]

11  **VIII.   <u>ORDER</u>**

12       In light of the foregoing, Defendants' Motions for Decertification are granted in

13  part and denied in part. The Court hereby DECERTIFIES the post-work and tray

14  washing subclasses.

15       The Court CERTIFIES the following pursuant to Rule 23(b)(3) as follows:

16       All non-exempt agricultural employees of DELANO FARMS
    COMPANY, CAL-PACIFIC FARM MANAGEMENT, L.P., and T&R
17  BANGI'S AGRICULTURAL SERVICES, INC. who performed field work at
    Delano Farms in California from four (4) years prior to the filing of this
18  action to the present, excluding irrigators, tractor drivers, swampers, and
    workers employed only in cold-storage." The class shall be divided into
19  subclasses as follows:

20  (1) Field workers who performed uncompensated and unrecorded work
    before the fixed start time in the harvest and pre-harvest work.
21
    (2) Field workers who incurred unreimbursed necessary tools expenses in
22  the harvest and pre-harvest work.

23  (3) Field workers who, due to the violations claimed in the pre-shift work

24  ////

25  ////

26

27       [13] Because these subclass claims are entirely derivative of the violations described in the pre-shift
    work subclass, subclass members must also be members of the pre-shift work subclass to have standing
28  as members of these subclasses.

subclass, received an inaccurate itemized wage statement.

(4) Field workers who were not paid wages within 72 hours of their termination and who qualify as a member of the pre-shift work subclass.

IT IS SO ORDERED.


Dated:   February 20, 2014           /s/ *Michael J. Seng*
                                   UNITED STATES MAGISTRATE JUDGE