1
2
3
4
5
6
7
8
9
10

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

11
12
13
14
15
16
17

| | |
|---|---|
| SABAS ARREDONDO et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DELANO FARMS CO., et al.,<br><br>Defendants. | 1:09-cv-01247 MJS<br><br>ORDER DENYING MOTION FOR PROTECTIVE ORDER<br><br>(Doc. Nos. 333, 340) |

18
19
20
21

    Plaintiffs seek a protective order to prevent Defendants from taking some 196 depositions of absent class members as a part of a "pilot study." Defendants assert the pilot study is a prerequisite to gathering statistical data necessary to respond to Plaintiffs' use of statistical evidence to prove labor violations suffered by the class.

22

**I.    FACTUAL AND PROCEDURAL BACKGROUND**

23
24
25

    The factual and procedural history of this case has been addressed in detail in this Court's earlier orders.  The court addresses here only events relevant to the present motion.

26
27
28

    Plaintiffs, agricultural workers employed by Defendants, filed this complaint on July 17, 2009 alleging various labor violations, including specifically that Plaintiffs

1  performed uncompensated, off-the-clock work and were not provided compensation for

2  the use of their own tools. Plaintiffs moved for class certification, and on April 19, 2011,

3  the Court granted certification to a class consisting of four subclasses of field workers.

4  (ECF No. 85.)

5       On November 13, 2012, Defendants moved to decertify the class. (ECF No. 203,

6  205.) After addressing issues of joint employment, the Court partially denied the motion

7  for decertification on February 21, 2014. (ECF No. 310.) The Court granted the motion

8  for decertification with regard to two of the four subclasses, but allowed the other two

9  subclasses (involving uncompensated pre-shift work and unreimbursed tool purchases)

10  to proceed. (Id.)

11       In its order on the decertification motion, the Court discussed at length the

12  evidence presented in support of and in opposition to decertification and its  pronounced

13  lack of clarity and credibility:

14       In determining whether there is sufficient commonality, the Court
must review and rely upon the declarations provided by each party. The
15  Court is not attempting to determine the underlying merits of the matter,
but at times it must address determinative issues to resolve certification
16  issues. With that said, it is noted that there are general credibility concerns
with regard to all the anecdotal evidence. Plaintiffs provided declarations
17  supportive of their claims, and Defendants' declarations generally tend to
show the contrary. Clearly, the declarations were not taken at random.
18  Because of the state of the evidence, it is also not particularly helpful to
combine and statistically analyze the information in the declarations.
19  Because of the differences in number of declarations submitted by the
opposing parties, any attempt to calculate the percentage of workers
20  suffering violations based on the number of violations reflected in
declarations is not likely to lead to an accurate result. The same problems
21  arise when attempting to show the percentage of violations that occurred
in each crew. In many instances only one person in the crew provided a
22  declaration. In the case of some crews, all the declarations were provided
by only Plaintiffs or only Defendants.
23
Arredondo v. Delano Farms Co., 2014 U.S. Dist. LEXIS 22658, 99-100 (E.D. Cal. Feb.
24
20, 2014).
25
26       The parties were then ordered to meet and devise a joint scheduling report. The

27  parties' July 3, 2014, report described their inability to agree on how to conduct

28  discovery relating to the liability phase of trial. (ECF No. 326.) Plaintiffs sought to test a

2

1   potential survey on three to five class members and then administer the survey through

2   stratified random sampling of approximately 1500 class members. Defendants intended

3   to conduct a pilot study consisting of taking depositions of fourteen foremen and fourteen

4   class members from each of the foremen's crews for a total of 210 depositions.

5   Defendants argued that without conducting a pilot study, it would not be possible to

6   determine if there was a legitimate basis to extrapolate the results of a survey to the

7   remainder of the class members. Because Plaintiffs' class potentially contains a

8   combination of class members who were subject to a policy to perform uncompensated

9   work, class members who performed uncompensated work due to a failure of a policy to

10  prevent them from doing so, and class members who possibly did not perform

11  uncompensated work, Defendants assert that a pilot study should be performed to

12  determine the amount of variability in the class. Defendants assert that the level of

13  variability in the class determines the required sample size of a survey which can provide

14  reliable results, unless variability is too great, in which case survey evidence may not

15  prove to be a reliable tool to assist in establishing liability.  (See ECF No. 326 at 20-21

16  (citing Duran v. U.S. Bank National Assn., 59 Cal. 4th 1, 33 (2014)).)

17          Despite further attempts to meet and confer, the parties could not come to an

18  agreement on how to proceed with discovery. (See ECF No. 329.) On August 19, 2014,

19  the Court ordered the parties to proceed to conduct discovery according to the

20  respective methods that each had described. (ECF No. 330.)

21          Plaintiffs objected to Defendant's attempts to conduct discovery. After

22  participating in a telephonic discovery dispute conference, Plaintiffs filed the instant

23  motion for a protective order to prevent Defendants from deposing the 196 absent class

24  members as a part of the pilot study. (ECF No. 333.) Defendants filed an opposition to

25  the motion on September 26, 2014. (ECF No. 336.) The parties appeared at the hearing

26  on October 1, 2014, and the matter now stands ready for adjudication.

27  **II.     PLAINTIFFS' CONTENTIONS**

28          Plaintiffs contend that discovery from absent class members is ordinarily not

1    permitted, and that there are several reasons why the depositions proposed by

2    Defendants should not proceed. Specifically, Plaintiffs contend that the pilot study is to

3    be used to show variability in the class, and therefore designed to reduce class size or

4    revisit issues of certification. Plaintiffs contend further that Defendants could have

5    obtained the discovery earlier in the litigation. Plaintiffs also argue that Plaintiff's counsel

6    will be overburdened by having to attend the depositions (and attend they must to

7    protect the interests of their client class members). Finally, Plaintiffs assert that Defense

8    counsel, not experts, arbitrarily arrived at the number of depositions to be taken.

9         In light of the above, Plaintiffs request the Court grant a protective order and deny

10    Defendants' proposed deposition of some 196 absent class members, or alternatively

11    require Defendant to question absent class members by interrogatories or surveys.

12    **III.    DEFENDANTS' CONTENTIONS**

13        The joint scheduling report filed by the parties on July 3, 2014, described in detail

14    the reasons Defendants seek a pilot study and why they concluded that as many as 196

15    absent class members would need to be deposed. Defendants argue that it is essential

16    that the parties first focus on variability in liability among class members and then on

17    determining which groups of class members can establish liability. Defendants' pilot

18    study is offered as an appropriate method for determining a process to ensure

19    consistent, reliable and representative information can be obtained from a sample of

20    class members. Defendants rely upon the testimony of their expert, Joseph Krock (ECF

21    No. 337) and the recent California Supreme Court decision in Duran v. U.S. Bank

22    National Ass'n, 59 Cal. 4th 1, 12 (2014). According to Krock, the greater the variability in

23    the sample, the larger the required sample size needed to obtain, within an acceptable

24    margin of error, a reliable result reflective of the population. (Krock Decl., ¶¶ 7-8); see

25    also Duran, 59 Cal. 4th at 42 ("The more diverse the population, the larger the sample

26    must be in order to reflect the population accurately." Further, "[i]t is impossible to

27    determine an appropriate sample size without first learning about the variability in the

28    population.") (Citations omitted.)

4

1    According to Defendants, the challenge in determining whether survey evidence

2    can reliably establish liability of the class as a whole is complicated by the nature of the

3    common questions at issue in this case. This is not like other class-action cases where

4    plaintiffs can establish liability based on a company-wide policy.  Here, with regard to the

5    pre-shift subclass,[1] Plaintiffs do not suggest that there was a wrongful companywide

6    policy, but instead allege that wrongful practices resulted from a failure to implement or

7    enforce proper polices. (See Opp'n to Mot. for Decert., ECF No. 286 at 24.) Plaintiffs

8    therefore have to show what groups of class members actually engaged in pre-shift

9    work. Defendants contend that the stratification built into their pilot study - dividing the

10   larger population of the class into subgroups based on specified factors such as which

11   foreman the class member worked under and dates of employment – will help identify

12   subpopulations with common experiences. (Krock Decl. at ¶ 10.)  Krock identified nine

13   subgroups ("strata") taking into account the period and duration of time foremen worked

14   and the time they worked at Delano Farms. (Id. at ¶ 14.)  Krock's proposed pilot study is

15   designed to enable the parties to test if subpopulations can be adequately defined and if

16   a precise, statistically reliable, sample size can be determined. (Id. at ¶¶ 15 -16.)

17   Acknowledging the law of diminishing returns, he feels that a pilot study of fourteen (14)

18   foremen crews (deposing each foreman and fourteen crew members per foreman for a

19   total of 210 depositions) reasonably balances the need to discover sufficient information

20   to enable a statistically meaningful survey with the need to avoid undue burden. (Id. at

21   ¶¶ 17, 21.)

22   **IV.    LEGAL STANDARD**

23   Both parties have set forth the relevant law regarding discovery and, more

24   specifically, the law relating to discovery of absent class members.

25   We start with the premise that the Federal Rules of Civil Procedure and the

26   decisions of the Ninth Circuit Court of Appeals favor discovery to assist in the underlying

27

28   _____

[1] The same arguments are almost certainly applicable to the tool reimbursement subclass.

5

goals of litigation. Pursuant to the Federal Rules, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense" and this "[r]elevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). The Ninth Circuit has explained that it favors a broad scope of discovery. "[W]ide access to relevant facts serves the integrity and fairness of the judicial process by promoting the search for truth." Epstein v. MCA, Inc., 54 F.3d 1422, 1423 (9th Cir. 1995); Dysthe v. Basic Research, L.L.C., 273 F.R.D. 625, 628 (C.D. Cal. 2011).

But the right to access information is not absolute and "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). "The party opposing disclosure has the burden of proving 'good cause,' which requires a showing 'that specific prejudice or harm will result' if the protective order is not granted." In re Catholic Archbishop of Portland Oregon, 661 F.3d 417, 424 (9th Cir. 2011) (quoting Foltz v. State Farm Mut. Auto. Ins. Co., 331 F.3d 1122, 1130 (9th Cir. 2003)).

No Supreme Court or Ninth Circuit case law addresses the propriety of conducting  discovery on absent class members. See Tierno v. Rite Aid Corp., No. C-05-2520-TEH, 2008 U.S. Dist. LEXIS 112461, 2008 WL 2705089 (N.D. Cal. July 8, 2008) ("The law on discovery directed to absent class members is flexible. Discovery from absent class members is 'neither prohibited nor sanctioned explicitly' by the Federal Rules.") (Citation omitted.) However, courts often apply the standard articulated by the Seventh Circuit in Clark v. Universal Builders, Inc., 501 F.2d 324, 340-41 (7th Cir. 1974). This standard permits such discovery "only where the proponent of the discovery establishes" four criteria:

> that (1) the discovery is not designed to take undue advantage of class members or to reduce the size of the class, (2) the discovery is necessary, (3) responding to discovery requests would not require the assistance of counsel, and (4) the discovery seeks information that is not already known by the proponent.

McPhail v. First Command Fin. Planning, Inc., 251 F.R.D. 514, 517 (S.D. Cal. 2008)

6

1  (citing <u>Clark</u>, 501 F.2d at 340-42).

2        Other courts have articulated standards that are similar to, or overlap with the

3  factors set forth in, <u>Clark</u>. For example, in <u>McCarthy v. Paine Webber Group, Inc.</u>, 164

4  F.R.D. 309 (D. Conn. 1995), the court required parties seeking discovery to make a

5  "strong showing . . . that the information sought (1) is not sought with the purpose or

6  effect of harassment or altering membership of the class; (2) is directly relevant to

7  common questions and unavailable from the representative parties; and (3) is necessary

8  at trial of issues common to the class." <u>Id.</u> at 313 (citations omitted). It reasoned that

9  "[d]iscovery of absent class members, while not forbidden, is rarely permitted due to the

10  facts that absent class members are not 'parties' to the action, and that to permit

11  extensive discovery would defeat the purpose of class actions which is to prevent

12  massive joinder of small claims." <u>Id.</u> (citations omitted); <u>see also</u> <u>McPhail</u>, 251 F.R.D. at

13  517 n.3 (citing <u>McCarthy</u>, 164 F.R.D. at 313).

14        Similarly, in <u>Tierno</u>, the court held that the proponent must demonstrate three

15  factors to justify discovery on absentee class members: (1) the information sought is

16  relevant; (2) the information is not readily obtainable from the representative parties or

17  other sources; and (3) the request is not unduly burdensome and made in good faith.

18  <u>See</u> 2008 U.S. Dist. LEXIS 112461, at *6 (citing <u>Cornn v. UPS, Inc.</u>, No. C-03-2001-

19  TEH, 2006 U.S. Dist. LEXIS 69196, 2006 WL 2642540, *2 (N.D. Cal. Sept. 14, 2006).

20        Accordingly, the Court concludes that as a general rule, discovery from absent

21  class members may be permitted when reasonably necessary, not conducted for an

22  improper purpose, and not unduly burdensome in the context of the case and its issues.

23  **V.    ANALYSIS**

24        **A.    Necessity of the Discovery**

25        Plaintiffs assert that the discovery is not necessary because (1) Defendants had

26  an opportunity to access the absent class members for a significant period prior to class

27  certification, (2) the Court, in addressing issues regarding certification, has already

28  addressed concerns over variability in the practice of class members, and (3) relevant

1  case law prevents such discovery. (P&A in Support of Mot. at 8, ECF No. 333.)

2            1.       Whether Discovery Could be Obtained by Other Means

3          Plaintiffs contend that the discovery is not necessary because Defendants had an

4  opportunity to investigate and conduct discovery prior to certification. Plaintiffs present

5  examples from other California district courts which have limited discovery of absent

6  class members where alternative means of presenting relevant evidence existed. In

7  McPhail v. First Command Fin. Planning, Inc., 251 F.R.D. 514 (S.D. Cal. 2008), a

8  securities fraud class action, defendants sought interrogatory responses from each of

9  the 178,527 absent class members as to whether they relied on alleged marketing

10  misrepresentations by defendants. Id. at 518. Besides finding the request overly

11  burdensome and an improper attempt to reduce the class size by, for example, seeking

12  to dismiss non-responders, the court held that defendants could rebut the issue of

13  reliance in other ways such as by showing that the marketing script did not contain

14  misrepresentations or that salespersons did not provide uniform statements. Id.

15          In Tierno, 2008 U.S. Dist. LEXIS 112461, an employment misclassification class

16  action, defendant sought to depose 100 absent class members before the court adopted

17  a discovery plan. In reviewing the decision of the magistrate judge disallowing the

18  depositions, the district court judge affirmed the decision, noting that "some appropriate

19  form of discovery will be allowed" and that the decision was "without prejudice to more

20  limited requests for discovery… made in the context of an agreed-upon discovery plan."

21  Id. at *19.

22          Neither of these cases address the issues presented before this Court. Tierno

23  does not support Plaintiff's contentions. The court there simply limited discovery until a

24  discovery plan was in place, but espoused a clear intent to allow it.  The McPhail court

25  focused on the necessity of the proposed discovery and concluded that the evidence to

26  be discovered could be addressed by other means. Here, Defendants argue

27  persuasively that their discovery is necessary to challenge representative testimony

28  Plaintiffs propose to present on liability.

1    In this case, both parties seek to determine which class members performed

2    uncompensated pre-shift work. Plaintiffs do not attempt to answer the question with

3    evidence that Defendants had a common policy requiring or allowing such work, but

4    instead by showing that class members in fact performed such work.  Given that there

5    are an estimated 25,000 workers who could conceivably fall within the class, but also

6    evidence that only some of them, working under the supervision of only some foremen,

7    worked off the clock during only limited periods of time, sampling is necessary. Plaintiffs

8    intend to conduct a random survey of a portion of the class members and then

9    extrapolate the surveyed workers' responses to the class as a whole.

10    Because of the evidence of variations among foremen and time periods,

11    Defendants contend that Plaintiffs' proposed survey will produce broad over-

12    generalization across disparate groups.  Defendants also argue that insofar as workers

13    claiming compensation for unpaid work have an incentive to respond to Plaintiffs' survey

14    and non-claimants do not, the results of Plaintiffs' survey will be biased. Defendants'

15    concerns regarding reliability of such survey evidence are not taken lightly. Thus

16    Defendants' seek to undertake what they and their expert believe is a more scientific and

17    more reliable approach to the diverse worker groups so that they will be prepared to test

18    the accuracy and reliability of Plaintiffs' survey results. Defendants assert that the

19    discovery they propose is necessary to objectively inquire of various cross-sections of

20    workers to determine issues of variability and whether certain subgroups of class

21    members, for example, those who worked during certain time periods and for certain

22    foremen, had more homogeneous experiences with regard to pre-shift work.

23    The Ninth Circuit has held that representative testimony may be used to assist in

24    establishing liability in a class action. See Jimenez v. Allstate Ins. Co., 2014 U.S. App.

25    LEXIS 17174 at 14 (9th Cir. Sept. 3, 2014) ("Since Dukes and Comcast were issued,

26    circuit courts including this one have consistently held that statistical sampling and

27    representative testimony are acceptable ways to determine liability…"). However real

28    concerns with regard to reliability of statistical evidence exist. See Duran, 325 P.3d at

1  933 ("[A] statistical plan for managing individual issues must be conducted with sufficient
2  rigor.").

3        The Court is unable to say that Defendants realistically could have discovered the
4  relevant information from a representative sample of its 25,000 past and current
5  seasonal workers other than, perhaps, through depositions. It would have been
6  premature to conduct such discovery before the class was certified, and once it was
7  certified Plaintiffs' presumably would have objected as they do now.  Regardless, the
8  Court finds that Defendants have made a persuasive case that it is necessary for them
9  to conduct the discovery at this juncture and that such discovery is relevant to the
10 reliability of sampling and the statistical study to be used to establish liability.

11            2.      Whether Variability was Addressed During Certification

12       Plaintiffs contend that the Court addressed any concerns regarding variability in
13 determining issues of certification. Unfortunately, arguments regarding variability in the
14 amount of damages or whether liability exists have been intermingled. With regard to
15 determining damages (once liability is established) "[t]he amount of damages is
16 invariably an individual question and does not defeat class action treatment." Leyva v.
17 Medline Indus., 716 F.3d 510, 514 (9th Cir. 2013) (citing Blackie v. Barrack, 524 F.2d
18 891, 905 (9th Cir. 1975)). However, liability is a different question and usually addressed
19 on a class-wide basis. See Jimenez, 2014 U.S. App. LEXIS 17174 at 13 (citing In re
20 Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig., 722 F.3d 838, 853-55 (6th Cir.
21 2013)).

22       The Court did not resolve all issues of variability in its order on Defendants'
23 motion for decertification. It did deny decertification of certain subclasses, but also noted
24 in great depth its many concerns about the interpretation and reliability of the evidence
25 presented. In light of those concerns, the Court explained that "Plaintiffs shall be
26 required at trial to present concrete and reliable methods for determining liability and
27 damages." (Decert. Order at 77.) That is still true. The parties are embarked on
28 competing strategies for gathering the necessary evidence and for challenging the

1   methods used.   Nothing said by the Court previously during certification or otherwise

2   was intended to, or does, limit discovery into issues of variability in determining liability.

3               3.      Whether Prevailing Case Law Precludes Discovery by Defendants

4         Plaintiffs rely heavily upon the recent Ninth Circuit decision in <u>Jimenez</u> for the

5   proposition that since liability should be tried as to the entire class, Defendants do not

6   have the right to conduct discovery on absent class members to challenge liability.

7   Instead, they argue that Defendants need only be given an opportunity to present

8   individual issues with regard to damages after liability is established. (<u>See</u> P&A in Supp.

9   Of Mot. at 12-14.)

10         <u>Jimenez</u> provides little insight into appropriate procedures for presenting or

11   defending against statistical evidence at the liability stage. This is because <u>Jimenez</u>

12   addresses certification in a case where plaintiffs sought to use the results of statistical

13   sampling to justify certification. <u>See</u> <u>Jimenez v. Allstate Ins. Co.</u>, 2012 U.S. Dist. LEXIS

14   65328 at 63-64 (C.D. Cal., Apr. 18, 2012). The district court granted certification and

15   commented as follows regarding the potential use of statistical evidence to prove liability

16   and damages:

17           As discussed above, the Court finds that the issues of liability are
    properly subject to class treatment, but has not yet determined how the
18       damages phase of a trial might proceed. Thus, the Court has not been
    convinced at this time about the propriety of the use of statistical sampling
19       to calculate damages. However, that is an issue that can be addressed in
    the future, and is not a sufficient basis to find a lack of superiority at the
20       class certification stage. "The 'risk [that individual damage calculations will
    be unmanageable] is better addressed down the road, if necessary' by
21       altering or amending the class, not by denying certification at the outset." 2
    Newberg on Class Actions § 4:26 (4th ed.) (quoting <u>In re Bally Mfg. Sec.</u>
22       <u>Corp. Litig.</u>, 141 F.R.D. 262, 268 (N.D. Ill. 1992), order clarified, 144
    F.R.D. 78 (N.D. Ill. 1992), aff'd, 2 F.3d 1456 (7th Cir. 1993)). Moreover,
23       when compared to the prospect of separately trying approximately 1200
    individual cases as to both liability and damages, the class process
24       envisioned would be superior based on the present facts and
    circumstances.
25
  <u>Jimenez</u>, 2012 U.S. Dist. LEXIS 65328 at 63-64. Upon appellate review, the Ninth Circuit
26
  affirmed, and found that the district court was correct to allow plaintiffs to present
27
  arguments in support of certification based on the use of statistical evidence to prove
28

1   liability. In accepting that statistical evidence could be used, the Ninth Circuit held that
2   "[t]he district court did not abuse its discretion by entering its class certification order."
3   Jimenez, 2014 U.S. App. LEXIS 17174 at 19.  Jimenez focused on the propriety of using
4   survey evidence during certification. Beyond stating that it may be acceptable to use
5   such evidence to prove liability, that court did not specify how or what procedure would
6   be allowed post-certification.  Plaintiffs read too much into Jimenez in suggesting it
7   specifies how to proceed with discovery relating to statistical sampling used to prove or
8   disprove liability.

9       Plaintiffs also argue that the California Supreme Court in Duran imposed limits on
10  Defendants' right to conduct discovery with regard to statistical sampling. This Court
11  does not find in that case any such limits on Defendants' right to present a defense
12  relating to Plaintiffs' methods of statistical sampling. Duran, 59 Cal. 4th at 49. ("If the trial
13  proceeds with a statistical model of proof, a defendant accused of misclassification must
14  be given a chance to impeach that model…").

15      Plaintiffs assert that Defendants' pilot study is an attempt to obtain information on
16  individual claims, not address class-wide issues relating to liability. Clearly, deposing an
17  absent class member will reveal individual information with regard to that class member.
18  Indeed, discovery performed for the primary purpose of addressing liability and damages
19  could reveal issues regarding certification. See Gen. Tel. Co. of the Southwest v. Falcon,
20  457 U.S. 147, 160 (1982) ("Even after a certification order is entered, the judge remains
21  free to modify it in the light of subsequent developments in the litigation.")

22      However, Defendants assert that their objective in deposing representatives from
23  the various identified strata is to determine how to proceed with reliable, representative
24  statistical testing. The Court has seen no persuasive evidence to the contrary. It appears
25  the approach proposed has been designed and sanctioned by a seemingly well-
26  qualified expert in the field. Indeed, conducting a pilot study or some other type of
27  preliminary assessment appears to be a widely accepted method of proceeding. Duran,
28  59 Cal. 4th at 33 ("In general, when a trial plan incorporates representative testimony

1   and random sampling, a preliminary assessment should be done to determine the level

2   of variability in the class.")

3        Accordingly, the Court finds that as presented to date, and without foreclosing

4   Plaintiffs' right to present new evidence to the contrary, the discovery requested appears

5   reasonably tailored to obtain information regarding the reliability of statistical sampling.

6   The Court's previous decision to allow Defendants to proceed with its proposed pilot

7   study is well within the limits of the Court's authority over creation of a discovery plan.

8                    **B.      The Burden Created by the Discovery**

9        Plaintiffs assert that the pilot study should be prohibited because it imposes a

10  large burden on absent class members and Plaintiffs' counsel.[2]  Certainly the taking of

11  some 200 depositions is a major undertaking not permitted without leave of court. <u>See</u>

12  Fed. R. Civ. P. 26(b)(2), 31(a)(2). However, given the extraordinary characteristics of this

13  case, including the large class size, the large amount in controversy, the issues with

14  regard to credibility and reliability of the evidence provided to the Court during the

15  certification phase, and the fact that it will be difficult, if not impossible, to locate and

16  contact many of the absent class members,[3] the Court is unwilling to limit a party's

17  seemingly good faith, expertly designed, effort to seek relevant and reliable evidence to

18  enlighten all regarding the need for and quality of representative testimony that may be

19  offered. Absent evidence of abuse or undue burden on deponents, the Court finds that

20  the benefit of the discovery outweighs the burden.

21       Unlike other cases where Defendants sought discovery from significantly larger

22  numbers of (and at times, all) absent class members, here Defendants have limited their

23  request to roughly 200 – less than one percent of the 25,000 total class members.

24  _____

25       [2] Plaintiffs also assert that the pilot study should be prohibited because it requires that which <u>Clark</u>
    criticized, namely, the assistance of counsel in responding. The Court finds this <u>Clark</u> factor really arose
26  out of concern that the discovery would be overly burdensome.  The Court here addresses that broader
    issue, but not Plaintiff's unfounded suggestion that <u>Clark</u> was condemning all discovery that necessitated
27  Plaintiff counsel's participation.
         [3] The parties noted during the hearing that they lack reliable contact information for many of the
28  class members, many of whom are migrant farm workers.

1    Accordingly, more than 99% of the absent class members will suffer no imposition at all

2    from the discovery. The two to four hours[4] of time the 196 deponents will be asked to

3    devote to the deposition is a relatively small time investment relative to a case of this

4    size and one which should help provide clarity on the issue of liability to class members.

5        Considering all of the foregoing, the Court concludes that the imposition which will

6    result from Defendants' pilot study depositions, though not insignificant, is outweighed by

7    the potential benefits to the process.

8        To the extent that personally appearing at a deposition is likely more time

9    consuming and burdensome than replying to a written survey or interrogatories, the

10   Court believes that given the complexities of this case and the population being

11   questioned, depositions will ultimately prove to be a more efficient and reliable method of

12   obtaining detailed information regarding absent class members' experiences.

13       Finally, the Court appreciates the time commitment such depositions will impose

14   on counsel. However, the commitment is mutual, not inconsistent with the tens of

15   millions of dollars Plaintiffs' counsel seeks to recover on behalf of the class, and given

16   the rather large stable of counsel aligned with Plaintiffs, certainly doable.

17       **C**.    **Proper Purpose**

18       As noted above, the Court has no reason to believe that Defendants' pilot study,

19   and the depositions to be taken pursuant to it, are designed for any reason other than

20   because they were rationally and legitimately believed by Defendants and their experts

21   in good faith to be necessary to address the complex issues presented in this case. If at

22   any time Plaintiffs discover evidence to the contrary, they may present it to the Court and

23   ask for reconsideration.

24       The primary concern, at least as reflected in cases cited by Plaintiffs as denying

25   discovery (see, e.g., McPhail, 251 F.R.D. at 518), seems to be that Defendants will seek

26   _____

27       [4] Defendants originally estimated that early depositions would take no more than four hours and
     that the time devoted to each likely would decrease as the attorneys grew familiar with the process and
     learned to deal with practical obstacles.  After the first few days of attempted depositions, Defense counsel

28   represented that those that did go forward were taking only about two hours each.

1   to use non-responses to move to impose issue sanctions on, and indeed dismiss, non-

2   responding class members. However, at the hearing, Defendants assured the Court that

3   they will not seek to remove absent class members from the action for failure to appear

4   at depositions. Further, the Court reserved Plaintiffs' right to seek relief if there was

5   strong affirmative evidence of bad faith solicitation of non-responses. Based on the

6   information presented to the Court, the discovery does not appear to be sought for an

7   improper purpose.

8   **VI.   PLAINTIFFS' OBJECTIONS**

9       On September 30, 2014, Plaintiffs filed objections to the declaration of

10  Defendants' expert, Joseph A. Krock. (ECF No. 340.) Plaintiffs object that several

11  statements in Krock's declaration do not meet standards of scientific reliability as

12  required under <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 582 (1993).

13      Plaintiffs' attempt to exclude expert testimony at this juncture is premature.

14  Krock, in his declaration, makes statements that explain his reasoning behind proposing

15  the pilot study. He does not, however, express an ultimate opinion on or relating to the

16  statistical relevance of the data to be collected, the conclusions to be drawn therefrom,

17  or otherwise.  To the extent Plaintiffs' objections intend to challenge Krock's proposed

18  pilot study technique or the principals upon which it is based, the Court finds the <u>Daubert</u>

19  criteria met. Certainly, the concept and practice of stratified sampling is grounded in the

20  "methods and procedures of science." <u>Daubert</u> at 590; <u>see</u> <u>In re Countrywide Fin. Corp.</u>

21  <u>Mortgage-Backed Secs. Litig. v. Countrywide Fin. Corp.</u>, 984 F. Supp. 2d 1021, 1036

22  (C.D. Cal. 2013) ("The Court's gate-keeping task is not so strict as to allow only the best

23  possible scientific evidence, but to allow only reliable scientific evidence. Stratification is

24  a widely accepted statistical technique…"). The Court finds Krock's methodology for

25  conducting a pilot study to determine the potential stratification of the class sufficiently

26  reliable under <u>Daubert</u>.

27      This case is in the nascent stages of liability discovery. Plaintiffs retain the right,

28  and will have the opportunity, to question or attack the reliability of Krock's methods and

any opinions and conclusions he bases thereon. Their objections are denied without prejudice at this time.

## VII.    **ORDER**

Accordingly, it is hereby ORDERED that Plaintiff's Motion for Protective Order is DENIED. Further, Plaintiff's objections to the testimony of Joseph Krock are dismissed without prejudice.

IT IS SO ORDERED.

Dated:    October 10, 2014               /s/ *Michael J. Seng*

UNITED STATES MAGISTRATE JUDGE